## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| ALANA CAIN, ASHTON BROWN, REYNAUD VARISTE, REYNAJIA VARISTE, THADDEUS LONG, VANESSA MAXWELL, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 15-4479 |
| CITY OF NEW ORLEANS; ORLEANS PARISH CRIMINAL DISTRICT COURT; MARLIN GUSMAN, ORLEANS PARISH SHERIFF; ARTHUR MORRELL, CLERK OF COURT; ROBERT KAZIK, JUDICIAL ADMINISTRATOR; SECTION "A" OF THE ORLEANS PARISH CRIMINAL DISTRICT COURT, JUDGE LAURIE A. WHITE; SECTION "B" OF THE ORLEANS PARISH CRIMINAL DISTRICT COURT, JUDGE TRACEY FLEMINGS- DAVILLIER; SECTION "C" OF THE ORLEANS PARISH CRIMINAL DISTRICT COURT, JUDGE BENEDICT WILLARD; SECTION "D" OF THE ORLEANS PARISH CRIMINAL DISTRICT COURT, AD HOC JUDGE DENNIS WALDRON; SECTION "E" OF THE ORLEANS PARISH CRIMINAL DISTRICT COURT, JUDGE KEVA LANDRUM-JOHNSON; SECTION "F"OF THE ORLEANS PARISH CRIMINAL DISTRICT COURT, JUDGE ROBIN PITTMAN; SECTION "G" OF THE ORLEANS PARISH CRIMINAL DISTRICT COURT, JUDGE BYRON C. WILLIAMS; SECTION "H" OF THE ORLEANS PARISH CRIMINAL DISTRICT COURT, JUDGE CAMILLE BURAS; SECTION "I" OF THE ORLEANS PARISH CRIMINAL DISTRICT COURT, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

JUDGE KAREN K. HERMAN;              )
SECTION "J" OF THE ORLEANS         )
PARISH CRIMINAL DISTRICT           )
COURT, JUDGE DARRYL DERBIGNY;      )
SECTION "K" OF THE ORLEANS         )
PARISH CRIMINAL DISTRICT COURT,    )
JUDGE ARTHUR HUNTER;               )
SECTION "L" OF THE ORLEANS         )
PARISH CRIMINAL DISTRICT COURT,    )
JUDGE FRANZ ZIBILICH;              )
MAGISTRATE OF THE ORLEANS          )
PARISH CRIMINAL DISTRICT COURT,    )
JUDGE HARRY CANTRELL               )        (Complaint: Class Action)
                                   )
        Defendants.                )
_____    )

## CLASS ACTION COMPLAINT

### Introduction

Despite longstanding Supreme Court precedent that the Government cannot imprison people just because they are poor, New Orleans officials routinely use jail and threats of jail to collect court debts from thousands of the City's poorest people.   The result is an illegal, unconstitutional, and unjust modern debtors' prison. To make matters worse, officials in the Collections Department of the Orleans Parish Criminal District Court have admitted under oath that they have been issuing arrest warrants for unpaid debts by signing themselves the signatures of judges without first presenting any information to the judge or even notifying the judge.[1]  The Defendants use their unconstitutional scheme of arresting and jailing people for their inability to pay and keeping them in jail until they come up with money to fund themselves off the backs of New Orleans' poorest.

The Plaintiffs in this case are each victims of this illegal scheme. They each live in poverty and each has been jailed for unpaid or late court debts. Although the Plaintiffs pleaded

---

[1] *See* Transcript of Evidentiary Hearing in *State of Louisiana v. Michael Addison*, No. 426-246J, Jan. 30, 2015, attached as Exhibit 1.

2

that they were unable to pay due to their indigence, they were all arrested on an illegal warrant, and all languished in jail for nonpayment without receiving notice of how or when they would be released or when a hearing would be held. None was afforded the inquiry into their ability to pay that the United States Constitution requires.

Once locked in jail, each person was told that they had no court date set and that they would not be released until they paid the entirety of their debts or posted a preset $20,000 secured money bond.[2] No inquiry was made into their individual circumstances, their ability to pay, or whether they constituted a danger to the community or a risk of flight prior to the setting of this secured money bond. Some languished in jail for days and others remained locked up for weeks.

The environment of threats of jail and actual jailing creates a culture of fear among indigent people and their families, who borrow money at high interest rates, divert money from food for their children, and cash their family members' disability checks in a desperate attempt to pay the Collections Department to avoid indefinite confinement.

The policies and practices that led to the jailing of the Plaintiffs and to the creation of a local debtors' prison are part of a broader breakdown of fairness and neutrality in the local criminal legal system, where financial conflicts of interest have derailed the pursuit of justice. When an indigent defendant appears in court, every government entity—the jailer who brought her there, the lawyer assigned to represent her, the prosecutor arguing against her, and the judge ruling on her case—funds its own budget in part based on the decisions made in her case. Each of them takes a percentage of every money bond that is required for release after arrest. Each also partially funds their own budgets through fees that are assessed only upon conviction.

---

[2] All named Plaintiffs had to seek the help of family members or others in jail with them to contact the clerk of court and find out why they were locked up to begin with. At no time did anyone come to them and tell them why they were locked up or when or how they could be released.

This Court struck down elements of these financial conflicts of interest over two decades ago. And yet, the system has persisted, with devastating consequences for the bodies and minds of the poorest people in New Orleans and for the dignity of the justice system. These conflicts of interest are out of line with fundamental principles of due process as those concepts have been understood throughout American legal history. Officials involved in every area of the local legal system, including law enforcement, lawyers, and judges, acknowledge and complain that these financial incentives have corrupted the basic delivery of justice in the City.

The treatment of Alana Cain, Ashton Brown, Reynaud Variste, Reynajia Variste, Thaddeus Long, Vanessa Maxwell, and each of the other Plaintiffs reveals systemic illegality perpetrated by the Defendants against some of the poorest people in the community. The Defendants, as a matter of policy and practice, engage in the same conduct against many other human beings on a daily basis, unlawfully jailing people if they are too poor to pay debts from prior convictions, including the associated fees, costs, and surcharges that the Defendants ultimately use for their own benefit.

Poverty is widespread in New Orleans. The United States Census Bureau reports that 104,919 people in New Orleans live in poverty.[3] That is more than one in four people (27%). Though millions of people work full-time and are still struggling to subsist below the federal poverty line, many people are living in extreme poverty: national statistics show that over 1.5 million families get by on less than $2 a day.[4] There are countless people in our community who have nearly no source of income at all. In New Orleans, about half of the adult men in the African American community are unemployed and receive no unemployment compensation.[5]

---

[3] United States Census Bureau, Quick Facts, *available at* http://quickfacts.census.gov/qfd/states/22/22071.html.

[4] http://www.cbsnews.com/news/the-surging-ranks-of-americas-ultrapoor/.

[5] http://allthingslocalnola.info/yahoo_site_admin/assets/docs/RecognizingPotential.170111053.pdf.

The Defendants know that most people appearing before them are impoverished because eighty-five percent of the people appearing in Orleans Parish Criminal District Court have been determined to be indigent for purposes of appointment of the Orleans Public Defenders. Plus, Louisiana Law Revised Statute 15:175 defines indigency for purposes of criminal proceedings as people who earn less than 200% of the Federal Poverty Guidelines or receive food stamps, Medicaid, or disability benefits. And yet, impoverished people represent the large majority of people who owe debts to the Collections Department.  The burden of court debts increases recidivism, blocks productive reentry, devastates families who have to make hard choices about debt payments or food, inhibits mental health care, and makes it harder for people to obtain housing and employment.[6]  It is therefore from those among us who are least able to pay that the Court's Collections Department attempts to fund its own budget through jailing and threats of jailing for nonpayment.

By and through their attorneys and on behalf of themselves and all others similarly situated, the Plaintiffs seek in this civil action the vindication of their fundamental rights, compensation for the violations that they suffered, injunctive relief assuring that their rights will not be violated again, and a declaration that the Defendants' conduct is unlawful.  In the year 2015, these practices have no place in our society.

### Nature of the Action[7]

1. Defendants fund themselves through the collection of money from the people that they process and judge.  The pursuit of that money has corrupted the basic delivery of justice and

---

[6] *See generally,* Brennan Center for Justice, *Criminal Justice Debt: A Barrier to Reentry* (2010), *available at* https://www.brennancenter.org/publication/criminal-justice-debt-barrier-reentry.

[7] Plaintiffs make the allegations in this Complaint based on personal knowledge as to matters in which they have had personal involvement and on information and belief as to all other matters.

resulted in pervasive conflicts of interest and rampant constitutional violations in the procedures for collecting those debts after cases are closed.

2.      The Orleans Parish Criminal District Court and the City of New Orleans jointly fund the Collections Department as part of their efforts to supplement the City and Court budgets with the debts collected from mostly indigent people.  Defendants act in concert to implement a regime of debt collection premised on assessing high amounts of court costs and discretionary fees and then collecting money from impoverished former defendants in a manner that deliberately ignores longstanding constitutional and statutory protections.

3.      This scheme is accomplished by threatening indigent people with jailing if they or their families do not pay, issuing invalid arrest warrants, wrongfully imprisoning court debtors, delaying any hearing in court indefinitely, charging preset secured money bonds for those arrested on Collections Department warrants (from which the judges, the District Attorney, the Public Defender, and the Sheriff each take a percentage), and failing to perform any inquiry into an individual's ability to pay when they are finally brought to court for debt-collection proceedings.  When released from jail, former defendant debtors who have not paid their debts in their entirety are returned to a cycle of debt and threats.

4.      Plaintiffs seek declaratory, injunctive, and compensatory relief.


**Jurisdiction and Venue**

5.       This is a civil rights action arising under 42 U.S.C. § 1983, § 1988 and 28 U.S.C. § 2201, *et seq*., and the Fourth and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has pendant jurisdiction over the state law claims under 28 U.S.C. § 1367.

6

6.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## Parties

7.      Plaintiff Alana Cain is a 26-year-old resident of New Orleans.  Plaintiff Ashton Brown is a 21-year-old resident of New Orleans.  Plaintiff Reynaud Variste is a 26-year-old resident of New Orleans.  Plaintiff Reynajia Variste is a 21-year-old resident of New Orleans. Plaintiff Thaddeus Long is a 33-year-old resident of New Orleans.  Plaintiff Vanessa Maxwell is a 49-year-old resident of New Orleans.  The named Plaintiffs represent themselves as individuals and a Class of similarly situated people all subject to the Defendants' debt-collection scheme.

8.      Defendant City of New Orleans is a municipal government entity, organized under the laws of the State of Louisiana.  Among other things, the City of New Orleans funds the hiring of the Collections Department employees who openly and as a matter of policy commit the violations at issue in this case.  Moreover, the City of New Orleans police officers execute the Collections Department warrants even though the City knows or should know that the warrants are invalid and unconstitutional and that arrestees will be subjected to the Defendants' unconstitutional practices once in custody.

9.      Defendant Orleans Parish Criminal District Court is a municipal government entity that manages the Judicial Administrator and the Collections Department and that, along with the City of New Orleans, jointly funds the operation of the Collections Department.  The Orleans Parish Criminal District Court is managed administratively by the Orleans Parish Criminal District Court judges, who jointly control and administer the Judicial Expense Fund.

10.      Defendant Judicial Administrator, Robert Kazik, is an employee of the Orleans Parish Criminal District Court.  He is responsible to and supervised by the judges of the Orleans Parish Criminal District Court.  Robert Kazik is responsible for the operation of the Collections

7

Department, which is jointly funded by the City of New Orleans and the Orleans Parish Criminal District Court.  He is sued in his official and individual capacities.

11.     The Clerk of Court, Arthur Morrell, is an elected public official responsible for oversight and funding of the Orleans Parish Criminal District Court's operations.  He is sued in his official and individual capacities.

12.     Orleans Parish Sheriff Marlin Gusman operates the local jail and unconstitutionally detains impoverished people indefinitely because of their inability to make a financial payment for their release.  He is sued in his official capacity.

13.     The individual Judges of the Orleans Parish Criminal District Court are defendants herein because: they supervise and are responsible for the Judicial Administrator as well as the employees of the Orleans Parish Criminal District Court; they knew or should have known of the unconstitutional practices described herein which result in the illegal, unconstitutional, and wrongful arrest and imprisonment of Plaintiffs; and they have each failed to provide Plaintiffs with the legal process they are constitutionally due if imprisoned for nonpayment of court debts. They are sued for declaratory relief only.

The thirteen Orleans Parish Criminal District Court judges are: Section A, Honorable Judge Laurie A. White; Section B, Honorable Judge Tracey Flemings-Davillier; Section C, Honorable Judge Benedict Willard; Section D, Honorable Judge ad hoc Dennis Waldron; Section E, Honorable Judge Keva Landrum-Johnson; Section F, Honorable Judge Robin Pittman; Section G, Honorable Judge Byron C. Williams; Section H, Honorable Judge Camille Buras; Section I, Honorable Judge Karen K. Herman; Section J, Honorable Judge Darryl Derbigny; Section K, Honorable Judge Arthur Hunter; Section L,  Honorable Judge Franz Zibilich; and Magistrate Judge Harry Cantrell.

8

## Factual Background

### A.     The Named Plaintiffs' Imprisonment

#### i.        Plaintiff Alana Cain

13.     Alana Cain is a 26-year-old woman.

14.     Ms. Cain lives in desperate poverty.  She struggles to get enough money for food, clothing, shelter, and the other basic necessities of life.  She has no income and helps take care of her mother who is sick with cancer.

15.     Ms. Cain was charged with a felony theft offense in 2012 and found to be indigent.  She was assessed a fine and court costs (including $600 in discretionary costs imposed by the judge to feed the judge's Judicial Expense Fund) after conviction.  Ms. Cain could not afford to pay.

16.     Pursuant to the Defendants' policy, Ms. Cain's case was closed after she was sentenced on July 8, 2013.  She was sent to the Collections Department, who decided in the discretion of its employees that she would be required to pay $100 per month even though she was destitute.  Collections Department employees informed Ms. Cain that they would also decide when she had to bring the money each month.

17.     Ms. Cain made every payment by borrowing money from friends and family, who were also living in poverty.

18.     After making consistent on-time payments, Ms. Cain was late one time.  She called the collections department and spoke to a supervisor.  The supervisor told her that he could give her more time to pay but that she might have a warrant put out for her arrest.  She informed him that she did not have enough money to pay, and he told her that he would issue a warrant for her arrest.

19.     Ms. Cain tried to come up with the money, but she was not able to do so.  When Ms. Cain asked if she could make a smaller payment to the Collections Department, employees in the Collections Department told her that, pursuant to their policy, they would refuse to accept any payment smaller than $50.  They told her not to bother to bring anything less.

20.     On March 11, 2015, Ms. Cain was a passenger in a car that New Orleans police pulled over for a traffic violation.  After asking for her identification, the police officer told her that she had a warrant for her arrest and that he could not let her go.  Ms. Cain had $80 that her friend had lent her that she was hoping to put toward her court debts. They were returning from the bank with the money in her purse.

21.     She informed the officer that she had spoken to the Collections Department and told them that she could not afford to pay, but the officer told her that he was just doing his job and that he had to take her to jail.

22.     When Ms. Cain arrived at the Orleans Parish Prison, the local jail run by the Orleans Parish Sheriff, jail staff told her that she had a warrant because she had not paid her court debts.  She told jail staff that she had spoken to the Collections Department and that she asked for more time to make her monthly payment. She had money on her when she was arrested and she asked if she could use that money to pay Collections. Jail staff told her that they could not do anything about it and that she had a $20,000 secured bond pursuant to standard policy.

23.     Ms. Cain asked when she could go to court, and jail staff told her that there was no way to find out when her court date would be.  Jail staff told her that someone from her family had to call the court to get her placed on a docket or else she would not get a court date. There was no free phone available for inmate use, and Ms. Cain therefore could not reach anyone in her family.

10

24.     Ms. Cain repeatedly tried to use the jail computer system to ask what was happening to her and to communicate with someone who could tell her when she could go to court.

25.     Another prisoner eventually took pity on Ms. Cain and let her use a paid phone account after several days.

26.     Ms. Cain then called her sister, who agreed to call the court and try to get her on the docket.

27.     After a week, Ms. Cain was brought to court.  The judge told her that if she ever missed a payment again, she would have to spend 90 days in jail.

28.     Ms. Cain told the judge that she did not have a job and that she was not able to come up with the money.  The judge made no meaningful inquiry into her indigence and, pursuant to policy, neither the lawyers representing the District Attorney nor the Public Defender informed her of her constitutional rights or asked the judge to conduct such an inquiry.  The judge told her that she was required to pay or she would be jailed.

29.     Ms. Cain has no bank account, no car, and no significant assets.  She relies intermittently on food stamps and the kindness of her family to provide her with clothing, food, shelter and the other basic necessities of life.  She has struggled to find work since her criminal conviction, and she takes care of her mother who is sick with cancer. She suffers from several medical conditions and has felt trapped in a cycle of debt and fear caused by the threats of the Collections Department employees.

### ii.     Plaintiff Ashton Brown

30.     Mr. Brown is a 21-year-old New Orleans resident.

31.     Mr. Brown lives in desperate poverty and struggles to meet the basic necessities of life, including food, clothing, medical care, and shelter.

32.     Mr. Brown was placed on inactive probation stemming from a theft conviction on December 16, 2013.  He was assessed a total of $500 in various costs and discretionary fees levied for the benefit of the judges, the District Attorney, and the Public Defender.  He could not afford to pay the court debts.  As is standard, Mr. Brown was also subsequently charged additional fees for his probation officer.

33.     Mr. Brown was forced to decide which set of fees he could pay with money he scraped together in lieu of buying food and clothing.  He decided to pay his probation officer $200 because he was told that he would be revoked if he did not pay his probation fees.

34.     When he paid his probation fees, the Collections Department told him that he could not get any extensions on his other court debts and told him to pay up.  Mr. Brown informed the Collections Department that he could not afford to pay his court debts.  When he could not pay, the Collections Department staff decided to sign and issue a warrant for his arrest because of nonpayment, even though they knew that he was indigent and could not pay.

35.     In May 2015, Mr. Brown was arrested for drug possession.[8]  After his drug case was resolved on July 23, 2015, Mr. Brown was assessed fees and costs and returned to jail from the courtroom solely because of his prior unpaid debts from the 2013 case.  He was told that he would not be released until he paid what he owed on his 2013 case or until he paid a new preset

---

[8] He was jailed and assessed an $8,000 secured money bond on the drug charges prior to trial.  Pursuant to local practice and procedure, the bond was assessed without any meaningful assessment of his ability to pay.  Mr. Brown could not afford to pay the bond, and so he remained in jail for months.  When he went to court for the first time, Mr. Brown's bond was raised at the urging of the District Attorney to $12,000, again without any meaningful inquiry into his ability to pay or any meaningful hearing concerning whether he was a danger to the community or a risk of flight.  It is common practice for local judges and the District Attorney to seek high money bonds because each is able to collect a percentage of every money bond, so each has a direct financial incentive to set bond as high as possible.

$20,000 bond on his Collections Department warrant.  Mr. Brown was destitute and had already been determined indigent by the court.  He had no bank account and no assets.

36.    For two weeks following the disposition of his drug case, Mr. Brown languished in terrible jail conditions without being brought to court.  He became increasingly desperate and depressed because he had just become a father for the first time, and he had been kept in jail since May, without being able to see his newborn daughter, solely because he could not come up with money that local officials required for his release.

37.    Mr. Brown reached out from jail to his uncle who was able to set up a potential job for him.  Mr. Brown was excited at the possibility because, prior to being locked up in May, he was only able to help support his new daughter by performing scattered odd jobs, like mowing lawns to pay for her food and diapers.

38.    Finally, on August 6, 2015, Mr. Brown was brought to court.  The judge, consistent with routine practice, told him that he would not be released from jail unless he paid his old court costs and fees.  Mr. Brown told the judge that he thought that he had a job waiting for him and that he could try to work for enough money to pay the court debts.  The judge told him that he could not release him.  The judge told him he could not release him unless he paid at least $100.  The judge told Mr. Brown that he would reset him for another court hearing in a week's time and that he would be kept in jail unless he got a family member to pay.  Mr. Brown was sent back to jail.  No meaningful inquiry was made into his ability to pay, and none of the required constitutional procedures for determining his ability to pay were followed.

39.    Pursuant to standard policy and practice, neither the District Attorney's Office nor the Public Defender informed Mr. Brown of his constitutional rights, including his right not to be jailed for nonpayment without an inquiry into his indigence.  As is routine, nor did either the

prosecutor or public defender request such an inquiry or findings in his case. Mr. Brown was not even given notice prior to or at the hearing that his ability to pay would be a critical issue in the proceedings as required by Supreme Court precedent.

40.      Several days later, with the help of another detainee at Orleans Parish Prison, Mr. Brown was able to get a message to his grandmother. Brown's family was able to scrape together $100.   They paid the Collections Department, and Mr. Brown was released from jail. Collections Department employees told him that he would be arrested and jailed again if he does not continue making payments on time.

### iii.       Plaintiff Reynaud Variste

41.      Reynaud Variste was sleeping quietly at home with his family in January 2015 when numerous armed officers surrounded and stormed his house with assault rifles and military gear.  The officers pointed guns at Mr. Variste and his family and handcuffed him.

42.      When Mr. Variste asked what was happening, the officers told him not to worry about it too much because he simply owed some old court costs and fees.  He was taken to jail.

43.      Mr. Variste had been convicted several years earlier and had been assessed about $1,600 in court costs and fees.  He had a low paying construction job, and he did his best both to make payments and to meet the basic necessities of life for himself and his family.  However, after he had reduced his court debts to $700 with regular payments, his hours on the job were cut approximately in half because of a slowdown in business.  He could no longer afford both to pay his court debts and to meet the basic necessities of life.

44.      Mr. Variste went to the Collections Department and told the employees there that he could not afford his payments anymore.  The Collections Department told Mr. Variste that there was nothing that they could do and that he had to pay what he owed.  An employee told

14

him that the best that he could offer Mr. Variste was to let him pay a total of $100 per month instead of $100 per month on each of his two cases.

45.     Mr. Variste separately owed about $65 per month for his probation fees.

46.     Each time Mr. Variste was late on a payment, Collections Department staff told him that he had to bring double the next time.   These purported fee increases were not made pursuant to any legal process.

47.     After his arrest, Mr. Variste languished in jail for 3 days, and he could not figure out what was happening to him.   Jail staff had no idea when or whether Mr. Variste would be taken to court because of the Defendants' policy of indefinite detention after Collections Department arrest warrants are executed.   Finally, Mr. Variste called a bondsman, who told him that he would probably not be released from jail until he paid his entire court debts, which would be cheaper than paying the $20,000 money bond needed to get a court date to challenge the debts.

48.     Mr. Variste was told that he had to pay the entirety of his court debts in order to get out. And although Mr. Variste's girlfriend eventually used his paycheck to pay the entire debt amount on the subsequent Friday, Mr. Variste stayed in jail over the weekend and was not released until the following Monday. He never saw a judge and was never brought to court.

49.     Mr. Variste missed work while in jail, and he was in danger of losing his job because he could nor reach his employer while he was jailed.

50.     Mr. Variste struggles to survive financially and to provide the basic necessities of life for himself and his 11-month-old child.

   **iv.**  **Plaintiff Reynajia Variste**

51.     Reynajia Variste is a 21-year-old New Orleans resident.

52.   Ms. Variste pled guilty to an offense in October 2014.  She was told that she owed approximately $900 as a result of the costs and fees imposed by the court.

53.   Ms. Variste was unable to pay what the Collections Department demanded.  No inquiry was conducted into her ability to pay, even though, like the other Plaintiffs, she had previously been found indigent for purposes of the appointment of counsel.

54.   In May 2015, New Orleans police set up an informal checkpoint in her neighborhood after a robbery and began stopping all residents.  Police stopped her while she was walking and ran her name through a database, which revealed a Collections Department warrant for non-payment.  Even though she was pregnant, she was handcuffed, arrested, and taken to a district station.  She was then transported to jail.

55.   At booking, staff told Ms. Variste that she could go free if she paid her court debts.  She was also given the choice to pay a standard $20,000 money bond in the alternative.  She was jailed instead because she did not have the money.

56.   Ms. Variste's family was desperate to get her out of jail because she was pregnant, and they worried about the effects of being in the notoriously dangerous and unsanitary jail on her unborn child.

57.   Ms. Variste's aunt went to the Collections Department to find out what was going on.  The Collections Department told her that they would require at least $400 before they would agree to let her out of jail.  The Collections Department told her aunt that they would require that amount of money because they needed close to half of what she owed in total.

58.   Ms. Variste and her family panicked because they could not come up with the money.

59.     Ms. Variste was not permitted to shower or clean herself for the first three days in jail, and she could not tolerate the food.  After a few days, she started bleeding from her vagina. She informed the guard, and the guard declined to tell a jail nurse.  She continued to bleed for two days without receiving medical attention.

60.     After seven days in custody, her family borrowed money to lend to Ms. Variste to buy her release.  A portion of the money was borrowed from the SSI check of one of her relatives, who depended on that money to survive.  When her family paid the Collections Department, Ms. Variste was released.  She never saw a judge.

61.     After her release, Ms. Variste went to the hospital, and she was told that the bleeding was a problem with her placenta.

62.     Ms. Variste survives on food stamps and has no significant assets and no bank account.

63.     Ms. Variste has applied to numerous jobs in the past couple of years, and despite nearly receiving them, she is routinely rejected after a background check reveals her felony theft conviction.

64.     After she was released from jail, the Collections Department resumed threatening her with arrest and jail if she did not pay what they told her to pay.  In early August 2015, she went to the Collections Department and paid $100 even though she could not afford it without severe hardship because she was scared of the threats to have her arrested before she gave birth. She continues to live in constant fear of being arrested and jailed indefinitely for being unable to pay.

### v.        Plaintiff Thaddeus Long

65.     Thaddeus Long is a 33-year-old resident of New Orleans.  He struggles financially to meet the basic necessities of life for himself and his family.

66.     Mr. Long was working at a temp-to-hire job in June 2015.  He was working for the City of New Orleans to modernize its parking meters by removing old meters and installing new pay stations.  He had just started the job and had been working for several weeks.

67.     Mr. Long was pulled over by City of New Orleans police.  After the police searched his name, the police system indicated that the Collections Department had issued a warrant for nonpayment of fees and costs stemming from a 2011 conviction.  Mr. Long explained to police that he had paid off his debts in their entirety.  A note in Mr. Long's court files confirms that he had paid his debts in full in October 2013.

68.     Nonetheless, the Collections Department had, pursuant to its policy and practice, issued a warrant for his arrest for nonpayment.

69.     Pursuant to policy and practice, Mr. Long was not brought to court to see a judge.  Instead he was transported to Coushatta, Louisiana and held there for six days on the standard $20,000 secured money bond until he convinced someone to inquire about his case and was brought to court.  When he appeared in court, he explained the mistake, which was apparent from the court records.  He was released immediately.

70.     Because of the Collections Department warrant, the standard bond set and perpetuated by those who profit from the setting of those bonds, and the policy and practice of not producing arrestees in a prompt manner, Mr. Long lost a week of work and soon after lost his job.

### vi.  Plaintiff Vanessa Maxwell

71.     Vanessa Maxwell is a 49-year-old resident of New Orleans.  She is the mother of seven children, and she has six grandchildren.

72.     Ms. Maxwell is indigent and is staying in her sister's home with seven other family members.

73.     Ms. Maxwell suffers from schizophrenia.  She regularly hears voices talking to her, usually the voice of her dead son.  She is also bipolar, suffers from major depressive disorder, and suffers from social anxiety disorder that debilitates her when she is forced to be around a lot of other people.

74.     In 2011, she was convicted of an offense in New Orleans and assessed court costs and fees.  After she served her sentence, she was sent to Mississippi because the Louisiana offense constituted a violation of her Mississippi probation terms.  She was then placed in revocation proceedings in Mississippi.

75.      Unbeknownst to Ms. Maxwell, while she was in Mississippi, the Collections Department issued a warrant for her arrest for nonpayment of her New Orleans court fees.

76.     Once she moved back to Louisiana, Ms. Maxwell did not find out about the warrant until she got into an argument with her boyfriend. When police arrived to investigate, Ms. Maxwell was arrested after the officer ran her name and saw the Collections Department warrant.

77.     Ms. Maxwell was brought to jail, where she stayed in central lockup for a couple of days.  She could not eat the food provided to her because it was moldy.  Mold, feces, and urine covered the toilet area around her cell. The place smelled like urine.

78.     After a couple of days, she was transferred to the women's facility.

79.     At no point did anyone inform her why she was being detained, how she could seek release, or when she would be brought to court.

80.     Ms. Maxwell wrote grievances every day to get the attention of someone who could tell her what was happening.  No one responded.

81.     After calling the Orleans Parish Criminal District Court clerk repeatedly without any help, her daughter and son-in-law hired a private attorney with money they scraped together to get her name on the docket. Ms. Maxwell was never brought to court. Instead she continued to sit in jail.

82.     Ms. Maxwell had the number of a public defender who had handled a case for her son.  She called repeatedly, and she finally got through after several days.  She begged the Public Defender's Office to get her name on a docket to see a judge.

83.     On Thursday, May 21, 2015, twelve days after her arrest, Ms. Maxwell was brought to court.  Ms. Maxwell's public defender argued for her release and although no indigency hearing was conducted, the judge ordered her release contingent on Ms. Maxwell paying $191 within a week.

84.     Ms. Maxwell has not been able to come up with any money to pay the Collections Department since her release.  She does not leave her house except to pick up her grandson from the bus stop nearby. She is in imminent danger of arrest and jailing again pursuant to monetary conditions that she cannot make.

**D.     The Defendants' Policies and Practices**

85.     The Plaintiffs and many other witnesses have, in recent months and years, observed numerous other indigent New Orleans residents jailed as a matter of pattern and practice by the Collections Department.  These residents are kept in jail for non-payment of debts

without an inquiry into their ability to pay, pursuant to standard preset secured monetary bonds from which supposedly neutral judicial and government actors who set those bonds are promised a percentage, and without the consideration of whether imprisonment serves legitimate interests in light of available alternatives as required by federal and Louisiana law.

86.     Moreover, when proceedings are eventually held days or weeks later for people who cannot buy their release or who cannot find anyone to buy their release for them, the Defendants' cursory and fleeting proceedings (commonly lasting less than a minute to several minutes) often do not even identify the specific debts and fees owed or the cases in which they were supposedly incurred. These unconstitutional proceedings do not provide a debtor with a meaningful opportunity to contest the validity of the debts, to put on evidence concerning their indigence, or to consider any non-financial alternatives to detention. Debtors are routinely sent back to jail until they pay an arbitrary amount of money without examination or findings on any of these constitutionally required issues.

87.     The treatment of the Plaintiffs was caused by the Defendants' policies and practices to collect debts from the fines, fees, costs, and surcharges that benefit the Defendants.

### 1.  The Initial Assessment of Court Costs, Fees, and Surcharges

88.     The Defendants impose an automatic $20,000 money bond on anyone illegally arrested and imprisoned for non-payment or late payment of court debts. This bond, like every pre-trial money bond issued in New Orleans, partially funds the District Attorney, the Public Defender, the Sheriff, and the Judicial Expense Fund. The judges collect 1.8% of each bond, and the other three entities each collect 0.4% of each bond.  The judges collect over $1 million from these bond fees alone into the Judicial Expense Fund each year, and they have decided to earmark these bond fees for payroll of court employees.  The Court and the judges rely to a

significant extent on these bond fees to fund their operating budget.  Even though this practice

was previously ruled unconstitutional by this Court nearly 25 years ago in *Augustus v. Roemer*,

771 F. Supp. 1458, 1473 (E.D. La. 1991), it continues unabated.[9]

89.     As a result, Defendants have developed a policy, pattern, and practice of

advocating for and implementing high bonds, fines, costs and fees without any constitutional

basis and any meaningful inquiry into a person's ability to pay, even when they know that the

person is indigent.  As a result, many people languish in jail every year solely because they are

too poor to make a monetary payment.

90.     At the conclusion of a criminal case, as a matter of policy and practice in the

thousands of cases prosecuted each year, prosecutors advocate for, and the judges impose, a

variety of mandatory court costs and discretionary fees.  Among these fees are assessments used

directly to fund the District Attorney's office, the Public Defender, and the Court itself.

Probation officers impose additional fees.  Each of these actors relies to a significant extent on

the assessment and collection of these myriad fees and costs to fund their operations and to pay

employee salaries and extra benefits.  These costs and fees fund a significant percentage of each

Defendant's overall operating budget.

91.     All of these fees and costs are imposed without any inquiry into an individual's

ability to pay.

---

[9] After *Roemer* struck down a statute specific to New Orleans, the legislature passed a new statute creating a materially indistinguishable scheme *for the whole state*.  After subsequent lobbying by the judges of the Orleans Parish Criminal District Court, the legislature authorized an additional percentage to be funneled into the Judicial Expense Fund of the Orleans Parish Criminal District Court.  As a result, 3% of every bail bond issued is set aside for local officials, including 1.8% for the judges to control and 0.4% directly for the budget of the District Attorney. LA. REV. STAT. ANN. § 22:822; § 13:1381.5.
        The Sheriff and Public Defender also each take 0.4% percent of every bail bond, thus giving the Sheriff incentive to continue to participate in unlawful policies and practices and the Public Defender a financial conflict of interest, including an incentive not to advocate for recognizance or lower secured money bonds and an incentive not to appeal excessive money bail orders.
        Because the statute was designed to fund a large percentage of the operating budgets of each actor, each currently depends on the continuation of the practice to survive.

92.     One of the discretionary fees assessed upon conviction is the "Judicial Expense Fund" of the Orleans Parish Criminal District Court.  The judges of the court manage the Fund and Court operations in an administrative capacity but refused for many years to disclose the financial details of the account or to permit basic public auditing.  The Fund collects millions of dollars to support the Court's operating budget in the administrative discretion of the judges of the Court, who decide in any individual's case whether to assess the fee and, if so, how much to levy up to $250 for each misdemeanor charge and $2,000 for each felony charge.

93.     Every relevant actor in the judicial proceedings thus has a direct and significant financial incentive for the proceedings to result in conviction.

94.     One of the fees collected from Plaintiffs was the subject of an expose in 2010.[10] For many years, Orleans Parish Criminal District Court judges had been using the money assessed and collected from former criminal defendants to purchase private insurance benefits for themselves that the State of Louisiana does not provide public employees.[11]   From 2006 until 2011, the judges had spent more than $1.9 million on their own personal medical and other benefits for themselves and their spouses.[12]

---

[10] Richard A. Webster, *Bail System Puts Court-Costs on Backs of Poor*, New Orleans City Business, Aug. 20, 2010.

[11] Gordon Russell, *The Times-Picayune, WVUE-TV file suit against Criminal District* Court (Feb.19, 2013), available at http://www.nola.com/crime/index.ssf/2013/02/nolacom_the_times-picayune_wvu.html; s*ee also* John Simerman, *Orleans criminal court judges turn over documents detailing lavish life-insurance benefits*, (Apr. 16, 2013), available at http://www.nola.com/crime/index.ssf/2013/04/orleans_criminal_court_judges_1.html ("Legislative Auditor Daryl Purpera's office found that during 2010, the 13 Criminal Court judges in Orleans Parish collectively held 249 supplemental insurance policies fully funded by the court. The average judge held 19 policies, at an average cost of $14,500 per judge.").

[12] In a similar scheme involving materially identical practices, local municipal court judges were caught using the money collected into the judicial expense fund to hire the personal chef of former New Orleans Saints football star Reggie Bush to prepare gourmet meals for themselves.  *See* Mike Perlstein, *Why Was High Profile Chef on Court Payroll as Custodian?* (Aug. 27, 2010), available at http://www.wwltv.com/news/eyewitness/10pm-Perlstein-Chef-story-101689763 html.

95.     The Orleans Parish District Attorney and the Louisiana Legislative Auditor condemned this misuse of court fees.[13]  The State of Louisiana Legislative Auditor investigated the judges in 2012 and confirmed the District Attorney's findings concerning the judges' misuse of money collected from former criminal defendant debtors. The State Auditor found in an audit issued November 21, 2012 that from 2009-2011:

- The Orleans Parish Criminal District Court judges spent over $154,750 from the Judicial Expense Fund to reimburse themselves for private out-of-pocket medical expenses.
- The judges paid 100% of the cost of their personal professional liability insurance policies out of the Fund.
- The judges spent nearly half a million dollars on extra health, dental, vision, cancer, hospitalization, critical illness, long-term care, accidental death and dismemberment, and life insurance policies.
- Each judge had an *average* of 15-19 additional supplemental insurance policies paid for entirely out of the Fund.

The judges spent excessive money on travel and lodgings at conferences, using money collected into the Judicial Expense Fund from former criminal defendants.[14]

96.     The systemic financial conflicts of interest have not improved in the years since. The Court still uses the millions of dollars of revenues collected in this manner to fund its basic operations, employee salaries, travel and more.  The Court and the judges and employees who administer its finances are aware that a substantial part of its operating budget depends on the generation and ultimate collection of fees from convicted defendants.[15]

---

[13] *See* Leon A. Cannizzaro, Jr., District Attorney, Letter to Buddy Caldwell, Aug. 4, 2011 and Louisiana Legislative Auditor's Report, November 21, 2012.

[14] Auditor's Report, *supra*.

[15] As one former Orleans Parish Criminal District Court judge publicly acknowledged: "I was as guilty of that as any when I was on the bench, but *you have to fund yourself in some fashion*.  And so you did it on the backs of the people who were least able to pay." (emphasis added). Richard A. Webster, Bail System Puts Court Costs on Backs of Poor, NEW ORLEANS CITY BUS., Aug. 20, 2010, available at http://www.projectjusticenola.org/wp-content/uploads/2010/08/Bail_System.pdf; *see also* Paul Purpura, *New Orleans Judge Camille Buras says she's*

97.     In 2012, the Orleans Parish Criminal District Court judges objected to the transfer of misdemeanor cases to the Municipal Court because it meant that they would lose significant revenue.   During one discussion at a City Council meeting, the Chief Municipal Court Judge responded to a discussion about this controversy:

> "The judges should not be in the business of . . . making money . . .. We're here to
> . . . dispense justice . . . . We're not even supposed to be placed in that extremely
> conflicting position, as to be concerned about how many fines and fees we take in
> so that we can operate. You cannot place that burden on us any longer. It's unfair
> . . . and it goes against the pledge we take when we take office."[16]

98.     The knowledge that operating budgets come from money bond and post-conviction fees affects every major decision of local court actors.   For example, employees of the Orleans Public Defender were recently informed by management that, because collections from fees had not been enough to fund even existing staff salaries, employees would have to be furloughed.   Employees were encouraged to supplement their income with donations from Facebook friends.

99.     Every Collections Department employee knows that their salaries and the operating budget of their departments depend to a significant extent on the assessment and subsequent collection of these court costs and fees.

**2.      Debt-Collection Policies and the Issuance of Invalid Warrants**

100.    Upon conviction, the various costs and fees are assessed. Indigent debtors who cannot pay in full immediately are told to go to the Collections Department.   Once at the Collections Department, debtors are told by Collections Department employees (who call

---

*repaying court for benefits* (Jul. 16, 2015) Nola.com,
http://www.nola.com/crime/index.ssf/2015/07/camille_buras_insurance.html
(at least one judge has since apologized for her impropriety and promised to pay back the Judicial Expense Fund).

[16] *City Council Budget Hearings on 2013 Proposed Budget*, supra note 4, at 20:00 (Nov. 9, 2012),
available at http://cityofno.granicus.com/MediaPlayer.php?view_id=3&clip_id=1382 (last visited August 29, 2015)

themselves "Collections Agents") that they must pay a certain amount of money at certain designated times.  These payments and times are determined in the discretion of Collections Department employees.

101.    Pursuant to Collections Department policy and practice, no inquiry is ever made into a person's ability to pay, even when former defendant debtors are known to be indigent.

102.    Collections Department employees are trained by supervisors as a matter of policy and practice that their goal should be to collect as much money as possible for the Court and, as a result, they never inform indigent people of any of their rights to seek to have the payments waived, reduced, or otherwise modified.

103.    Pursuant to Collections Department policy and practice, debtors are told that Collections Department employees will have them arrested if they do not make the payments determined by the employees.  Collections Department employees refuse to accept, as a matter of policy, amounts less than the entire amount due as determined by Collections Department staff.

104.    Pursuant to Collections Department policy and practice, if a person fails to make the payments determined by the Collections Department, Collections Department employees will sign without authorization the signature of a judge on a "warrant" and "issue" such warrants themselves even if the person is not on probation and even if the case has been closed.[17]

105.    These warrants are issued purportedly for "failure to pay" and not for failure to appear at any particular court proceeding.  They are issued instead of simply informing a debtor of a future court date, issuing a valid summons, and giving a debtor an opportunity to explain his or her nonpayment prior to the deprivation of the debtor's fundamental liberty.

---

[17] Collections Department employees will also often send an uncertified letter to the last known address of a debtor demanding payment.  Those letters do not set forth any process available to the debtor or inform the debtor of any of the debtors' rights, and Collections Department employees have no way of knowing whether the letters are ever received.

106.    The warrants are printed from Collections Department computing software and filled out by collections agents working in the Department.  Agents have been trained to sign the signatures of judges themselves rather than to present any evidence or information to a neutral judicial officer.

107.    A neutral judicial officer does not evaluate these warrants.  Additionally, they are often issued years after a purported nonpayment, and they are routinely issued in error or by ignoring evidence of a person's indigence.[18]

108.    The Defendants are aware of these open policies and practices and yet allow them to continue.[19]  Indeed, the Court and the City have even agreed to fund extra positions in the Collections Department in order to maximize additional revenues from more people.[20]

### 3.    The Illegal Post-Arrest Procedures

109.    After arrest on an illegal Collections Department warrant, the Defendants' standard policy and practice is to let arrestee debtors languish in jail indefinitely.

110.    As a matter of policy and practice, each Collections Department warrant is accompanied by a preset $20,000 secured money bond required for release.  This standard money bond is set without reference to ability to pay or any other circumstance.  If paid, a percentage of the bond goes to the Sheriff, to the Public Defender, to the District Attorney, and to the Judicial Expense Fund of the Orleans Parish Criminal District Court.

---

[18] The Criminal District Court reported to the City Council in June 2015 that it was in the process of collaborating with the City of New Orleans Police Department and the District Attorney to implement a more efficient online warrant system.

[19] Collections Department officials testified earlier this year under oath confirming the implementation and execution of these policies and practices in open court during a hearing into the detention of an indigent debtor.

[20] Despite the extra positions funded jointly by the Court and the City of New Orleans, the Court complained to the City Council in June 2015 that a shortage of funding for the Collections Department had forced it to float other employees to cover that and other areas of its administration.  It noted that budget cuts had left it with one vacant position in the Collections Department.  The Court made the same complaints to the City Council in previous years, even though the City has agreed each year jointly to fund additional Collections Department positions.

111.    Jailed debtors are routinely told that they can pay this money bond, pay the entirety of their debts, or pay an amount Collections Department employees unilaterally determine.  Thus, a debtor wishing to remain at liberty in order to contest the validity of her debt or raise other legal or factual issues relating to the amount or the collection must almost always pay a bond amount larger than the value of the debt just for the opportunity to be heard at a future court date.  In contrast, if a debtor simply pays what the Collections Department claims is owed, they are released from jail with no opportunity to contest the debt or the jailing.[21]

112.    After indefinite periods in jail, arrestees are eventually brought to court if they have not been able to pay their debts or afford their money bond.  The Defendants have no set policy or practice concerning how long arrestees must wait in jail prior to a court date, and the wait is routinely longer than 48 hours.  Indeed, it is routine that prisoners languish a week or several weeks.  As a result of their indefinite detention, debtors are forced to seek the assistance of family members and friends.

113.    When brought to court, arrestees are either sent back to jail unless they make a payment or released on threat of future arrest and incarceration if they do not bring money to the Collections Department, all with the consent and advocacy of the District Attorney and often without the representation of a lawyer.[22]  It is the Defendants' policy and practice never to conduct any meaningful inquiry into a debtor's ability to pay or to give notice to the debtor as to what the critical issues at the proceeding will be.

114.    The Defendants' policy and practice is never to allow court debtors to enjoy any of the civil judgment protections offered to every judgment debtor under Louisiana law.  For

---

[21]This is particularly troubling because clerical errors and mistakes of fact and law are common in matters involving collection of court fines, fees, and costs.

[22] Debtors are often released on threat of future incarceration if they are represented by a lawyer at such hearings even though unrepresented debtors are typically sent back to jail.

example, the Defendants ignore the basic substantive statutory asset exemptions and safeguards protecting judgment debtors from creditors taking assets needed for the basic necessities of life, as well as procedural protections concerning how money can be collected.  *See generally, e.g.*, Louisiana Rev. Stat. Ann. § 13:3881; § 13:3913.

## Class Action Allegations

115.    The named Plaintiffs bring this Class action on behalf of themselves and all others similarly situated, for the purpose of asserting the declaratory and injunctive claims alleged in this Complaint on a common basis.

116.    A class action is a superior means, and the only practicable means, by which Plaintiffs and unknown Class members can challenge the Defendants' unlawful debt-collection scheme.

117.    This action is brought and may properly be maintained as a Class action pursuant to Rule 23(a)(1)-(4), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

118.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

119.    The Plaintiffs propose a Declaratory and Injunctive Class.  The Declaratory and Injunctive Class is defined as:  All persons who currently owe or who will incur court debts to the Orleans Parish Criminal District Court from fines, fees, costs, or surcharges arising from cases in the court.

**A.    Numerosity.  Fed. R. Civ. P. 23(a)(1)**

120.    The Defendants subject thousands of people each year to the Collections Department's policies and practices discussed in this Complaint.  Pursuant to the Defendants' policy and practice, all of these people with outstanding court debts are currently being

threatened with arrest and indefinite jailing if they do not make the payments in the amount or frequency purportedly required by the Collections Department.

121.   The Defendants have jailed hundreds of people for nonpayment of debts in the past several years.  The names, case numbers, and dates of imprisonment of those jailed are easily available by consulting records maintained by the Defendants.

122.   The Defendants followed and follow the same debt-collection policies, practices, and procedures to accomplish the threats and jailing of the Class members.  For example, pursuant to the Defendants' policy and practice, those jailed for nonpayment by the Defendants' scheme do not receive meaningful inquiries into their ability to pay as required by federal law. Pursuant to policy, invalid "warrants" are issued and the posting of preset monetary bonds or full debt payment are required for release, with indefinite detention the result of nonpayment. Pursuant to policy, no determinations of indigence or evaluations of alternatives to incarceration are made during eventual court appearances, and the Defendants provided none of the relevant state and federal protections for judgment debtors.   Nor are those jailed by the Defendants provided adequate counsel to represent them at the fleeting court proceeding that result in their further jailing.

123.   Those who still owe the Defendants debt payments or who will incur such debts will be subjected to the same ongoing policies and practices absent the relief sought in this Complaint.

**B.     Commonality.  Fed. R. Civ. P. 23(a)(2).**

124.   The relief sought is common to all members of the Class, and common questions of law and fact exist as to all members of the Class.  The Plaintiffs seek relief concerning whether the Defendants' policies, practices, and procedures violated their rights and relief

requiring the Defendants to change their policies, practices, and procedures so that the Plaintiffs' rights will be protected in the future.

125.    Among the most important, but not the only, common questions of fact are:

- Whether the Collections Department has discretion to set the amount and timing of payment requirements;
- Whether the Collections Department has a policy and practice of issuing warrants based solely on nonpayment during the time and in the manner required by the Collections Department and without probable cause that any offense has been committed;
- Whether the money assessed and collected by supposedly neutral actors actually is used for the benefit of the budgets of those actors and, if so, to what extent;
- Whether the Collections Department fails to conduct any meaningful inquiry into indigence prior to issuing arrest warrants that result in indefinite jailing;
- Whether Collections Department employees sign the signature of judicial officers without authorization to create the "warrants" that they issue unilaterally;
- Whether Defendants arrest Plaintiffs pursuant to these illegal warrants;
- Whether Defendants imprison Plaintiffs pursuant to these illegal warrants;
- Whether each warrant comes with a standard $20,000 secured money bond;
- Whether the money bonds result in a percentage going to the Judicial Expense Fund and to the District Attorney, the Public Defender, and the Sheriff's budgets;
- Whether the Defendants have a policy and practice of delaying a hearing indefinitely;
- Whether the Defendants provide notice to debtors that their ability to pay will be a relevant issue at the hearings at which they are continued to be jailed and whether the Defendants ensure that findings are made concerning ability to pay and alternatives to incarceration;
- Whether (and, if so, how) the Defendants provide adequate representation to those jailed for unpaid debts in proceedings that result in their incarceration and whether any representation provided is free of financial conflicts of interest;
- What procedural mechanisms, if any, the Defendants use as matter of policy and practice to determine indigence; for example, whether the Defendants use a standard state-issued form for determining ability to pay;
- Whether the Defendants apply state procedural and state and federal substantive law designed to determine indigence and to protect indigent debtors;
- Whether Defendants have a policy and practice of threatening debtors with incarceration for unpaid debts without informing them of their constitutional rights.

126.    Among the most important common question of law are:

- Whether it is lawful to issue arrest warrants solely for non-payment of amounts and during a time period required by Collections Department employees, especially given the lack of inquiry into indigence and the actual knowledge of

Collections Department employees that a debtor is indigent and unable to pay;

- Whether such warrants can be issued to deprive debtors of their liberty without prior meaningful opportunity to be heard;
- Whether it is lawful to sign the signature of a judicial officer without contacting that officer or presenting any evidence to that officer in order to obtain a warrant and whether it is lawful to issue such warrants without a finding of probable cause that any offense has been committed;
- Whether it is lawful to arrest people under such illegal warrants;
- Whether it is lawful to detain people under such illegal warrants;
- Whether a person can be kept in jail pursuant to a standard $20,000 bond fee without any inquiry into indigence or into the person's danger to the community or risk of flight;
- Whether bail amounts advocated for and set by supposedly neutral actors who actually have a personal financial stake in the amounts set violates due process;
- Whether the Defendants can keep debtors in jail indefinitely after arrest until they pay and whether the policy and practice of delaying a hearing indefinitely is lawful;
- Whether due process is violated by proceedings conducted without notice to debtors that their ability to pay will be a relevant issue at the hearings and without findings made concerning the ability to pay;
- Whether competent constitutional counsel is required at hearings involving complex statutory fees, constitutional issues, jailing, an adversary represented by an experienced prosecutor, and potentially years of documents, court records, and fees to evaluate;
- Whether the Defendants can operate a scheme that ignores all of the basic state law protections for civil judgment debtors, such as exemptions from seizure, garnishment protections, and protection of federal benefits.

127.    These common legal and factual questions arise from one central scheme and set of policies and practices: the Defendants' unconstitutional debt-collection system.    The Defendants operate this scheme openly and in materially the same manner every day.    The material components of the scheme do not vary from Class member to Class member, and the resolution of these legal and factual issues will determine whether all of the members of the class are entitled to the constitutional relief that they seek.

## C.    Typicality.  Fed. R. Civ. P. 23(a)(3).

128.    The named Plaintiffs' claims are typical of the claims of the members of the Class, and they have the same interests in this case as all other members of the Class that they

represent.  Each of them suffered injuries from the failure of the Defendants to comply with the basic constitutional provisions detailed below.  The answer to whether the Defendants' scheme of policies and practices is unconstitutional will determine the claims of the named Plaintiffs and every other Class member.

129.    If the named Plaintiffs succeed in their claims that the Defendants' policies and practices concerning debt collection for fines, fees, costs, and surcharges violate the law in the ways alleged in each claim of the Complaint, then that ruling will likewise benefit every other member of the Injunctive Class.[23]

> **D.    Adequacy.  Fed. R. Civ. P. 23(a)(4).**

130.    The named Plaintiffs are adequate representatives of the Class because they are members of the Class and because their interests coincide with, and are not antagonistic to, those of the Class.  There are no known conflicts of interest among Class members, all of whom have a similar interest in vindicating the constitutional rights to which they are entitled.

131.    Plaintiffs are represented by William Quigley, his associates[24] and attorneys from Equal Justice Under Law[25] who have experience litigating complex civil rights matters in federal court and extensive knowledge of both the details of the Defendants' scheme and the relevant constitutional and statutory law.

132.    Counsel's efforts have so far included extensive investigation over a period of

---

[23] The named Plaintiffs representing the Declaratory and Injunctive Class are: Alana Cain, Ashton Brown, Reynajia Variste, and Vanessa Maxwell.

[24] William Quigley has practiced law in Louisiana for nearly forty years, during which time he has litigated numerous class action civil rights cases in federal court. He holds the positions of Professor of Law and Director of the Stuart H. Smith La Clinic and Center for Social Justice and the Gillis Long Poverty Law Center at Loyola University New Orleans College of Law.  Anna Lellelid-Douffet has been practicing law in Louisiana with Bill Quigley since graduating from Loyola in 2013. Most of her work has been in Federal court in the Fifth and Sixth Circuits, representing criminal defendants.

[25] Equal Justice Under Law is a non-profit civil rights organization based in Washington, D.C.  The organization was founded and is run by Alec Karakatsanis and Phil Telfeyan, and it is funded in part by the Harvard Law School Public Service Venture Fund.

months, including numerous interviews with witnesses, legal system employees, law enforcement officials, jail inmates, families, attorneys practicing in New Orleans and Louisiana courts, and national experts in debt collection, court costs, conflicts of interest, and constitutional law.

133.    Counsel has also studied budget documents, court records, and transcripts in order to gain an understanding of state law and practices as they relate to federal constitutional requirements. Counsel has studied the way that these systems function in other cities and states in order to investigate the wide array of options in practice for government officials.

134.    As a result, counsel has devoted enormous time and resources to becoming intimately familiar with the Defendants' scheme and with all of the relevant state and federal laws and procedures that can and should govern it.   Counsel has also developed relationships with many individuals and families victimized by the Defendants' practices.

135.    The Plaintiffs are represented by attorneys from Equal Justice Under Law who have experience litigating complex civil rights class action lawsuits in federal court and extensive knowledge of the relevant constitutional law. Counsel for Plaintiffs has also been lead counsel in several similar class action constitutional challenges to unlawful municipal debt-collection regimes.   *See, e.g.*, *Mitchell et al, v. City of Montgomery*, 2014-cv-186 (M.D. Ala. 2014).  That case involved a major investigation to end widespread injustices involving the use of private probation and the jailing of impoverished people by the City of Montgomery over a period of years for their non-payment of debt from traffic tickets and other misdemeanor offenses.[26]   The litigation resulted in the cancelling of the private probation contract, the release

---

[26] Counsel is also lead attorney in several recent class action lawsuits challenging the use of money bail to keep impoverished people in jail prior to trial.  *See Jones et al. v. City of Clanton,* 15-cv-34 (M.D. Ala. 2015); *Pierce et. al. v. City of Velda City*, 15-cv-570 (E.D. Mo. 2015); *Powell et al. v. City of St. Ann*, 4:15-cv-840 (E.D. Mo. 2015); *Thompson et al. v. City of Moss Point*, 1:15-cv-00182-LG-RHW (S.D. Miss. 2015); *Cooper et al. v. City of Dothan*,

of numerous people from the local jail, and a consent decree mandating new policies and practices.[27]   Counsel is also lead attorney in pending lawsuits challenging the treatment of indigent people with court debts in the municipal courts and jails of Jennings and Ferguson, Missouri.  *See also Jenkins et al. v. City of Jennings*, 15-cv-252-CEJ (E.D. Mo. 2015); *Fant et al. v. City of Ferguson*, 15-cv-253-AGF (E.D. Mo. 2015).

136.   The Plaintiffs and their attorneys will fairly and adequately protect the interests of the members of the Class.

**E.     Rule 23(b)(2)**

137.   Class action status is appropriate because the Defendants, through the policies, practices, and procedures that make up their court debt-collection scheme, have acted and/or refused to act on grounds generally applicable to the Declaratory and Injunctive Class.  Thus, a declaration that people are entitled, as a matter of federal law, to a meaningful inquiry into their ability to pay and an evaluation of alternatives to incarceration before they are jailed for nonpayment will apply to each Class member.  The same applies to rulings on the other claims, including: that Defendants cannot issue and execute illegal arrest warrants for debtors without probable cause that they have committed an offense and without notice or a hearing prior to the deprivation of their fundamental liberty; that Class members cannot be held in jail indefinitely pursuant to a fixed monetary bond that they cannot afford without any inquiry into their indigence or finding that they pose a danger to the community or risk of flight; that Class

---

1:15-cv-425-WKW (M.D. Ala. 2015).  Counsel was also previously the lead attorney in a constitutional civil rights class action against the District of Columbia in the United States District Court for the District of Columbia.  *See* 1:13-cv-00686-ESH (D.D.C. 2013).  In that litigation, undersigned counsel was responsible for investigating and building the complex constitutional claims against the District of Columbia, authoring the legal filings in the class action case, and negotiating a Memorandum of Understanding with the District of Columbia Attorney General that stayed the class action litigation and began to implement sweeping changes to the County's policies and practices governing the civil forfeiture of property by the District's Metropolitan Police Department—procedures that affect thousands of putative class members every year.

[27] *See* Consent Decree in *Mitchell et al, v. City of Montgomery*, 2014-cv-186 (M.D. Ala. 2014) *attached as* Exhibit 2.

members are entitled to notice, a neutral tribunal, and representation by counsel at a complex hearing initiated and litigated by experienced prosecutors and after which they are jailed; and that the Defendants cannot collect debts from Class members in a manner that violates and evades all of the relevant protections for other judgment debtors.

138.    Injunctive relief compelling the Defendants to comply with these constitutional rights will similarly protect each member of the Class from being again subjected to the Defendants' unlawful policies and practices with respect to the debts that they still owe and protect those who will incur such debts in the future from the same unconstitutional conduct. Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

139.    Plaintiffs seek the following relief and hereby demand a jury in this cause for all matters so appropriate.

### Claims for Relief

**Count One:   The Defendants' Policy of Issuing and Executing Illegal Arrest Warrants Violates the Fourth and Fourteenth Amendments.**

140.    Plaintiffs incorporate by reference the allegations in paragraphs 1-140.

141.    The Defendants' policy and practice is to issue and execute arrest warrants for those debtors who have not paid old court debts based solely on nonpayment.  These warrants are sought, issued, and served without any inquiry into the person's ability to pay even when the Defendants have knowledge that the person is impoverished and unable to pay the debts.  These warrants are sought, issued, and served without any finding of probable cause that the person has committed any offense and with knowledge that no probable cause exists.  Moreover, the warrants are issued not by a judicial officer but by Collections Department employees called "Collections Agents," who write the signatures of the judicial officer on warrants without

presenting any evidence or information, let alone providing any information under oath, to any judicial officer.

142.    The Defendants issue arrest warrants instead of using legal summonses and scheduling court dates.  The Defendants therefore deprive people of their liberty unnecessarily and without any opportunity to be heard, even when they have spoken to people on the phone or in person and have the opportunity to notify them to appear in court for a hearing.   The Defendants' policy and practice is to deprive people of their fundamental liberty without any proper notice and hearing or any basic inquiry into whether the debt is still owed or valid or whether nonpayment was willful.    These practices violate the Fourth and Fourteenth Amendments and result in a deprivation of fundamental liberty without adequate due process.

**Count Two:  The Defendants' Use of a Fixed Secured Money Bond for each Collections Department "Warrant" Violates the Fourteenth Amendment.**

143.    Plaintiffs incorporate by reference the allegations in paragraphs 1-143.

144.    The Fourteenth Amendment's due process and equal protection clauses have long prohibited imprisoning a person because of the person's inability to make a monetary payment. The Defendants violate the Plaintiffs' rights by placing and keeping them in jail prior to any debt-collection proceedings when they cannot afford to pay the preset amount of money required for release after a Collections Department nonpayment arrest if the person seeks to contest the issue of nonpayment or the validity of the debt.

**Count Three: The Defendants Violated Plaintiffs' Rights By Jailing Them Indefinitely Without a Judicial Appearance.**

145.    Plaintiffs incorporate by reference the allegations in paragraphs 1-145.

146.    The Due Process Clause of the Fourteenth Amendment prohibits the Defendants from jailing the Plaintiffs indefinitely and without any meaningful legal process through which

they can challenge their detention by keeping them confined in the local jail (routinely for days or weeks) unless or until they can make arbitrarily determined cash payments to the Collections Department.

**Count Four: Defendants Violated Plaintiffs' Due Process Rights By Implementing a Scheme of Money Bonds In Which Constitutionally Neutral Judicial and Government Actors Take a Percentage of Each Bond to Fund Their Own Budgets.**

147.    Plaintiffs incorporate by reference the allegations in paragraphs 1-147.

148.    The Defendants operate a system of money bond in which the judges collect and control 1.8% of every bond paid into the Fund that they manage as administrators to operate the budget of the Court.  Every relevant actor in the local system implementing and reviewing such money bail settings has an incentive to set money bonds in a manner that ensures the maximization of their own revenues.[28]  This creates an intolerable financial conflict of interest.

149.    The Defendants therefore enforce a Collections Department money bond system on which the judges, District Attorney, Sheriff, and Public Defender depend to fund their own operations that is unconstitutional under the Fourteenth Amendment because it contravenes fundamental principles of neutrality.  Despite this Court striking down that system nearly 25 years ago, the Defendants continue to operate the illegal money bail arrangement and to take a cut of every money bond paid.  To the extent the Defendants are complying with state statutes, *see* La. Rev. Stat. Ann. § 22:822; § 13:1381.5, those statutes are, as this Court has previously held, unconstitutional.

---

[28] The District Attorney collects 0.4% of every bond paid to fund its own salaries and other operations.  Because the Public Defender also collects 0.4% of every bond paid to fund its salaries and operations. This money collected through convictions is insufficient to fund the Public Defender.  As a result, indigent defense in Orleans Parish Criminal District Court is chronically underfunded with devastating results.  Indeed, in addition to ensuring that enough money is assessed and collected from the convictions of their clients, Public Defenders have recently been told that they will be furloughed unless more money is brought in.

**Count Five: The Defendants Violated Plaintiffs' Rights By Jailing Them For Non-Payment of Debts Without Any Inquiry Into Their Ability To Pay and in Proceedings that Otherwise Violate Basic Due Process.**

150.    Plaintiffs incorporate by reference the allegations in paragraphs 1-150.

151.    The Fourteenth Amendment's due process and equal protection clauses have long prohibited imprisoning a person for the failure to pay money owed to the government if that person is unable to pay and without following basic procedures to make that determination.  The Defendants violated Plaintiffs' rights by imprisoning them when they could not afford to pay the debt allegedly owed and without following the basic constitutional process required.

152.    The Defendants violated the Plaintiffs' rights by jailing them, and by threatening to jail them, without conducting any inquiry into their ability to pay and without conducting any inquiry into alternatives to imprisonment as required by the United States Constitution.  The Defendants similarly did not: provide the required notice to the Plaintiffs concerning the relevant and critical issues at any hearing contemplating their imprisonment; provide a meaningful opportunity for the Plaintiffs to present evidence of their inability to pay; or make findings concerning their ability to pay.

153.    Moreover, the Defendants did not and do not provide the neutral tribunal free of financial conflicts of interest due process requires because the prosecutor and judicial officer at such debt-collection hearings are both financially interested in the outcome of the proceeding because they depend, to a significant extent, on the collection of revenue from those proceedings to fund their own operating budgets.  The due process findings of fact and law required by *Bearden v. Georgia,* 461 U.S. 660, 672-73 (1983) and *Turner v. Rogers*, 131 S. Ct. 2507, 2520 (2011) require, at a minimum, neutral prosecutorial and judicial officers, free from financial

conflicts of interest of the kind condemned in *Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972).

**Count Six: The Defendants' Use of Jail and Threats of Jail To Collect Debts Owed to the Defendants Violates Equal Protection Because It Imposes Unduly Harsh and Punitive Restrictions On Debtors Whose Creditor Is the Government Compared To Those Who Owe Money to Private Creditors.**

154.   Plaintiffs incorporate by reference the allegations in paragraphs 1-154.

155.   The Supreme Court has held that, when a government seeks to recoup costs of prosecution from indigent defendants—for example, the cost of appointed counsel—it may not take advantage of its position to impose unduly restrictive methods of collection solely because the debt is owed to the government and not to a private creditor.  The Defendants take advantage of their control over the machinery of the court, jail, and police systems to deny debtors the statutory protections that every other Louisiana debtor may invoke against a private creditor. This coercive policy and practice constitutes invidious discrimination and violates the fundamental principles of equal protection of the laws.

**Count Seven: Defendants' Conduct Constitutes Wrongful Arrest Under Louisiana Law.**

156.   Plaintiffs incorporate by reference the allegations in paragraphs 1-156.

157.   Defendants' conduct described herein constitutes wrongful arrest of Plaintiffs under the laws of the state of Louisiana and the United States.

**Count Eight: Defendants' Conduct Constitutes Wrongful Imprisonment Under Louisiana Law.**

158.   Plaintiffs incorporate by reference the allegations in paragraphs 1-158.

159.   Defendants' conduct described herein constitutes wrongful imprisonment of Plaintiffs under the laws of the state of Louisiana and the United States.

## **Request for Relief**

 WHEREFORE, Plaintiffs request that this Court issue the following relief:

a.  A declaratory judgment that the Defendants violate Plaintiffs' Fourth and Fourteenth Amendment rights by arresting them on illegal warrants issued only on the basis of nonpayment of a monetary judgment and without any meaningful pre-deprivation process;

b.  A declaratory judgment that the Defendants violate the Fourteenth Amendment rights of the Plaintiffs by keeping them in jail pursuant to a fixed secured bond that they cannot afford;

c.  A declaratory judgment that the Defendants violate the Fourteenth Amendment rights of the Plaintiffs by keeping them in jail indefinitely after arrest unless they pay an arbitrarily determined amount of money to settle their debts;

d.  A declaratory judgment that the Defendants violate the Fourteenth Amendment rights of the Plaintiffs by imprisoning them without conducting any meaningful inquiry into their ability to pay or into any alternatives to incarceration and at proceedings lacking in basic judicial neutrality;

e.  A declaratory judgment that the Defendants violated the Plaintiffs' equal protection rights by imposing harsh debt collection measures that could not lawfully be imposed on debtors whose creditors are private entities;

f.  An order and judgment preliminarily and permanently enjoining the Defendants from enforcing the above-described unconstitutional policies and practices against the Plaintiffs and the Class of similarly situated people that they represent;

g.  A judgment compensating the named Plaintiffs for the damages that they suffered as a result of the Defendants' unconstitutional and unlawful conduct;

h.  An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other relief this Court deems just and proper.


                              Respectfully submitted,


                              *s/Bill Quigley*
                              _____

                              William P. Quigley,
                              La Bar No. 7769
                              7214 St. Charles Ave.
                              Campus Box 902
                              New Orleans, LA 70118
                              (504) 710-3074 (c)

(504) 861-5590 (p)
(504) 861-5440 (f)
quigley77@gmail.com
*Designated TA*

 *s/ Anna Lellelid*
_____

Anna Lellelid-Douffet
La Bar No. 35204
PO Box 19388
New Orleans, LA 70179
(504) 224-9670 (c)
lellelid.law@gmail.com

Alec Karakatsanis
(D.C. Bar No. 999294)
(Pending Admission *Pro Hac Vice*)
Equal Justice Under Law
 916 G Street, NW Suite 701
 Washington, DC 20001
 (202)-681-2409
 alec@equaljusticeunderlaw.org

*Attorneys for Plaintiff*