UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ALANA CAIN, ET AL.                                   CIVIL ACTION

VERSUS                                               NO. 15-4479

CITY OF NEW ORLEANS, ET AL.                          SECTION "R" (2)


## ORDER AND REASONS

Plaintiffs Alana Cain, Ashton Brown, Reynaud Variste, Reynajia Variste, Thaddeus Long, and Vanessa Maxwell filed this civil rights putative class action under 42 U.S.C. § 1983 seeking to declare the manner in which the Orleans Parish Criminal District Court collects post-judgment court costs from indigent debtors unconstitutional and other relief. Plaintiffs appeal from the Magistrate Judge's denial of their motion for leave to amend their complaint.  For the following reasons, plaintiffs' appeal is granted in part and denied it part.


## I.    BACKGROUND

### A.    Factual Allegations

Plaintiffs allege that the defendants maintain an unconstitutional scheme of jailing indigent criminal defendants and imposing excessive bail amounts for nonpayment "offenses" in an effort to collect unpaid court costs.

According to plaintiffs, the Criminal District Court maintains an internal "Collections Department," informally called the "fines and fees" department, that oversees the collection of court debts from former criminal defendants. The "typical" case allegedly proceeds as follows.

When a person is charged with a crime, the Criminal District Court judges first determine whether the criminal defendant is legally "indigent," which means they qualify for appointment of counsel through the Orleans Public Defenders under Louisiana Revised Statutes § 15:175 (2016). According to plaintiffs, 85% of the criminal defendants in Orleans Parish are legally indigent.[1]  With assistance of counsel, the defendants either plead guilty to their criminal charges or proceed to trial.  If convicted, the criminal defendants must appear before a judge for sentencing.

At sentencing, in addition to imposing a term of imprisonment or probation, the judge may assess various "court costs" against the defendants. These costs may include restitution to any victim, a statutory fine, fees, or other costs imposed at the judge's discretion.  According to plaintiffs, the discretionary assessments "fund the District Attorney's office, the Public Defender, and the Court," which rely on these collections "to fund their

---

[1]      R. Doc. 7 at 5.

operations and pay employee salaries and extra benefits."[2]  Plaintiffs allege that the Criminal District Court judges impose court costs without inquiring into the criminal defendants' ability to pay.[3]

If the criminal defendants cannot immediately pay in full, the judges allegedly direct them to the Collections Department.  There, an employee allegedly imposes, at his discretion and without inquiring into a defendant's ability to pay, a payment schedule—usually requiring a certain amount per month.[4]  Collections Department employees also allegedly warn defendants that failure to pay the monthly amount, in full, will result in their arrests. Plaintiffs contend that Collections Department employees refuse to accept anything less than full payment.[5]

When criminal defendants fail to pay, a Collections Department employee allegedly issues a pre-printed warrant for the defendant's arrest by forging a judge's signature.[6]  According to plaintiffs' allegations, the Collections Department often issues these warrants "years after a purported

---

[2]      *Id.* at 22-23 ¶ 88.
[3]      *Id.* at 23 ¶ 91.
[4]      *Id.* at 27-28 ¶103.
[5]      *Id.* at 28 ¶ 106.
[6]      *Id.* at 29 ¶ 109.

nonpayment," and the warrants are "routinely issued in error" or without regard to a debtor's indigence.[7]

Plaintiffs also allege that each Collections Department arrest warrant is "accompanied by a preset $20,000 secured money bond required for release."[8] According to plaintiffs' allegations, the amount a debtor must pay to satisfy the $20,000 secured money bond is often more than all of the debtor's outstanding court costs.[9] Plaintiffs allege that this "automatic $20,000 secured money bond" is motivated by defendants' financial interest in state court arrestees' paying for their release.[10] Plaintiffs contend that the Criminal District Court judges collect 1.8% of each bond, while the Orleans Parish District Attorney's office, the Orleans Public Defenders' office, and the Orleans Parish Sheriff each collect 0.4% of each bond.[11]

Plaintiffs allege that when criminal defendants are arrested for nonpayment, they are "routinely told" that to be released from prison, they must pay for the $20,000 secured money bond, the entirety of their outstanding court debts, or some other amount "unilaterally determine[d]"

---

[7]     *Id.* at ¶ 110.
[8]     *Id.* at ¶ 113.
[9]     *See id.* at 15 ¶ 47.
[10]    *Id.* at 21-22 ¶88.
[11]    *Id.* at 22 ¶88.

by the Collections Department.[12]  As a result, these indigent debtors allegedly "languish" in prison "indefinite[ly]" because they cannot afford to pay any of the foregoing amounts.[13]  Although "arrestees are eventually brought to court," plaintiffs allege that defendants "have no set policy or practice" regarding how long arrestees must wait for a hearing.[14]  According to plaintiffs, indigent debtors "routinely" spend a week or more in prison.[15] Plaintiffs allege that some arrestees, with help from family and friends, pay for their release without ever having a hearing and thus have "no opportunity to contest the debt or the jailing."[16]

When criminal defendants are brought to court, the judges allegedly send them back to prison if they are unable to pay their debts or release them "on threat of future arrest and incarceration" if they do not promptly pay the Collections Department.[17]  The judges allegedly hold these brief "failure-to-pay hearings" without providing the debtors notice of the critical issues or considering the debtors' ability to pay. [18]

---

[12]   *Id.* at 30 ¶114.
[13]   *Id.* at ¶115.
[14]   *Id.*
[15]   *Id.*
[16]   *Id.* at ¶114.
[17]   *Id.* at ¶116.
[18]   *Id.*

Plaintiffs contend that these practices are unconstitutional under the Fourth and Fourteenth Amendments.

## B.   Plaintiffs

The named plaintiffs in the First Amended Complaint are six persons who were defendants in the Orleans Parish Criminal District Court—Alana Cain, Ashton Brown, Reynaud Variste, Reynajia Variste, Thaddeus Long, and Vanessa Maxwell.[19]   During the criminal proceedings, Criminal District Court judges appointed counsel from the Orleans Public Defenders to represent each of the named plaintiffs, except Reynaud Variste, during their criminal proceedings.[20]   Thus, the court must have determined that Cain, Brown, Reynajia Variste, Long, and Maxwell were legally indigent under Louisiana Revised Statutes § 15:175.[21]   Reynaud Variste appears to have retained private counsel.[22]

---

[19]   *Id.* at 7 ¶7.

[20]   R. Doc. 59-3 at 1 (Alana Cain Docket Sheet, entry for 12/04/2012) ("Court appointed Alex Liu, OPD."), 5 (Ashton Brown Docket Sheet, entry for 10/02/2013) ("Court appointed Seth Wayne, OPD."), 9 (Reynajia Variste Docket Sheet, entry for 10/02/2014) ("Court appointed Lindsey Samuel, OPD."), 23 (Vanessa Maxwell Docket Sheet, entry for 12/14/2011) ("Court appointed Jerrod Thompson-Hicks, OIPD."); R. Doc. 95-7 at 1 (Thaddeus Long Docket Sheet, entry for 06/02/2011) ("Court appointed Anna Fecker, OIDP).

[21]   *See* R. Doc. 7 at 5.

[22]   *See* R. Doc. 59-3 at 14 (Reynaud Variste Docket Sheet, entry for 9/25/2012) ("Defendant must retain private counsel.").

With the assistance of counsel, all of the named plaintiffs pleaded guilty to their respective criminal charges, including theft,[23] battery,[24] drug possession,[25] "simple criminal damage,"[26] and disturbing the peace.[27]   At plaintiffs' sentencings, the presiding judges imposed terms of imprisonment, which were often suspended, and terms of active or inactive probation.   In addition, the judges assessed various court costs against plaintiffs, including restitution, fines, and/or discretionary fees and costs.[28]   At some point, all of the named plaintiffs were subsequently arrested for failing to pay outstanding court costs on a warrant issued by the court's Collections Department.

## C.    Claims in the First Amended Complaint

Plaintiffs filed this civil rights action under 42 U.S.C. § 1983, alleging violations of their Fourth and Fourteenth Amendment rights, and violations

---

[23]    *Id.* at 4 (Alana Cain Guilty Plea), 8 (Ashton Brown Guilty Plea).
[24]    *Id.* at 12 (Reynajia Variste Guilty Plea).
[25]    *Id.* at 22 (Reynaud Variste Guilty Plea).
[26]    *Id.* at 28 (Vanessa Maxwell Guilty Plea).
[27]    R. Doc. 95-7 at 5 (Thaddeus Long Guilty Plea).
[28]    R. Doc. 59-3 at 2 (Alana Cain Docket Sheet, entry for 5/30/2013), 6 (Ashton Brown Docket Sheet, entry for 12/16/2013), 9 (Reynajia Variste Docket Sheet, entry for 10/21/2014), 18 (Reynaud Variste Docket Sheet, entry for 10/31/2013), 23 (Vanessa Maxwell Docket Sheet, entry for 3/06/2012); R. Doc. 95-7 at 1 (Thaddeus Long Docket Sheet, entry for 7/29/2011).

of Louisiana tort law.[29]  The First Amended Complaint named the following defendants: (1) The City of New Orleans, (2) Orleans Parish Criminal District Court (OPCDC), (3) Orleans Parish Sheriff Marlin Gusman, (4) Clerk of Court Arthur Morrell, (5) Judicial Administrator Robert Kazik, and (6) thirteen individual judges of the Orleans Parish Criminal District Court (the Judges).   In their original and First Amendment complaints, plaintiffs primarily alleged claims against, and sought relief from, "Defendants" as a group, without distinguishing between different actors.    The Court previously summarized plaintiffs' claims as follows:

(1)      Defendants' policy of issuing and executing arrest warrants for nonpayment of court costs is unconstitutional under the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment;

(2)      Defendants' policy of requiring a $20,000 "fixed secured money bond" for each Collections Department warrant (issued for nonpayment of court costs) is unconstitutional under the Due

---

[29]      Only Cain, Brown, Reynajia Variste, and Maxwell's claims for equitable relief remain.  In an order addressing an earlier motion to dismiss, the Court found that Reynaud Variste and Thaddeus Long lacked standing to pursue prospective equitable relief and dismissed those claims.  R. Doc. 109 at 19-21.

Process Clause and the Equal Protection Clause of the Fourteenth Amendment;

(3)     Defendants' policy of indefinitely jailing indigent debtors for nonpayment of court costs without a judicial hearing is unconstitutional under the Due Process Clause of the Fourteenth Amendment;

(4)     Defendants' "scheme of money bonds" to fund certain judicial actors is unconstitutional under the Due Process Clause of the Fourteenth Amendment.  To the extent defendants argue this scheme is in compliance with Louisiana Revised Statutes §§ 13:1381.5 and 22:822, governing the percentage of each surety bond that judicial actors receive, those statutes are unconstitutional;

(5)     Defendants' policy of jailing indigent debtors for nonpayment of court costs without any inquiry into their ability to pay is unconstitutional under the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment;

(6)     Defendants' policy of jailing and threatening to imprison criminal defendants for nonpayment of court debts is unconstitutional under the Equal Protection Clause of the

9

Fourteenth Amendment because it imposes unduly harsh and punitive restrictions on debtors whose creditor is the State, as compared to debtors who owe money to private creditors;

(7)     Defendants' conduct constitutes wrongful arrest under Louisiana law; and

(8)     Defendants' conduct constitutes wrongful imprisonment under Louisiana law.

In the First Amended complaint, Plaintiffs' request for relief sought: (1) declaratory judgements that "the Defendants'" actions violate plaintiffs' Fourth and Fourteenth Amendment rights; (2) an order enjoining "the Defendants" from enforcing the purportedly unconstitutional policies; (3) money damages for named plaintiffs; and (4) attorney's fees under §1983.

After a round of motions, all claims against the City of New Orleans, the Orleans Parish Sheriff, and the Orleans Parish Criminal District Court were dismissed, along with claims against the remaining Judicial Defendants for monetary and injunctive relief.[30]   The only remaining claims were for declaratory relief against the Judges and Administrator Kazik.

---

[30]     R. Docs. 119, 123-26.

### A.   Motion to Amend Complaint.

After these dismissals, plaintiffs moved for leave to amend their complaint again.[31] The proposed amendments would return to this case claims against the three previously dismissed defendants: the City, the Sheriff, and OPCDC.  Specifically, (1) the City would be added as a defendant in Count 1, plaintiffs' claim that City police officers execute the illegal warrants issued by the Court; (2) the Sheriff would be added as a defendant in Counts 1, 2, 3, 4, and 7; and (3) OPCDC would be added as a defendant in Counts 1, 2, 4, and 6.  The proposed amendments specify which allegations and claims are asserted against each defendant. The proposed complaint also contains various additions, which are summarized as follows:

(1)      Monique Merren is added as a named plaintiff;

(2)      Additional allegations concerning the organizational structure of OPCDC;

(3)      Additional allegations concerning written grievances sent to jail staff by Plaintiffs Cain and Maxwell during their incarceration;

(4)      Additional allegations concerning how Collections Department employees "seek" and "issue" warrants;

---

[31]      R. Doc. 161.

(5)     Additional allegations concerning disparate treatment between individuals jailed on Collections Department warrants and other arrestees, and the Sheriff's failure to bring fines and fees arrestees to court;

(6)     Additional allegations concerning the City's knowledge of the number of arrests made by City police officers pursuant to Collections Department warrants, and new allegations regarding the City's knowledge of Collections Department practices.

(7)     Additional allegations concerning the City's budgeting process and funding of the Collections Department

Plaintiffs' motion was submitted for decision by Magistrate Judge Wilkinson, and was opposed by the Judicial Defendants, the Sheriff, and the City.[32]   Magistrate Judge Wilkinson issued an order denying plaintiffs' motion.[33]  Because the amendment was submitted well after the deadline for amendments previously set by the Court, Judge Wilkinson found under Fed. R. Civ. P. 16(b)(4) that none of the four factors considered when determining good cause to permit an untimely amendment supported granting plaintiffs' motion.[34]   The Magistrate Judge found that all of plaintiffs' allegations

---

[32]   R. Docs. 163, 173, 174.
[33]   R. Doc. 179
[34]   *Id.*

12

concerning claims and defendants previously dismissed by order of the District Judge were not important under the Rule 16 analysis because they were futile.[35] Plaintiffs now appeal the order denying their motion to amend.[36]

## II.   LEGAL STANDARD

A magistrate judge's ruling on a non-dispositive civil motion may be appealed to the district court. Fed. R. Civ. P. 72(a). When a timely objection is raised, the district judge must review the magistrate judge's ruling and "modify or set aside any part of the order that is clearly erroneous or contrary to law." *Id.* Under this standard, a magistrate judge's ruling "should not be rejected merely because the court would have decided the matter differently." *Arvie v. Tanner*, No. 12-1638, 2012 WL 3597127, at *1 (E.D. La. Aug. 21, 2012) (internal quotations omitted). Instead, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a

---

[35]   *Id.*

[36]   R. Doc. 183. Plaintiffs also suggest that instead of ruling on their motion for review, the Court may simply rule on plaintiffs' motion for extension of deadlines. R. Doc. 156. Resolving either motion requires the Court to apply Rule 16(b). Rather than cut a new path, the Court chooses to instead proceed with the benefit of Magistrate Judge Wilkinson's analysis, and considers plaintiffs' motion for review.

mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).  A legal conclusion, however, is contrary to law "when the magistrate fails to apply or misapplies relevant statutes, case law, or rules of procedure."  *Ambrose-Frazier v. Herzing Inc.*, No. 15-1324, 2016 WL 890406, at *2 (E.D. La. Mar. 9, 2016).  Therefore, the court applies plenary review to the Magistrate Judge's legal conclusions. *See Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 91 (3d Cir. 1992) ("[T]he phrase 'contrary to law' indicates plenary review as to matters of law."); *Bruce v. Hartford*, 21 F. Supp. 3d 590, 594 (E.D. Va. 2014) ("For questions of law there is no practical difference between review under Rule 72(a)'s contrary to law standard and a de novo standard." (internal quotations and modifications omitted)).

The Magistrate Judge found that plaintiffs failed to demonstrate good cause to amend their pleadings.  Rule 16(b) governs amendment of pleadings after a scheduling order deadline has expired.  *S&W Enters. v. SouthTrust Bank of Ala.*, 315 F.3d 533, 536 (5th Cir. 2003).  Under that rule, the Court will modify the scheduling order, and apply Rule 15(a)'s liberal amendment standard, "[o]nly upon the movant's demonstration of good cause." *Id.*; Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent.").  To determine whether plaintiffs have shown good cause, the Court considers: (1) the explanation for the failure to timely move

14

for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice. *S&W Enters.,* 315 F.3d at 536 (quoting *Reliance Ins. v. La. Land & Expl. Co.*, 110 F.3d 253, 257 (5th Cir. 1997)). Once a movant demonstrates good cause to modify the scheduling order, the "more liberal standard of Rule 15(a) appl[ies] to the district court's decision to grant or deny leave." *S&W Enters.,* 315 F.3d at 536; *see also* Fed. R. Civ. P. 15(a).

The Magistrate Judge's order turned in part on his determination that all of plaintiffs' new allegations regarding previously dismissed claims and defendants were not important because they were inadequate to state a claim and therefore futile. The Court performs plenary review of these conclusions of law.

An amendment is futile if it would be dismissed under a Rule 12(b)(6) motion. *Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014). To survive a Rule 12(b)(6) motion to dismiss, plaintiffs must plead enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference

15

that the defendant is liable for the misconduct alleged." *Id.*  A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff.  *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232-33 (5th Cir. 2009); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).  But the Court is not bound to accept as true legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678.

Generally, a court ruling on a motion to dismiss may rely on only the complaint and its proper attachments. *Fin. Acquisition Partners v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006).  A court is permitted, however, to rely on "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  The court may not consider new factual allegations made outside the complaint. *See Fin. Acquisition Partners*, 440 F.3d at 289.

## III.  DISCUSSION

Plaintiffs propose to amend their complaint by adding a named plaintiff, presenting new factual allegations, and reasserting several previously dismissed claims. Specifically, plaintiffs seek to: (1) add Monique Merren as a named plaintiff; (2) reassert claims for non-declaratory relief

16

against Judicial Administrator Kazik based on new allegations purportedly showing that he is not entitled to absolute quasi-judicial immunity; (3) reassert claims against OPCDC based on new allegations purportedly showing that it is not entitled to immunity under the Eleventh Amendment; (4) reassert Count One against the City for its alleged policies of executing invalid arrest warrants and funding the Collections Department; (5) reassert Count One against the Sheriff for his alleged detention of plaintiffs based on invalid arrest warrants; (6) reassert Count Three against the Sheriff for his alleged indefinite detention of plaintiffs; (7) reassert claims for prospective, injunctive relief against the City under Count One, and against the Sheriff under Counts One, Two, Three, and Four; and (8) reassert Count Seven against the Sheriff for his alleged wrongful arrest and imprisonment of plaintiffs under Louisiana tort law. The Magistrate Judge found that each of these proposed amendments was futile and therefore unimportant. The Court considers the proposed amendments in turn.

### A.   Monique Merren

Merren brings claims that essentially mirror those of the existing named plaintiffs. The Court finds no error in the Magistrate Judge's determination that adding a new plaintiff at this stage needlessly complicates the litigation, prejudices defendants and is unimportant to resolving the

claims of existing plaintiffs. Plaintiffs' motion for leave to amend the complaint with allegations concerning Monique Merren is therefore properly denied.

### A.    Judicial Administrator Kazik – quasi-judicial immunity

The Court previously concluded that Kazik is protected by quasi-judicial absolute immunity and dismissed all of plaintiffs' non-declaratory claims against him.[37] Plaintiffs' amendments do nothing to disturb this conclusion. Plaintiffs have attempted to restyle their allegations against Kazik to assert that he *seeks* rather than *issues* warrants.[38] In doing so, plaintiffs hope to tie Kazik to decisions applying qualified immunity to police and probation officers who submit insufficient affidavits to magistrate judges in support of warrants. *See, e.g.*, *Malley v. Briggs*, 475 U.S. 335, 343 (1986); *Galvan v. Garmon*, 710 F.2d 214, 215-16 (5th Cir. 1983). This reinterpretation of Kazik's role—as de facto police officer rather than stand-in judge—is undermined when plaintiffs' allegations are read as a whole. Plaintiffs' principal grievance is that the defendant judges have allegedly outsourced their job. Instead of performing the allegedly required willfulness inquiry, and then ordering arrest only if a defendant's failure to

---

[37]    R. Doc. 119.
[38]    R. Doc. 183-2 at 34-35.

pay is found to be willful, the Judges have purportedly given Kazik and the Collections Department standing orders to issue warrants for any defendant who does not pay.

It is clear that framed in this manner Kazik's alleged role in causing plaintiffs' injuries is fundamentally judicial.  Unlike the officers in *Malley* and *Galvan*, Kazik does not ask for issuance of a warrant based on his own investigation.  Rather, Kazik applies a formula for issuing warrants set by judges who are indisputably authorized to issue warrants on their own.  This conclusion is further supported by the materials attached to plaintiffs' complaint.  Exhibit 1, referenced in the proposed complaint, is a transcript of an evidentiary hearing concerning OPCDC Collections Department practices.[39]   In the hearing, Shannon Sims, Deputy OPCDC Judicial Administrator, explains that the authority to issue Collections Warrants is given to the Collections Department by the judges of OPCDC.[40]   According to Ms. Sims, one section of Court, Section A, issues its own warrants rather than delegating that responsibility to the Collections Department.[41]  As made clear by Ms. Sims' testimony, when Kazik issues warrants he stands in the shoes of a judge under a judge's direction.  When Kazik's authority to issue

---

[39]    R. Doc. 161-5.
[40]    *Id.* at 23.
[41]    *Id.*

19

warrants is rescinded, a judge takes over.   In this way Kazik allegedly "perform[s] *functions* comparable to those of judges," and is entitled to absolute immunity. *Da Vinci Inv., Ltd. P'ship v. Parker*, 622 F. App'x 367, 373 (5th Cir. 2015) (quoting *Beck v. Tex. State Bd. of Dental Exam'rs*, 204 F.3d 629, 634 (5th Cir. 2000)).

Because Plaintiffs' new allegations concerning Kazik do not undermine the Court's earlier finding of quasi-judicial immunity, plaintiffs' attempt to reinstate claims for damages and injunctive relief against Kazik is futile, and good cause to permit this amendment after the Rule 16 deadline is not established.

### B.   OPCDC – Eleventh Amendment immunity

Plaintiffs offer a handful of amendments which purportedly undermine the Court's earlier ruling that plaintiffs' claims against OPCDC are barred by the Eleventh Amendment.[42]  The Court finds that these minor tweaks cannot overcome the clear weight of precedent holding that OPCDC and similar entities are covered by the Eleventh Amendment.[43]

Even if OPCDC's immunity were impacted by the proposed amendments, plaintiffs' claims against OPCDC must fail because it is not a

---

[42]   R. Doc. 183-2 at 8, 28-29.
[43]   *See* R. Doc. 123.

"person" subject to suit under section 1983. *See Dunn v. Louisiana*, No. 10-4519, 2011 WL 445684, at \*1 (E.D. La. Feb. 3, 2011) (adopting Report and Recommendation concluding that Section K of the Orleans Parish Criminal District Court is not a section 1983 person); *see also Mumford v. Basinski*, 105 F.3d 264, 267 (6th Cir. 1997) ("A state court is not a 'person' for purposes of 42 U.S.C. § 1983 and hence is not subject to lawsuit under that statute."). The Court therefore finds that plaintiffs' proposed amendments regarding OPCDC are futile.

### C.   The City – Count One

In Count One, plaintiffs allege that they have been arrested by City police officers, who execute the OPCDC warrants that were issued absent probable cause in violation of the Due Process Clause of the Fourteenth Amendment.  The Court has already found that plaintiffs' allegations of arrest and detention pursuant to OPCDC collections department warrants issued absent probable cause adequately allege a constitutional violation.[44] Because the City is a municipal entity, plaintiffs' section 1983 claims against the City must satisfy the Supreme Court's test first articulated in *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658 (1978), before the City may be held liable.

---

[44]   R. Doc. 136 at 17-19.

Plaintiffs point to two alleged city policies that are purportedly responsible for plaintiffs' illegal arrests: (1) that "[C]ity officials allow [the City's police] officers to execute warrants issued by the Collections [Department employees]" despite the City's knowledge that the warrants are invalid; and (2) that "City officials fund the salaries of the Collection [Department employees]," despite knowing of the employees' allegedly invalid procedures for issuing warrants.[45]   The Court considers these contentions in turn under the relevant *Monell* standards.

### i.   Permitting Arrests on Invalid Warrants

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

In section 1983 suits, municipalities cannot be held liable under a theory of respondeat superior.  *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002).  Instead, the Court must apply the *Monell* test, which ensures

---

[45]   R. Doc. 183-2 at 57.

that cities are held responsible *only* for "their *own* illegal acts*." Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in original).  To state a claim under *Monell*, plaintiffs must allege the existence of (1) an official policy or custom, of which (2) a policymaker is charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom.  *Valle v. City of Houston*, 613 F.3d 536, 541-42 (5th Cir. 2010).

Thus, a plaintiff seeking to impose liability on a municipality under section 1983 must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403-04 (1997).   A policy need not itself be unconstitutional to satisfy *Monell. City of Canton v. Harris*, 489 U.S. 378, 387 (1989) ("[W]e reject petitioner's contention that only unconstitutional policies are actionable under the statute.").  The Fifth Circuit has identified three ways in which plaintiffs may meet their burden to show a policy or custom.  *See Burge v. Par. of St. Tammany*, 187 F.3d 452, 471 (5th Cir. 1999).  The first two involve direct action by a "policymaker," either in the form of generally applicable policies or specific, directed actions.  *Id.*  The third involves a failure to act by policymakers when "the need to take some action to control [its agents] 'is so obvious, and the inadequacy [of existing practice] so likely to result in

23

a violation of constitutional rights, that the policymaker . . . can reasonably be said to be deliberately indifferent to the need.'"  *Id.* (quoting *Canton*, 489 U.S. at 390).  Since plaintiffs do not allege direct action by City policymakers, plaintiffs' allegations must satisfy the third method of showing a policy or custom.

As noted, in addition to a policy or custom, plaintiffs must allege that the City's policy or custom is the moving force behind the constitutional violation.  The "moving force" component of *Monell* liability is critical. *Canton*, 489 U.S. at 389 (holding that municipal liability can be found "only where [city's] policies are the moving force [behind] the constitutional violation" (internal quotations omitted)).  The "moving force" element requires plaintiff to show "that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged."  *Bryan Cty.*, 520 U.S. at 406 (emphasis in original).  "'[M]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." *Canton*, 489 U.S. at 389 (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1986)).

Because plaintiffs do not allege that the City—as opposed to its police officers—directly inflicted their injuries, the "moving force" analysis requires

that "rigorous standards of culpability and causation . . . be applied to ensure that the municipality is not held liable solely for the actions of its employee[s]." *Bryan Cty.*, 520 U.S. at 405; *see also Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 280 (5th Cir. 2015) (holding that moving force inquiry requires showing of causation and culpability)  As to causation, "a plaintiff must show a 'direct causal connection . . . between the policy and the alleged constitutional deprivation.'"  *Mason*, 806 F.3d at 280 (quoting *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992)).   "The "moving force" inquiry imposes a causation standard higher than "but for" causation."  *Id.*

As to culpability, the applicable standard in this context is deliberate indifference, or a showing that the City "promulgated the policy with 'deliberate indifference' to the known or obvious consequences that a constitutional violation would result."  *Id.* (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579).  The conduct of the City employees at issue consists of police officers' checking a warrants database maintained by the Sheriff's office, determining that a warrant for unpaid fines and fees is outstanding against a person the officers have encountered for other reasons, and arresting persons shown to have such outstanding warrants.[46]   The

---

[46]    R. Doc. 161-4 at 123-25.

complaint does not allege that the police officers are aware of any constitutional defect in the warrants, and plaintiffs appear to accept that the warrants are facially valid. The custom or practice of executing facially valid warrants is not unconstitutional. Instead, plaintiffs allege that the Mayor made the City liable for the unconstitutional system put in place by the judges of the Criminal District Court, and without the knowing complicity of the police, by purportedly obtaining information about the practices of OPCDC and not stopping the police from executing the warrants. Plaintiffs do not specifically allege what actions the Mayor failed to take. The allegations could be read to mean that the Mayor failed to issue an immediate order to NOPD to refuse to execute all OPCDC issued warrants for outstanding fines and fees. Alternatively, since the City controls the behavior of its police by training them to respond to the situations they encounter in the field, plaintiffs' allegations could be construed as a failure to train. Under either construction of plaintiffs' claims, the standard of culpability is deliberate indifference. *See Bryan Cty.*, 520 U.S. at 410. (applying deliberate indifference standard when plaintiffs alleged that the city did not directly inflict their injury but instead caused employees to do so); *Mason*, 806 F.3d at 280 (holding that if policy is facially lawful, plaintiffs must show deliberate indifference); *see also Thompson*, 563 U.S. at 61 ("[A] municipality's failure

to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" (quoting *Canton*, 489 U.S. at 388)).

"'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Thompson*, 563 U.S. at 61 (quoting *Bryan Cty.*, 520 U.S. at 410). "Heightened negligence is insufficient to satisfy this standard." *Mason*, 806 F.3d at 280. But, "inaction in light of notice that the city's policy or practice will cause constitutional violations is the functional equivalent of a decision by the city to violate the constitution." *Thompson*, 563 U.S. at 61-62. "Policymakers' 'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their actions—the 'deliberate indifference'—necessary to trigger municipal liability.'" *Id.* at 62 (quoting *Bryan Cty.*, 520 U.S. at 407). In the failure to train context, "without notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

Applying these standards for *Monell* liability to plaintiffs' allegations, the Court finds that the plaintiffs have failed to plausibly allege that the City's

27

failure to prevent its officers from executing Collections Department warrants was a "moving force" behind plaintiffs' injury or that any City policy that its police officers execute facially valid warrants was promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result.  The need for an immediate order to stop executing all warrants for unpaid fines and fees or for police training to look behind all such warrants is not "so obvious," based upon what the City allegedly knew about OPCDC's collection practices, that City policymakers could reasonably be said to have been deliberately indifferent.

In support of their contention that the City was aware of the alleged infirmity of the Collections Department warrants, plaintiffs rely on quotes— with little context—purportedly drawn from memos in the Mayor's office.[47] The memos allegedly date from 2015, years after OPCDC allegedly started the practice of Collections Department warrants, and within months of the filing of this lawsuit.  At most, the allegations in the proposed amendment indicate that the City's policymakers *may* have had some unclear, indefinite information about the alleged collections practices at OPCDC, practices attributed to judges who are trained in the law and who would not reasonably be presumed to order citizens locked up without probable cause.   The

---

[47]     R. Doc. 183-2 at 47.

"internal memos" allegedly dating from April or May of 2015 quoted in Paragraph 155 of the proposed amendment are unattributed to any source or recipient.  Nor do plaintiffs allege who discussed the reports or whether the Mayor, the alleged final policymaker, was aware of the reports.  The quoted memos employ hedge words to describe the unidentified author's understanding of the alleged OPCDC practices, like "seem to" and leave out words.  The unidentified authors state the judges "seem to be delegating a number of their powers to the collections departments," which issued warrants "without . . . the constitutional safeguard" of a "judicial determination of probable cause."[48]  This "seem to" language suggests uncertainty by the unnamed author.  Further, there is no mention of the role of City police in the process and no suggestion that the City or its police, instead of the OPCDC, was responsible for it.

Further, plaintiffs allege that these internal memos "advised the Mayor's office" of the Collection Department's warrant practices "in April or May of 2015."[49]  Only one plaintiff, Thaddeus Long, alleges that he was arrested after that period.  The remaining plaintiffs were either arrested

---

[48]   *Id.*

[49]   *Id.* at 46.

before or during the "April or May" period, rendering the relevancy of the memos suspect at best.

None of the other material relied on by plaintiffs is any more indicative that a City policymaker possessed sufficient knowledge to make plaintiffs' injuries a "known or obvious" consequence of the City's failure to train or direct police. Plaintiffs rely on a report by an advocacy group, but supply no facts indicating that any policymaker was ever aware of it, much less that the memo warranted immediate action by the City.[50] They also point to an unidentified advocacy group memo in the Mayor's office file from 2015, which discusses practices by the judges at OPCDC, but does not mention warrant practices, or the New Orleans police, and recommends that "the Court should make a systemic indigency determination before imposing fines and fees."[51] Such a court determination *before* the imposition of fines is undoubtedly good policy, but it is not required by the Constitution. *See United States v. Voda*, 994 F.2d 149, 154 n.13 (5th Cir. 1993) (citing *Williams v. Illinois*, 399 U.S. 235, 243 (1970)), and *Bearden v. Georgia*, 461 U.S. 660, 663 (1983) (holding indigency no bar to imposing fine but limiting the penalty courts can impose for nonpayment because of inability to pay)). This

---

[50]     *Id.* at 46-47.
[51]     *Id.* at 46.

memo, for which no recipient is identified, is not even an accurate source of information on the constitutional duty of OPCDC, much less a discussion of the constitutional infirmity of police conduct.  Receipt of it in the Mayor's office is not a basis for a plausible inference of deliberate indifference.

The upshot of plaintiffs allegations is that the vague, unsourced, not-always-accurate information they describe, some of which they do not even allege anyone in the Mayor's office had possession of, was sufficient to require the Mayor either to immediately order city police officers to refuse to execute any facially valid, outstanding warrants for unpaid fines and fees issued under the authority of a duly constituted court, or to provide some unspecified training for looking behind facially valid warrants.  In evaluating these allegations, the Court is mindful of the Supreme Court's admonition in *Iqbal*, that determining whether a complaint states a plausible claim for relief will "be a context-specific task that requires the reviewing court to draw on judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  And, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint fails to show "that the pleader is entitled to relief." *Id*.  These considerations require the Court to find plaintiffs' allegation of City liability implausible.  Plaintiffs' allegations are insufficient to alter the essential import of their allegations in the remainder

31

of Count 1, that the moving force behind the alleged constitutional violation is the Orleans Parish Criminal District Court and its judges. The court is a political entity separate and distinct from the City. It is not the Municipal Court of the City of New Orleans. It is an agency of the State, not the City. Its judges are its policymakers, not the City Council, the City's mayor, the City's police chief, or any other City official. The allegations in the proposed amended complaint are insufficient to establish that the City had knowledge of the alleged practices of OPCDC that made it so obvious to the City that constitutional violations would occur that the City was deliberately indifferent to the need to order or train its police officers to alter their practice of executing facially valid warrants. This is especially true in this context where Fifth Circuit law holds that "when law enforcement officers hold[] a warrant for arrest identifying the person named in the warrant, their duty [is] to arrest him." *Perry v. Jones*, 506 F.2d 778, 780 (5th Cir. 1975). And, this conclusion is buttressed by the fact that plaintiffs' own exhibit indicates that at least one OPCDC judge issues her own warrants, and plaintiffs allege others bore the purported signatures of judges.[52]   It would be wholly unrealistic and would stretch the boundaries of *Monell* liability beyond recognition to hold that, based on plaintiffs' allegations, the City

---

[52]   *See* R. Doc. 161-5 at 23.

32

should have instructed its police officers to refuse to execute facially valid arrest warrants or to go behind them and make their own determination as to whether probable cause existed to support them.

Plaintiffs have failed plausibly to allege any failure to act by the City with respect to its police officers' execution of the challenged warrants that was a "moving force" behind their allegedly unconstitutional arrests. Plaintiffs therefore cannot state a claim relating to a City policy, and the proposed amendments regarding arrests performed by the City are futile.

### i.   The City's funding of the Collections Department.

Plaintiffs assert as a second ground for the City's *Monell* liability the City's alleged policy of funding the Collections Department.  To evaluate whether the City may be held liable for this policy, the Court must again apply the *Monell* factors to determine whether the complaint plausibly alleges that the City's own policy caused plaintiffs' injuries.

This allegation fails at the causation prong.  As noted above, for a policy to be a "moving force" under *Monell* there must be a "direct causal link" between City policy and plaintiffs' injury.  *Bryan Cty.*, 520 U.S. at 400.  The Fifth Circuit has made clear that "[t]he 'moving force' inquiry imposes a causation standard higher than 'but for' causation."  *Mason*, 806 F.3d at 280; *see also Fraire*, 957 F.2d at 1281 ("[A] direct causal connection must exist

between the policy and the alleged constitutional deprivation. This connection must be more than a mere 'but for' coupling between cause and effect."). "But for" causation is, in other words, necessary but not sufficient for *Monell* liability.

Here, plaintiffs cannot meet even the lower "but for" causation standard. "But for" causation exists when "the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *United States v. Ramos-Delgado*, 763 F.3d 398, 402 (5th Cir. 2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2525 (2013)). Plaintiffs allege that the City provides OPCDC with millions of dollars in funding each year.[53] Plaintiffs allege that OPCDC's budget request for the fiscal year 2012 indicates OPCDC's Collection Department employees are "fully funded" by the City.[54] Additionally, plaintiffs allege that in 2015 the City provided an additional $92,831 in funding, with the understanding that this money would be used to hire two new Collections Department employees.[55] The City provides these funds, according to plaintiffs, despite having no legal obligation to fund the Collections Department.[56]

---

[53]     R. Doc. 183-2 at 41.
[54]     *Id.*
[55]     *Id.* at 47-48.
[56]     *Id.* at 41.

Plaintiffs admit, however, that the City is not OPCDC's only benefactor. The proposed complaint states that OPCDC's "annual budget is composed of funds from a variety of sources, including the State of Louisiana, grants, monies generated via fines and fees, and contributions from the City of New Orleans to the OPCDC general fund."[57]  The money generated for the Court by fines and fees is allegedly placed in the Judicial Expense Fund, which is "used in [the Judges'] discretion."[58]  OPCDC allegedly collects "millions of dollars in revenues" for the Fund, and uses this money to "fund [the Court's] basic operations" including "employee salaries."[59]

The thrust of these allegations is that the Collections Department generates millions of dollars in revenue for OPCDC, and that OPCDC is free to spend that money as it pleases.  Assuming, as the Court must, that this is true, it is simply not plausible that–even if the City cut all funding to the OPCDC—the court would shutter the Collections Department or restrict its warrant practices.  On the contrary, every dollar not contributed by the City increases the budgetary pressure on OPCDC.  Therefore, a reduction in City funding would, if anything, cause an *increase* in the collection activities that plaintiffs challenge.  Plaintiffs have therefore failed to plead a plausible "but

---

[57]     *Id.* at 40.
[58]     *Id.* at 28-29.
[59]     *Id.* at 30.

for" connection between their alleged injuries and the City's policy of funding the Collections Department. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) (rejecting notion that a city's "'policy' of establishing a police force" could justify § 1983 liability because *Monell* requires "an affirmative link between the policy and the particular constitutional violation alleged").

Finally, in the proposed complaint, plaintiffs concede that "OPCDC retains ultimate control over the daily activities of its employees," but nonetheless maintain that "nothing prevents the City from exercising its authority to understand and oversee the activities of a program it is fully or largely funding."[60]   This purported causal link also stretches "but for" causation, and is plainly insufficient to meet *Monell*'s rigorous "moving force" standard.   Plaintiffs cite no authority for finding causation based on a failure to exercise the City's implicit power of the purse, and this Court has rejected similar theories in the past. *See Broussard,* 2001 WL 258055, at *2 (dismissing city from suit regarding jail policy where city funded and maintained jail, but sheriff operated facility); *Jones v. St. Tammany Par. Jail*, 4 F. Supp. 2d 606, 613 (E.D. La. 1998) (dismissing parish from suit regarding jail policy where "[p]arish's responsibility to the jail [wa]s limited to the funding of the jail"); *see also Deaton v. Montgomery Cty.,* 989 F.2d

---

[60]   R. Doc. 183-2 at 42.

885, 887 (6th Cir. 1993) (County policy was not "moving force" behind strip search policy at jail where "County erected the facility and maintained the physical plant and the City managed and operated the facility").  Because plaintiffs have failed to plausibly allege the required causal link between their injuries and the City's policy of funding the Collections Department, plaintiffs' proposed amendments regarding this policy are futile.

### D.    Sheriff Gusman – Count One

In Count One Plaintiffs challenge the Sheriff's authority to jail them at all on Collections Department warrants.[61]  Plaintiffs allege that the Sheriff is a final policymaker with respect to management of the jail, and argue that the Sheriff is "aware of his deputies' custom of booking and detaining individuals arrested on [Collections Department] warrants."[62]

Count One is brought against the Sheriff in his official capacity.  As the Fifth Circuit has noted, "[o]fficial capacity suits generally represent another way of pleading an action against an entity of which an officer is an agent." *Burge*, 187 F.3d at 466.  When a § 1983 claim is asserted against the Sheriff in this way "proper analysis requires us to separate two different issues . . . (1) whether plaintiff's harm was caused by a constitutional violation, and (2)

---

[61]    *Id.* at 4, 10-20.
[62]    *Id.* at 12.

if so, whether the [Sheriff] is responsible for that violation." *Collins v. City of Harker Heights,* 503 U.S. 115, 120 (1992); *see also Bush v. Viterna*, 795 F.2d 1203, 1209 (5th Cir. 1986) ("Whenever a cause of action is alleged under § 1983, the first question must be whether a federally secured right has been affected.").

As noted, the Court has previously determined that plaintiffs' allegations of arrests and detention under invalid warrants plausibly state a constitutional violation.[63]  But the Sheriff cannot be liable in his official capacity for these detentions unless plaintiffs can satisfy the liability standards of *Monell.  See Burge*, 187 F. 3d at 468; *Nagle v. Gusman*, 61 F. Supp. 3d 609, 630 (E.D. La. 2014).  The Sheriff has no *Monell* liability unless he acted or failed to act with deliberate indifference to the resulting constitutional injury.  *Mason*, 806 F.3d at 280; *see also* discussion *supra* Section III. D. i.  To show deliberate indifference, plaintiffs must plausibly allege that the Sheriff was "on actual or constructive notice" of the invalidity of the warrants, and therefore that jailing plaintiffs pursuant to these warrants was "substantially certain to result in the violation of their constitutional rights." *Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 756 (5th Cir. 1993) (quoting *Canton*, 489 U.S. at 396 (O'Connor, J.,

---

[63]     R. Doc. 136 at 17-19.

concurring in part and dissenting in part)).  The Court finds that Plaintiffs'
allegations concerning the Sheriff's knowledge do not include sufficient facts
to "nudge[] their claims across the line from conceivable to plausible."
*Twombly*, 550 U.S. at 570.

Given the absence of any allegations concerning how the Sheriff was
directly made aware of Collections Department policies, plaintiffs attempt to
rely on alleged media reports concerning poor people in New Orleans facing
jail for failure to pay fines and fees.[64]  Even if the Court were to find that
publication of these reports was sufficient to provide the Sheriff with "actual
or constructive notice" of their contents, plaintiffs' allegations would remain
defective. There is no indication from plaintiffs' complaint that these media
reports discuss the Collections Department's warrant practices or suggest
that OPCDC issues warrants without the required finding of probable
cause.[65]  Accordingly, plaintiffs have not plausibly alleged that even if the
Sheriff reviewed these publications, he could reasonably be expected to
conclude from reading them that anyone was falsely imprisoned in OPP.  The
Court therefore finds that plaintiffs have failed to plausibly allege that the
Sheriff's alleged policy of detaining individuals pursuant to Collections

---

[64]   R. Doc. 183-2 at 45-46.
[65]   *Id.*

Department warrants occurred with deliberate indifference to a resulting constitutional injury.

Plaintiffs also argue that the Sheriff was made aware of the infirmity of the warrants by virtue of being served with the complaint in this case, and that he has nonetheless continued to detain individuals pursuant to Collections Department warrants. Prior lawsuits may sometimes be relevant in evaluating knowledge of *Monell* defendants. *See, e.g.*, *Deaton v. Montgomery Cty.*, 989 F.2d 885, 890 (6th Cir. 1993). But, in this instance the plaintiffs filed their lawsuit *after* they suffered injury, so that information acquired after initiation of this suit is irrelevant to determining the Sheriff's knowledge at the time of the alleged deprivations.

Because plaintiffs have failed to plausibly allege that the Sheriff was aware of the Collections Department's alleged warrant practices, Count One fails to state a claim as to the Sheriff and the proposed amendments related to this count are futile.[66]

### E.   Sheriff Gusman – Count Three

Count Three focuses on the Sheriff's conduct after plaintiffs were arrested by New Orleans police officers and brought to Orleans Parish

---

[66]   *See infra*, Section H. i, for a discussion of plaintiffs' claims for injunctive relief under Count One.

Prison.  Plaintiffs challenge the Sheriff's alleged "indefinite" detention of them without a court hearing.  The Sheriff did not issue or execute the warrants at issue, but instead detained plaintiffs on the basis of facially valid arrest warrants.  The Court has already found that plaintiffs failed to plausibly allege that the Sheriff knew or should have known that the capias warrants were invalid.

Plaintiffs sue Sheriff Gusman in his official capacity in Count Three.  As in Count One, the Court must ask (1) whether plaintiffs have alleged a constitutional violation, and (2) whether the Sheriff is responsible for it. *Collins*, 503 U.S. at 120.

In Count Three, plaintiffs allege that the Sheriff violated their rights under the Due Process Clause of the Fourteenth Amendment by jailing them "indefinitely" without a hearing.  Specifically, plaintiffs allege that, after arriving at OPP, arrestees are informed that to secure their release they must either: (1) pay the $20,000 bond affixed to the Collections Department warrant, or (2) pay a sum of money to the Collections Department and thereby secure an order of release.[67]  According to the proposed amended complaint, jail staff do not bring such arrestees before a magistrate for an initial appearance, the Sheriff does not have written procedures for notifying

---

[67]   R. Doc. 183-2 at 36.

OPCDC of their arrests, and the Sheriff does not "consistently" inform OPCDC of the arrest of persons on fines and fees warrants.[68]

Plaintiffs further allege that in response to plaintiffs' discovery requests in this case, the Sheriff stated that his duty with respect to individuals held on Collections Department warrants is to maintain custody until his staff receives an order directing that the inmate be brought to OPCDC or released.[69]   Plaintiffs also plead that, according to OPCDC, OPCDC has had a policy for five years (in writing since June of 2016) of placing arrestees for unpaid fines and fees on the Court's docket within 48 hours of arrest.[70]

As a result of the Sheriff's policies, plaintiffs allege that they respectively spent seven,[71] fifteen,[72] three,[73] seven,[74] six,[75] and twelve[76] days in jail before being either brought before a judge or released.  Plaintiffs describe their eventual release or hearing as dependent on the help of a third party who either paid the Collections Department or lobbied OPCDC to

---

[68]   *Id.* at 36.
[69]   *Id.* at 37-38.
[70]   *Id.* at 38.
[71]   *Id.* at 12.
[72]   *Id.* at 13-14.
[73]   *Id.* at 16.
[74]   *Id.* at 18.
[75]   *Id.* at 19.
[76]   *Id.* at 21.

secure a place on the docket.[77]  Finally, plaintiffs also allege that five other unnamed individuals arrested on Collections Department warrants were detained between one week and 57 days without a hearing, and that a sixth arrestee was told he would not be brought to court for at least 12 days unless he paid $50 to the Collections Department.[78]

The Court finds that the alleged detention of plaintiffs for the periods described under facially valid warrants fails to state an unconstitutional denial of due process.  This conclusion is based on the following authority. In *Baker v. McCollum*, 443 U.S. 137, 141 (1979), police arrested McCollum pursuant to a facially valid warrant and detained him for three days.  After McCollum complained repeatedly, the police released him upon discovering that although the warrant bore McCollum's name, he was not the wanted man.  *Id.* McCollum sued the police under 42 U.S.C. § 1983, alleging that his three-day detention violated his Fourteenth Amendment protection against deprivation of liberty without due process.  *Id.* The Court held that whatever claim McCollum might have under state tort law, he stated no claim under the Fourteenth Amendment.  *Id.* at 146-47.  The Court held that a sheriff executing a valid arrest warrant is not required by the Constitution to

---

[77]      *Id.* at 12-21.
[78]      *Id.* at 38-39.

investigate every claim of innocence.   *Id.* at 146.   "Nor is the official maintaining custody of the person named in the warrant required by the Constitution to perform an error-free investigation of such a claim."   *Id.*  The Court acknowledged that McCollum's detention for three days under a facially valid warrant, albeit one that named the wrong person, "indeed deprived him of his liberty for a period of days."   *Id.* at 144.   But, because the detention was pursuant to a facially valid warrant, McCollum's detention did not give rise to a Fourteenth Amendment claim.   *Id.* The Court noted that one in *McCollum*'s position could not be held "indefinitely" in face of repeated claims of innocence because he enjoyed a right to a speedy trial.   *Id.* In *dicta*, the Court assumed for the sake of argument that "depending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will, after the lapse of a certain amount of time, depriv[e] the accused of liberty . . . without due process of law."   *Id.* But, the Court said it was "quite certain that a detention of three days" could not amount to such a deprivation.   *Id.* at 145.

In *Harris v. Payne*, 254 Fed. Appx. 410, 421 (5th Cir. 2007), the Fifth Circuit, after considering *Baker v. McCollum,* found no due process violation when the Sheriff detained the wrong person for four months on a facially

valid capias warrant, despite the arrestee's protests of innocence and the failure by the Sheriff and his deputies to access available information that would have exonerated him.  Further, the Fifth Circuit has consistently held, without in-depth discussion or analysis, that a requirement, either under state or federal rules, to be promptly taken to court following an arrest within any particular time period "has not been given constitutional status." *Anderson v. Nosser*, 438 F.2d 183, 196 (5th Cir. 1971) (quoting *Kulyk v. United States*, 414 F.2d 139, 141 (5th Cir. 1969)).   The Fifth Circuit has rejected constitutional challenges to even extended periods of detention without an initial court appearance.  *See Rheaume v. Tex. Dep't of Pub. Safety*, 666 F.2d 925, 929 (5th Cir. 1982) (reiterating the Fifth Circuit's "holding consistently" that a claim of failure to bring an arrestee before a judge within time requirements set by state law was *not* "of constitutional dimension under the due process clause"); *Stephenson v. Gaskins*, 539 F.2d 1066, 1067-68 (5th Cir. 1976) (thirty-eight day "failure to take an arrestee before a magistrate [judge] is not a federal constitutional issue"); *Perry v. Jones*, 506 F.2d 778, 780 (5th Cir. 1975) (arrestee detained for six days without being "promptly taken before a magistrate or given the opportunity to post bail" made a complaint that "has not been given constitutional status"); *Scarbrough v. Dutton*, 393 F.2d 6, 7 (5th Cir. 1968) (seven month

detention without preliminary hearing "does not amount to a violation of constitutional rights").

Less than a year ago, the Eleventh Circuit reiterated the Fifth Circuit's long-standing conclusion that no violation of constitutional rights occurs for detentions like those alleged in the Count Three of plaintiffs' proposed amended complaint. In *Taylor v. Taylor*, 649 Fed. App'x 737, 748 (11th Cir. 2016), plaintiff asserted a Section 1983 claim against a sheriff and his deputy based on allegations that "they failed to present her to a judge immediately after her arrest." *Id.* The delay resulted in her detention for nine days, at which time a judge set a bond, and she was subsequently released. *Id.* at 741. The Eleventh Circuit stated:

> [W]e note that our predecessor court, by which we are bound, has 'held that even though [Georgia state law] required that an officer arresting under a warrant bring the person arrested before a committing officer within 72 hours after arrest, failure to take an arrestee before a magistrate [judge] is *not* a federal constitutional issue. . . .' [Plaintiff] has *not* shown that her due-process rights were violated or that those rights were clearly established."

*Id.* at 748 (emphasis added)(citations omitted).

The Court finds that the decisions of the Fifth Circuit, which bind this Court, dictate the outcome of plaintiffs' claims regarding the length of their detentions without being afforded a hearing, and require a finding that Count Three fails to allege a constitutional violation. Hence, plaintiffs'

allegations fail to satisfy *Monell* and are futile.   Nevertheless, plaintiffs' allegations about the Sheriff's systematic incompetence in handling their detentions, if true, are indeed troubling.   The Court also notes that other circuits have held that allegations similar to plaintiffs' give rise to actionable due process violations.   *See Oviatt Pearce*, 954 F. 2d 1470, 1473-77 (9th Cir. 1992); *Hayes v. Faulkner County,* 388 F.3d 669, 674 (8th Cir. 2004).   But because the Fifth Circuit's precedent is binding on this Court, the Court must find that plaintiffs claim in Count Three is futile.   This result does not foreclose plaintiffs from stating a plausible tort claim under State law for false imprisonment.   *See* discussion of Count Seven *infra,* Section III. H.

## F.     Injunctive relief under Counts One, Two, and Four.

### i.     Counts One and Two

Plaintiffs maintain that even if the Court finds the *Monell* requirements unfulfilled, it may nevertheless order prospective, injunctive relief against the Sheriff and City. This power, according to plaintiffs, derives from the Court's authority to enjoin "individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional

act, violating the Federal Constitution." *Ex parte Young*, 209 U.S. 123, 155-56 (1908).

The Supreme Court, however, recently held that "claims for prospective relief, like claims for money damages, fall within the scope of the 'policy or custom' requirement." *Los Angeles County, v. Humphries*, 562 U.S. 29, 36-37 (2010). In *Humphries*, plaintiff sued the county, rather than a county official in his or her official capacity. *Id.* Plaintiffs argue that *Humphries* can be distinguished. They argue that *Monell* always applies to municipalities sued in their own name, regardless of the type of relief sought, because municipalities cannot act, except through the types of policies and customs discussed in *Monell*. According to plaintiffs, however, claims against municipal officials in their official capacities for prospective, injunctive relief need not check the *Monell* boxes because a county official can act on his or her own to commit a constitutional violation.

The problem with plaintiffs' argument is twofold. First, this argument does not apply to plaintiffs' claim against the City, which is brought against an entity. Second, as to plaintiffs' claims against the Sheriff, the Supreme Court has repeatedly stated that a suit against a government official in his official capacity "is not a suit against the official but rather is a suit against the official's office." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71

48

(1989); *see also Monell*, 436 U.S. at 690 n.55 ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.").  The equivalence between official-capacity and entity suits is further supported by the Supreme Court's statement that "[t]here is no longer a need to bring official-capacity actions against local government officials, for under *Monell . . .* local government units can be sued directly for damages and injunctive or declaratory relief." *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985).  Accordingly, since an official capacity suit is simply a suit against an entity by another name, *Humphries* applies whether the plaintiff brings an official capacity suit against a municipal official or sues the municipality itself.

This conclusion is, however, somewhat in tension with the *Ex parte Young* line of cases. Courts have long recognized that under *Young* "[a] suit is not 'against' a state . . . when it seeks prospective, injunctive relief from a state actor . . . based on an alleged ongoing violation of the federal constitution." *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015) (quoting *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013)).  Rather, "a state official attempting to enforce an unconstitutional law 'is stripped of his official clothing and becomes a private person subject to suit [and s]uits by private citizens against state officers in their official capacit[ies] are not,

therefore, categorically barred.'" *Id.* (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 125 (5th Cir. 2010). The First Circuit has recognized and discussed, but not resolved, the competing pull of these doctrines as applied to municipal officials, sued in their official capacity, for prospective, injunctive relief. *Dirrane v. Brookline Police Dep't*, 315 F.3d 65, 72 (1st Cir. 2002).

Faced with this uncertainty, the Court holds that it may not order prospective injunctive relief against the Sheriff absent a finding that the *Monell* requirements are satisfied. Contrary to plaintiffs' argument, this ruling does not upend our constitutional order. The Court entertains no doubts about its authority and obligation to enjoin constitutional violations. In applying *Monell* to plaintiffs' claim for injunctive relief, the Court merely recognizes that such relief against a municipal actor is appropriate only when the municipality's own actions cause the complained-of injury. Absent this causal link, the Court's unquestioned authority to enjoin ongoing constitutional violations would be misapplied.

Because the Court has already found that plaintiffs failed to meet the *Monell* requirements as to Count One against both the Sheriff and City, plaintiffs cannot state a claim against these parties for injunctive relief under this Count. Plaintiffs make no argument that the Sheriff is a moving force behind the injuries alleged in Count Two, and that claim therefore fails for

50

the same reason.   Accordingly, the Court finds that the proposed amendments as to these two counts are futile.

### ii.   Count Four

Under Count Four, plaintiffs challenge the constitutionality of sections 22:822 and 13:1381.5 of the Louisiana Revised Statutes.  Those provisions direct the Sheriff to collect "a fee of three dollars for each one hundred dollars worth of liability on . . . bail bond[s] being presented for the release of a person on bail."  La. Rev. Stat. § 22:822 (2016).  The Sheriff is further required to divide the collected funds according to a set formula and distribute them among his own office, OPCDC, the Judicial Expense Fund, the district attorney, and the public defender.  La. Rev. Stat. § 13:1381.5. Plaintiffs allege that this arrangement robbed them of their Fourteenth Amendment right to a neutral forum by giving the judge charged with setting their bond—along with other actors in the criminal justice system—a financial stake in that bond.

Before evaluating plaintiffs' claims against the Sheriff, the Court must determine whether the Sheriff, in enforcing section 22:822, acts as a state or municipal official.  In *Echols v. Parker*, 909 F.2d 795, 801 (5th Cir. 1990), the Fifth Circuit held:

> [T]he state cannot dissociate itself from actions taken under its
> laws by labeling those it commands to act as local officials. A

> county official pursues his duties as a state agent when he is
> enforcing state law or policy.  He acts as a county agent when he
> is enforcing county law or policy.  It may be possible for the
> officer to wear both state and county hats at the same time . . .
> but when a state statute directs the actions of an official, as here,
> the officer, be he state or local, is acting as a state official.

Accordingly, because plaintiffs allege that the Sheriff distributes bond fees as directed by a state statute, he acts as a state official when he does so.  *See also McMillian v. Monroe County,* 520 U.S. 781, 783 (1997) (Sheriff was, for purposes of the issue before the Court, a state policymaker, not a county policymaker); *Bostic v. Schaefer*, 760 F.3d 352, 371 n.3 (4th Cir. 2014) (Clerk for the Circuit Court for the City of Norfolk was "proper defendant" to challenge state law).

However, as a state actor sued in his official capacity, the Sheriff is entitled to the protection of the Eleventh Amendment.  *See Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 n.3 (5th Cir. 1996) ("Suits against state officials in their official capacity are considered to be suits against the individual office, and so are generally barred as suits against the state itself."). "The Eleventh Amendment bars citizens of a state from suing their own state or another state in federal court unless the state has waived its sovereign immunity or Congress has expressly abrogated it." *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013) (internal citations omitted).  Section 1983 does not abrogate Eleventh Amendment immunity, *Khan v. S. Univ. &*

52

*Agric. & Mech. Coll. Bd. of Supervisors*, No. 03-30169, 2005 WL 1994301, at *3 (5th Cir. Aug. 19, 2005), and Louisiana has explicitly asserted its sovereign immunity by statute La. Rev. Stat. § 13:5106(A) (2016) ("No suit against the state or a state agency or political subdivision shall be instituted in any court other than a Louisiana state court.").

Because the Sheriff's actions as a state official are protected by Eleventh Amendment immunity—and that immunity is undermined by neither abrogation nor consent—plaintiffs' claims under Count Four may proceed only if they fall under the limited exception articulated in *Ex parte Young*, 209 U.S. 123 (1908). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (internal quotations and modifications omitted). Because this claim is brought against the Sheriff as a state actor, and not a municipality, the Court need not apply *Monell*. *See Rounds v. Clements,* 495 F. App'x 938, 941 (10th Cir. 2012) ("[T]he 'policy or custom' standard . . . [is] a liability standard for suits against municipalities—entities not immune from suit under the Eleventh Amendment—and it has no applicability to state officers

who are immune from suit for damages but susceptible to suit under *Ex parte Young* for injunctive relief.").

Plaintiffs plainly allege that the Sheriff's enforcement of the challenged state statutes is ongoing,[79] and seek only "injunctive and declaratory relief,"[80] which may be fairly characterized as prospective. The Court therefore need only determine whether plaintiffs have plausibly alleged that the statutory scheme, as described, violates a federal constitutional right.

"Trial before 'an unbiased judge' is essential to due process." *Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 217 (5th Cir. 2001) (quoting *Johnson v. Mississippi*, 403 U.S. 212, 216 (1971)); *see also Brown v. Edwards*, 721 F.2d 1442, 1451 (5th Cir. 1984) ("The right to a judge unbiased by direct pecuniary interest in the outcome of a case is unquestionable."). "[M]ost matters relating to judicial disqualification," however, do "not rise to a constitutional level." *FTC v. Cement Inst.,* 333 U.S. 683, 702 (1948).

Plaintiffs cite to two Supreme Court cases finding due process violations when judges maintained pecuniary interests in cases before them. In *Tumey v. Ohio*, 273 U.S. 510, 510 (1927), a defendant was convicted of possessing liquor in violation of Ohio's then-existing Prohibition Act. The

---

[79]   R. Doc. 183-2 at 27.
[80]   *Id.* at 58.

Act provided for trial in a "liquor court," in which the village mayor served as judge. *Id.* at 521. The money raised by fines levied in these courts was divided between the state, the village, a "village safety" fund, and a "secret service" fund. *Id.* at 521-22. The latter fund covered expenses associated with enforcing the Prohibition Act, including nearly $700 paid to the mayor "as his fees and costs, in addition to his regular salary." *Id.* at 522. The Supreme Court overturned Tumey's conviction, and held that the mayor, acting as judge, was disqualified from deciding Tumey's case "both because of his direct pecuniary interest in the outcome, and because of his official motive to convict and to graduate the fine to help the financial needs of the village." *Id.* at 535.

In *Ward v. Vill. of Monroeville,* 409 U.S. 57, 57 (1972), the Court considered a challenge to traffic fines imposed by another Ohio "mayor's court." Fines generated by the mayor's court at issue in *Ward* provided a "substantial portion" of the total operating funds for the municipality that the mayor oversaw. *Id.* at 58. The Court viewed the case as controlled by *Tumey* and noted that "[t]he fact that the mayor there shared directly in the fees and costs did not define the limits of the principle" of judicial bias articulated in that case. *Id.* Instead, the Court offered a general test to

determine whether an arrangement of this type compromises a defendant's right to a disinterested and impartial judicial officer:

> [T]he test is whether the [judge's] situation is one which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused.

*Id.* at 60 (internal quotations omitted). The Court found that this test was met in *Ward* because that possible temptation "[p]lainly . . . may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court." *Id.*

Considering this Supreme Court authority, the Court finds that plaintiffs have plausibly alleged that the bond fee system described in sections 22:822 and 13:1381.5 and implemented by the Sheriff is inconsistent with the right to an impartial judge guaranteed by the due process clause of the Fourteenth Amendment. Accordingly, the proposed amendment to permit injunctive relief against the Sheriff in his official capacity under Count Four should be permitted.

### G.    Sheriff Gusman – Count Seven: False Imprisonment

In addition to their federal claims, plaintiffs allege that the Sheriff is liable for the state law tort of false imprisonment. In Louisiana, false imprisonment "consists of two elements: '(1) detention of the person; and (2)

56

the unlawfulness of the detention.'" *Waganfeald v. Gusman*, 674 F.3d 475, 480 (5th Cir. 2012) (quoting *Kennedy v. Sheriff of E. Baton Rouge,* 935 So. 2d 669, 690 (La. 2006)).   Here, the plaintiffs plainly allege that they were detained.   The Court therefore need only ask whether plaintiffs have plausibly alleged that these detentions were unlawful.

Louisiana law provides that a law enforcement officer having custody of an arrested person shall promptly bring him, "and in any case within seventy-two hours from the time of the arrest, before a judge for the purpose of appointment of counsel." La. Code Crim. Proc. art. 230.1(A) (2016). Detention beyond this 72 hour period is illegal, and gives rise to a claim for false imprisonment against the jailer. *State v. Wallace*, 392 So. 2d 410, 413 (La. 1980) ("[W]hen an arrested person is held in custody more than 72 hours without being brought before a judge, then any detention thereafter is illegal, whether or not the initial detention was proper, and that detention (in excess of 72 hours) gives rise to (1) the right to immediate release and (2) a claim for civil damages for that illegal detention.").

Every plaintiff except Reynaud Variste alleges specific facts concerning his or her detention in excess of 72 hours without being brought before a judge.   These plaintiffs have therefore stated a claim for false imprisonment

under Louisiana law, and the proposed amendments as to this Count are not futile.

### H.    Remaining good cause factors

Having considered the futility—and therefore the importance—of the proposed amendments, the Court reconsiders the remaining factors to determine whether plaintiffs have demonstrated good cause to allow amendment. The Magistrate Judge found that plaintiffs' explanation for their failure to timely move for leave to amend was inadequate, that permitting the proposed amendment would prejudice defendants, and that this prejudice cannot be cured by granting a continuance. The Court does not find any of these conclusions to be clearly erroneous.

The factors, however, must be reweighed in light of the above findings regarding importance and futility. Given the importance of the proposed amendments in asserting previously dismissed claims, and the general preference for resolving disputes on the merits, the Court finds that plaintiffs have shown good cause for permitting those amendments not found to be futile above.

## IV.   CONCLUSION

For the foregoing reasons, the Magistrate Judge's order is MODIFIED as follows. Plaintiffs' motion to amend is GRANTED as to the amendments regarding:

- Counts Four and Seven against Sheriff Gusman

Plaintiffs' motion to amend is DENIED as to the amendments regarding:

- Counts One, Two, and Three against Sheriff Gusman;
- Claims against the City of New Orleans;
- Claims against Judicial Administrator Robert Kazik;
- Claims against Orleans Parish Criminal District Court.

Plaintiffs' motion for extension of deadlines is DENIED AS MOOT.  The Court will issue a new scheduling order separately after a status conference with all counsel.

New Orleans, Louisiana, this __3rd__ day of February, 2017.

_Sarah Vance_

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE