**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| ALANA CAIN, et al., | Case No. 2:15-4479-SSV |
| Plaintiffs, | |
| v. | (Class Action) |
| | Judge Sarah S. Vance, Sec. R(2) |
| CITY OF NEW ORLEANS, et al., | Mag. Judge Joseph C. Wilkinson, Div. 2 |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

I. Introduction ................................................................................................ 1

II. Factual Background ................................................................................... 2

    1. The General Fund, a.k.a. the Judicial Expense Fund ................................ 2

        a. Expenditures: More than 80% for Employees' Salaries ............... 3

        b. Revenues: Three Major Sources ..................................................... 4

            i. Appropriations by the City of New Orleans ..................... 5

            ii. 3% Bond Fee ...................................................................... 5

            iii. Court Costs ......................................................................... 5

    2. Assessment and Collection of Court Costs and Fines ............................. 6

        a. Assessments at Sentencing: Mostly Costs for OPCDC ................. 6

        b. Efforts to Increase Costs Since 2012 ............................................ 8

        c. Most OPCDC Defendants Are Indigent ........................................ 9

        d. Collections Procedure ................................................................... 10

            i. Debtors Are Processed through the Court's
Collections Department ................................................... 10

            ii. Collections Agents Issue Arrest Warrants for
Debtors with Overdue Payments ..................................... 11

            iii. Arrested Debtors Linger in Jail Until They or Their
Families Pay the Collections Department ....................... 11

III. Procedural History ................................................................................... 12

IV. Standard of Review .................................................................................. 14

V. Argument .................................................................................................. 14

    1. The OPCDC Defendants Violate the Fourteenth Amendment by
Failing to Inquire into Debtors' Ability to Pay and by Failing to
Consider Alternatives to Jailing ............................................................. 14

        a. Defendants' Use of Arrest Warrants for Failure to Pay
Violates Due Process and Equal Protection (Count One) ........... 18

        b. Defendants' Warrant Process Violates the Fourth
Amendment (Count One) ............................................................. 18

            i. Defendants Issue Failure-to-Pay Warrants Without
Oath or Affirmation ........................................................ 19

            ii. Defendants Issue Arrest Warrants Without Probable
Cause ............................................................................... 20

i

# TABLE OF CONTENTS
### (continued)

iii.    Defendants' Collections Agents are Not Neutral, Detached, and Capable Magistrates ................................. 23

c.    Defendants' Use of Fixed Money Bail Violates Due Process and Equal Protection (Count Two) ................................ 25

d.    Defendants' Failure to Consider Ability to Pay Violates Due Process and Equal Protection (Count Five) ......................... 29

2.    Financial Conflicts of Interest Prevent the Judges from Making the Unbiased Money Bond and Ability to Pay Determinations Required by Due Process (Counts Four and Five) .................................. 30

a.    Louisiana Revised Statute § 22:822 Impermissibly Biases the Judges and Violates Due Process (Count Four) .................... 34

b.    Financial Conflicts of Interest Prevent the Judges from Being the Neutral Decisionmakers on Ability to Pay Required by Due Process (Count Five) ....................................... 38

3.    The OPCDC Defendants' Unduly Harsh Collection Measures Violate Equal Protection (Count Six) ...................................... 44

4.    Defendant Sheriff Wrongfully Imprisoned the Plaintiffs Under State Law (Count Seven) ........................................................ 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkins v. E.I. DuPont de Nemours,*
    335 U.S. 331 (1948)..................................................................................................47

*Aetna Life Ins. Co. v. Lavoie,*
    475 U.S. 813 (1986)..................................................................................................30

*Alabama v. White,*
    496 U.S. 325 (1990)..................................................................................................22

*Alexander v. Johnson,*
    742 F.2d 117 (4th Cir. 1984) ....................................................................................47

*Alkire v. Irving,*
    330 F.3d 802 (6th Cir. 2003) ....................................................................................15

*Alpha Epsilon Phi Tau Chapter Housing Ass'n v. City of Berkeley,*
    114 F.3d 840 (9th Cir. 1997) ....................................................................................32

*Ast v. Ast,*
    2014-1282 (La. App. 3 Cir. 4/1/15), 162 So. 3d 720 ...............................................45

*Augustus v. Roemer,*
    771 F. Supp. 1458 (E.D. La. 1991) .....................................................................33, 35

*Barker v. Wingo,*
    407 U.S. 514 (1972)..................................................................................................46

*Bearden v. Georgia,*
    461 U.S. 660 (1983)........................................................................................ *passim*

*Bigford v. Taylor,*
    834 F.2d 1213 (5th Cir. 1988) ..................................................................................22

*Brinegar v. United States,*
    338 U.S. 160 (1949)..................................................................................................21

*Brown v. Vance,*
    637 F.2d 272 (5th Cir. 1981) ....................................................................................33

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)..................................................................................................14

*Connally v. Georgia,*
   429 U.S. 245 (1977) ..................................................................................30

*Connecticut v. Doehr,*
   501 U.S. 1 (1991) ......................................................................................17

*De Luna v. Hidalgo Cty., Tex.,*
   853 F. Supp. 2d 623 (S.D. Tex. 2012) ......................................................17

*DePiero v. City of Macedonia,*
   180 F.3d 770 (6th Cir. 1999) .........................................................33, 35, 37

*Doe v. Angelina Cty., Texas,*
   733 F. Supp. 245 (E.D. Tex. 1990) ......................................................15, 18

*Doolin Sec. Sav. Bank, F.S.B. v. F.D.I.C.,*
   53 F.3d 1395 (4th Cir. 1995) ....................................................................32

*Dow v. Baird,*
   389 F.2d 882 (10th Cir. 1968) ..................................................................19

*Esso Standard Oil Co. v. Cotto,*
   389 F.3d 212 (1st Cir. 2004) .....................................................................32

*Esso Standard Oil Co. v. Lopez-Freytes,*
   522 F.3d 136 (1st Cir. 2008) .....................................................................33

*Frey v. Hebenstreit,*
   1 Rob. (La.) 561, 562-63 (1842) ...............................................................45

*Fuentes v. Shevin,*
   407 U.S. 67 (1972) ................................................................................17, 18

*Fuller v. Oregon,*
   417 U.S. 40 (1974) ................................................................................46, 47

*Gerstein v. Pugh,*
   420 U.S. 103 (1975) ..................................................................................23

*Gibson v. Berryhill,*
   411 U.S. 564 (1973) ............................................................................30, 32

*Giordenello v. United States,*
   357 U.S. 480 (1958) ..................................................................................19

*Groh v. Ramirez,*
   540 U.S. 551 (2004) ..................................................................................19

*Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n,*
426 U.S. 482 (1976).................................................................................30

*Illinois v. Gates,*
462 U.S. 213 (1983)...........................................................................22, 23

*James v. Strange,*
407 U.S. 128 (1972).................................................................. *passim*

*Johnson v. United States,*
333 U.S. 10 (1948).................................................................................19

*Jones v. City of Clanton,*
Civil Action No. 2:15CV34-MHT, 2015 WL 5387219 (M.D. Ala. Sept. 14,
2015) ...............................................................................................28

*Landry v. Hoepfner,*
840 F.2d 1201 (5th Cir. 1988) ...........................................................15

*Little v. Liquid Air Corp.,*
37 F.3d 1069 (5th Cir. 1994) ............................................................14

*Lo-Ji Sales, Inc. v. New York,*
442 U.S. 319 (1979)...........................................................................23, 24

*Mapp v. Ohio,*
367 U.S. 643 (1961)............................................................................18

*Mathews v. Eldridge,*
424 U.S. 319 (1976)............................................................................17

*Meyer v. Niles Twp., Ill.,*
477 F. Supp. 357 (N.D. Ill. 1979) ......................................................33

*ODonnell v. Harris Cty.,*
Civil Action No. H-16-1414, 2017 WL 1735456 (S.D. Tex. April 28, 2017)
(Rosenthal, C.J.)................................................................................27

*Olson v. James,*
603 F.2d 150 (10th Cir. 1979) ...........................................................47

*Pierce v. City of Velda City,*
No. 4:15-cv-570-HEA, 2015 WL 10013006 (E.D. Mo. June 3, 2015) ...................................28

*Pugh v. Rainwater,*
572 F.2d 1053 (5th Cir. 1978) (*en banc*) .......................................15, 26

*Rodriguez v. Providence Cmty. Corr., Inc.*,
　155 F. Supp. 3d 758 (M.D. Tenn. 2015) (Sharp, C.J.)................................26, 27, 28

*Rose v. Vill. of Peninsula*,
　875 F. Supp. 442 (N.D. Ohio 1995)................................................................36, 37

*Rousset v. Rousset*,
　14-663 (La. App. 5 Cir. 4/15/15), 170 So. 3d 253 ..............................................21

*Salazar-Limon v. City of Houston*,
　826 F.3d 272 (5th Cir. 2016) ...........................................................................14

*Salcido v. Woodbury Cty.*,
　119 F. Supp. 2d 900 (N.D. Iowa 2000)...............................................................37

*Shadwick v. City of Tampa*,
　407 U.S. 345 (1972).................................................................................19, 23

*State v. Brumfield*,
　737 So. 2d 660 (La. 1998) ...............................................................................33

*State v. Hoffman*,
　141 Ohio St.3d 428 (2014)...............................................................................24

*Tate v. Short*,
　401 U.S. 395 (1971)..................................................................................14, 18

*Thompson v. Moss Point*,
　No. 1:15cv00182LG-RHW, 2015 WL 10322003 (S.D. Miss. Nov. 16, 2015) ......................28

*Tumey v. Ohio*,
　273 U.S. 510 (1972).............................................................................*passim*

*Turner v. Rogers*,
　131 S. Ct. 2507 (2011) .........................................................................*passim*

*United Church of the Med. Ctr. v. Med. Ctr. Comm'n*,
　689 F.2d 693 (7th Cir. 1982) ........................................................................32, 33

*United States v. Bracewell*,
　569 F.2d 1194 (2d Cir. 1978)...........................................................................47

*United States v. Christian*,
　187 F.3d 663 (D.C. Cir. 1999) .....................................................................20, 21

*United States v. Payan*,
　992 F.2d 1387 (5th Cir. 1993) .....................................................................15, 17

*United States v. Raborn*,
  872 F.2d 589 (5th Cir. 1989) ........................................................................20

*United States v. Ventresca*,
  380 U.S. 102 (1965)......................................................................................19

*Waganfeald v. Gusman*,
  674 F.3d 475 (5th Cir. 2012) ........................................................................49

*Walker v. City of Calhoun, Ga.*,
  No. 16-10521-HH (11th Cir. Aug. 18, 2016) ...............................................28

*Walker v. City of Calhoun, Ga.*,
  No. 4:15-cv-00170-HLM (11th Cir. July 25, 2016) .....................................29

*Ward v. Village of Monroeville*
  409 U.S. 57 (1972)................................................................................. *passim*

*Williams v. City of Alexander, Ark.*,
  772 F.3d 1307 (8th Cir. 2014) ......................................................................20

*Williams v. Farrior*,
  626 F. Supp. 983 (S.D. Miss. 1986).............................................................28

*Williams v. Illinois*,
  399 U.S. 235 (1970)...........................................................................14, 16, 18

*Wong Sun v. United States*,
  371 U.S. 471 (1963).......................................................................................20

*Ex parte Young*,
  209 U.S. 123 (1908)................................................................................38, 39

*Youngberg v. Romeo*,
  457 U.S. 307 (1982).......................................................................................17

**Statutes**

15 U.S.C. § 1673....................................................................................................47

38 U.S.C. § 5301....................................................................................................47

42 U.S.C. § 407......................................................................................................47

42 U.S.C. § 1383(d)(1) ..........................................................................................47

La. Code Civ. Proc. art. 225...................................................................................45

La. Code of Crim. Pro. Art. 887(A).........................................................................7

La. Code Crim. Proc. arts. 21, 23.....................................................................................21

La. Code Crim. Proc. art. 24 ..........................................................................................46

La. Code Crim. Proc. art 314 .........................................................................................34

La. Code Crim. Proc. art. 886(A)....................................................................................46

La. R.S. §§ 13:691(B) .....................................................................................................34

La. R.S. § 13:1381.4 ....................................................................................2, 7, 8, 34, 41

La. R.S. § 13:4281 ...........................................................................................................45

La. R.S. § 22:822 ..................................................................................................2, 5, 34

Louisiana Code of Criminal Procedure § 230.1.............................................................48

Louisiana Revised Statutes § 13:3881 ......................................................................47, 48

**Other Authorities**

Christopher D. Hampson, *The New American Debtors' Prisons*, 44 Am. J. Crim.
  L. 1, 18-19 (2016) .......................................................................................................45

Fed. R. Civ. P. 56(a) .......................................................................................................14

U.S. Constitution Fourth and Fourteenth Amendments..........................................*passim*

## I.    Introduction

The OPCDC Defendants routinely use jail and threats of jail to collect court debts from thousands of New Orleans' poorest people.  They extract payments from court debtors by jailing them without regard for their ability to pay; issuing invalid arrest warrants solely for non-payment, without probable cause, sworn statements of fact, or review by a neutral magistrate; ignoring the basic property protections available to judgment debtors under State and federal law; and detaining arrested debtors on a predetermined $20,000 secured bond amount for days or weeks unless their friends or family make a payment for their release.  The result is a modern debtors' prison that local officials and several of the OPCDC Defendants have publicly condemned.  Each of these practices is and must be declared unconstitutional.

The policies and practices that led to Plaintiffs' jailing are part of a broader breakdown of fairness and neutrality in the local legal system.  The OPCDC system is pervaded by financial conflicts of interest. When the Judges require and set a money bond for release from jail, they receive 1.8% of the money bond, a statutory scheme that fills their Judicial Expense Fund with over one million dollars every year.  The Judges also rely on their own collection of fees and costs for another one million dollars of the OPCDC's budget each year.  These two sources of funds—bond fees and collections from court costs imposed upon conviction—have formed more than half of the OPCDC's general operating Fund for the last three years.  The Judges have total independent executive control of this Fund and rely on it as administrators to keep the OPCDC functioning.  Among other things, they use it to pay the employees they hire for their individual chambers.  The system violates longstanding judicial neutrality principles central to American law.

Plaintiffs ask this Court to find that, when they preside over legal proceedings concerning a person's ability to pay court-imposed debts, the Judges cannot be the neutral decision-makers required by due process.  Plaintiffs also ask this Court to find that the potential bias created by the

OPCDC's receipt of a 3% bond fee, pursuant to La. R.S. § 22:822, violates due process, and to enjoin the Sheriff from enforcing that statute.

Finally, as this Court has previously acknowledged, Plaintiffs' predicaments were made worse by the "systematic incompetence" of Defendant Sheriff Gusman, who enabled the Collections Department's scheme by failing to bring Plaintiffs before a judge within 72 hours of arrest, as required by State law.  They seek compensation for this wrongful imprisonment.

## II.    Factual Background[1]

Plaintiffs rely on the contemporaneously submitted Statement of Material Facts and accompanying exhibits.  Plaintiffs also provide a brief summary of the factual background below.

### 1.    The General Fund, a.k.a. the Judicial Expense Fund

The Judges, in an executive capacity, control and administer millions of dollars in annual revenue and expenditures for the OPCDC.  S4, 5, 8; Rec. Doc. 248-1 at 1-4.[2]  Some of the funds under their control are restricted and may be used only for special programs or purposes.  S6.  The rest are unrestricted.  *Id.*  These unrestricted funds are often called the "General Fund," or sometimes the "Judicial Expense Fund;"[3] they form the "general operating fund of the court."  S7.

---

[1] Plaintiffs rely on facts that the parties agree are undisputed and specific facts proffered by Defendants through affidavit that Plaintiffs assume to be true for the purposes of this posture.  The parties are just beginning discovery on these issues.  Should the Court conclude that the undisputed facts and the law relied on here are insufficient to establish Plaintiffs' entitlement to relief, Plaintiffs will supplement this Motion after they have had the opportunity to obtain and present deposition testimony, internal financial records, court records, communications concerning court debt-collection practices, and other evidence from Plaintiffs' witnesses.  Plaintiffs are, of course, entitled to proceed through the normal course of discovery, to test Defendants' assertions, and to obtain all relevant and appropriate evidence from Defendants.  Plaintiffs believe that even the simple, undisputed facts clearly prove several of their claims and agreed to a process to test whether a ruling only on those agreed facts could significantly simplify the case and obviate the need for more intensive discovery.  They believe that additional evidence and testimony available through the normal course of civil discovery and fact development would overwhelmingly strengthen their claims if the undisputed evidence is insufficient and if this case then proceeds to discovery.

[2] All citations in this Memorandum to the Statement of Material Facts are in the format of S[paragraph number].  For example, a fact contained in paragraph 39 of the Statement of Material Facts would be cited as S39.

[3] The term "Judicial Expense Fund" also refers to an "account" expressly created by State law for the deposit of certain costs revenue.  *See* La. R.S. § 13:1381.4(B).  The Judicial Expense Fund referenced in Section 13:1381.4 and the

The General or Judicial Expense Fund will be referred to hereinafter as the "Fund."  The Fund received approximately four million dollars per year in revenues in 2011-2015.  Ex. 13.

### a.        Expenditures: More than 80% for Employees' Salaries

The Judges have "extremely broad" discretion in how Fund money is spent (save on their own salaries).  S8.  The Judges spend it on a variety of basic operating expenses, such as office supplies, bottled water, coffee, jury expenses, etc.  S24.  Prior to 2012, the Judges also spent hundreds of thousands of dollars of Fund money every year on supplemental insurance policies for themselves and their families.  S10.  This practice was publicly exposed in 2011.  S11.  A State of Louisiana investigation resulted in cancellation of the policies and even a public apology in The Times-Picayune from one of the Defendants.  S12, 13.  Defendant Buras wrote: "[B]ecause of the public controversy my receipt of these benefits has caused, which cast doubt on the public trust in me as a judge and raised the appearance of impropriety, I have now begun repayment of the costs of benefits to the Judicial Expense Fund of the court."  S13. The Judges still spend Fund money on their own professional liability insurance.  S14.

The vast majority of Fund money—more than 80% in 2012 through 2015—goes to pay for the salaries and benefits of more than 100 of the Judges' roughly 140 employees.  S15, 16, 19, 20. These employees include the people the Judges rely upon each day to do their jobs: Secretaries, Law Clerks, Court Reporters, Minute Clerks, Messengers, etc.  S18-20.  Most of them are paid with Fund money.  S21, 22.  And most money for Salaries and benefits comes from the Fund.  S17. Roughly two dozen employees are paid only with Fund money, including nine of the Judges'

---

General Fund described in public audits, *see* S5-7, are not necessarily technically the same, but the Judges nonetheless use the terms interchangeably, *e.g.* Rec. Doc. 248 ¶ 6.

Secretaries.  S19; Exs. 2, 8, 9.  Roughly eighty employees' salaries are heavily supplemented with Fund money.  S20-21.

Pursuant to an en banc vote, each Judge has independent authority over $250,000 of Fund money each year for the salaries and benefits of employees dedicated to serving each Judge's particular section.  S18.  If Fund revenue in any given year falls below expectations, the Judges may be forced to cut positions and/or reduce their employees' salaries and/or benefits.  S23.

### b.    Revenues: Three Major Sources

Most of the Fund money comes from three sources: money appropriated by the City of New Orleans ("City Money"); money received pursuant to the 3% "Bond Fee"; and money collected as a result of court debts assessed by the Judges ("Costs").  S25.  In the year this case was filed and the two prior, most Fund revenue came from Bond Fees and Costs.  S26.



**The Majority of the OPCDC's General Fund (Unrestricted) Revenue comes from the 3% Bond Fee and "Fines & Fees" Collections between 2013 and 2015**

### i. Appropriations by the City of New Orleans

The amount of City Money appropriated year to year is mostly up to City officials; it is not within the Judges' control.  S27.  The amount appropriated varies dramatically from year to year. For example, the OPCDC received $1,310,535 for personnel in 2012 but only $749,065 in 2013. Ex. 13.

### ii. 3% Bond Fee

The Judges have far more control over how much the OPCDC makes in Bond Fees.  Bond Fee revenue comes from a fee collected by the Sheriff for the OPCDC on every monetary bail set by the Judges and paid by a commercial surety, effectively equal to 1.8% of the bail amount.  La. R.S. § 22:822(A)(2); § 13:1381.5(B)(2)(a); S29.  The Judges can influence Bond Fee revenue by requiring defendants who appear before them to pay a secured money bail, rather than permitting release on an unsecured or nonfinancial conditions of release, and by increasing or decreasing the amount of money bail required and requiring the bond be paid by a surety instead of cash.  S31. The vast majority of defendants before the OPCDC have secured monetary bail conditions.  S32. And the vast majority of defendants who meet that bail condition do so using a commercial surety, S33, assuring that the Fund receives 1.8% of the bail amount in Bond Fees.  S29.  Since 2012, the OPCDC has received approximately $1 million dollars per year—roughly a quarter of the Fund— from Bond Fee revenue.  S28.  The Judges have "extremely broad" discretion in how they use this money, S30, but they use it exclusively for payroll and their accountant has called it "critical" to their ability to meet that expense on a monthly basis, S34.

### iii. Court Costs

The Judges have the most significant control over Costs revenues.  S36.  They influence Costs revenues at the front end, by increasing or decreasing Costs assessed on OPCDC defendants,

and at the back end, by exercising control over the manner in which Costs are collected.  S36.  The

OPCDC takes in about $1 million dollars a year in Costs, another quarter of the Fund.  S35.

### 2.  Assessment and Collection of Court Costs and Fines

#### a.  Assessments at Sentencing: Mostly Costs for OPCDC

The Judges' monetary assessments after conviction generate revenue for the OPCDC.  S37.

Most defendants are assessed only costs and fees, not fines or restitution.  S37(b).  And most of

the money assessed flows back to the OPCDC.  S37(c).  The chart below shows assessments

imposed in 255 cases, 20 each from Sections A-L and 15 from Section M, provided in initial

discovery by the Judges.  Each line represents the percentage of the total assessments (including

costs, fines, and restitution) in an individual case that goes to the Fund, and the overall surface area

highlighted in green represents the overall share of monetary assessments that go into the Fund.



When an individual is convicted in a case before one of the Judges, the Judges can generate revenue for the OPCDC by imposing costs and fees pursuant to more than a half dozen discrete sources of statutory authorization.  S37(a).  Since 2013, the Judges assess five different costs for the OPCDC in most cases on any given person: a $5 cost, pursuant to La. R.S. § 13:1381.4(A)(1); a cost of $14.50, per § 13:1381.1(B); a $100 cost, per § 13:1377; costs in the hundreds of dollars, with no specified limit, for the "Indigent Transcript Fund," pursuant to La. Code of Crim. Pro. Art. 887(A); and costs in the hundreds of dollars, up to $500 for a misdemeanor or $2500 for a felony,

which they label Judicial Expense Fund assessments (hereinafter "JEF Assessments"), per La. R.S.

§ 13:1381.4(A)(2).  S37(a)(viii).[4]

The Judges also usually assess other costs and fees at sentencing that flow to a variety of

other actors in the legal system.  S38; Rec. Doc. 248-1 at 5.  As of February 2015, these costs total

another $167 for non-drug related convictions and $217 for drug-related convictions.  *Id*.

In addition, the Judges can generate Costs revenue via assessments in the form of fines, but

the vast majority of OPCDC defendants are not assessed any fines.  S37(b).  Unlike the cost

assessments above, the OPCDC Judges are required to split 50% of any money assessed as a fine

with the District Attorney.  37(a)(i).  And fines revenue can also reduce the amount of money the

City is obliged to pay the OPCDC.  *Id*.  In 2015, twelve of the thirteen Judges assessed less than

$1,000 each in fines the entire year in all cases combined.  S37(e).

All of the Plaintiffs and former plaintiffs owed costs to the OPCDC that would flow to the

OPCDC.  S43.  None of them were assessed fines.  S37(b).  Brown, Cain, Reynajia Variste, and

Reynaud Variste were each assessed hundreds of dollars in costs for the OPCDC.  Rec. Doc. 248

¶ 14.

### b.    Efforts to Increase Costs Since 2012

The Judges have made concerted efforts since at least 2013 to increase Costs revenue at

both the front and back ends.  S37, 70.  These efforts followed a major drop in City Money from

2011 to 2012, Ex. 13, and a major drop in criminal cases filed from 2012 to 2013, which continued

in 2014 and 2015.  Rec. Doc. 248 ¶ 17.  In 2013, the Judges' total JEF Assessments increased by

35% over 2012, despite a 22% drop in the total number of cases closed in 2013.  S37(h).  The

---

[4] The Judges routinely assess all of these costs at sentencing, despite directives in the plain text of La. R.S.
§§ 13:1381.1 and 13:1377 that those costs of $14.50 and up to $100 should not be assessed on indigent persons.  *See*
Ex. 13 (table of statutes); Ex. 19 at Ex. B, 10-16 (table of sentencing assessments for 20 cases each for Sections A-L,
15 for M); S37(j).

Judges also began assessing hundreds of dollars in costs per conviction for the "Indigent Transcript Fund" ("ITF") in 2013.  Ex. 19 at Ex. B, 10-16; S37(f)-(g).  Total assessments for the ITF in 2012 were close to $10,000.  S37(f).  Total assessments in 2013 were about $270,000.  *Id.*  By 2015, when the Judges closed even fewer cases than in 2013, total assessments for the ITF went up to about $300,000, a nearly 3,000% increase over 2012.  S37(g).  Each individual Judge's assessments for the ITF increased over those same years at high rates, ranging between increases of 2,328% to 41,477%.  S37(g).  There was also a steady downward trend in the number of Judges assessing fines at all between 2012 and 2015.  In 2012, two Judges assessed no fines; by 2015 nine Judges assessed no fines.  S37(e).

### c.  Most OPCDC Defendants Are Indigent

The Judges have increased assessments on the persons they sentence despite knowing that 95% of them have been determined legally indigent, and despite knowing that many of them lack steady income.  S39.  In other words, the OPCDC Defendants know that they are squeezing blood from stones.  They have repeatedly relayed this message to City officials when explaining why they could not reliably increase Costs revenue.  S39, 70.

In a 2014 City Council hearing, Defendant Zibilich stated: "If they can't afford an attorney, just imagine how difficult it's going to be for us to chase him around the block to try to get money from him."  S39(b).  In a 2014 letter to the Deputy Mayor, Defendant Kazik wrote: "Most defendants are unemployed and indigent, which makes collecting those assessed fees a challenge . . . ."  S39(a).  In a 2015 hearing, the OPCDC's accountant explained to City Councilmembers that the OPCDC did not accept payment via credit card because most people who owed money did not have (could not get) credit cards.  S39(d).

#### d.      Collections Procedure

In order to maximize the likelihood of extracting payments from poor court debtors, the Judges administer a post-conviction debt collection process that relies on threats of jail and long periods of actual detention to coerce payment.  Defendant Zibilich, again to City Councilmembers, explained it simply:  "If you pick somebody up for failing to pay the fine, you can threaten 'em and you can scare 'em into maybe paying the money."  S70.  The trick is "inconveniencing somebody into paying."  *Id*.

#### i.      Debtors Are Processed through the Court's Collections Department

The Judges have delegated debt collection to a handful of Collections Agents in a specialized Collections Department ("Collections").  S42, 44, 47.  Debtors who do not pay their court-imposed debt in full immediately after sentencing are referred to Collections to set up a payment plan.  S42.  The Collections Agents have authority to accept payments, create payment plans, grant extensions for payment, telephone or write individuals who miss payments, issue arrest warrants for failure to pay, and to recall those warrants in their discretion, for no payment, partial payment, or full payment.  S47.

At an individual's first meeting with a Collections Agent ("Intake"), the Agent records her name, address, telephone, and place of employment, if any.  S48.  The individual is put on a payment plan, generally $100 per month, S51, and given a document titled "Payment Notice," which lists the total amount of court-imposed debts due and the due date for first payment, S52. After the due date, the Payment Notice states:  "If payment is not received by 3:00 p.m., a warrant will be issued for your arrest."  *Id*.  Collections Agents do not consider an individual's ability to pay a given amount of money in a month when setting the individual's payment plan.  S48-50.

### ii. Collections Agents Issue Arrest Warrants for Debtors with Overdue Payments

Sometime thereafter, at their own pace, Collections Agents review individual files for delinquencies. S53. If someone is behind a month or more on payments, Collections Agents are supposed to send a letter to the last known address, by regular mail, informing the individual of the default and instructing her to appear at the Collections Department by a set date to "resolve" the "matter" with Collections Agents. S54, 56. The letter reiterates the Payment Notice's jail threat: "Failure to comply with the conditions of probation will result in your immediate arrest." S54. It does not inform individuals that they have a right to be heard with respect to their ability to pay the debts or that they cannot be jailed unless a judge determines their nonpayment to be willful. *Id*.; Ex. 22 at 41 (letter).

Sometime thereafter, a Collections Agent reviewing a file with a missed payment might decide to issue an arrest warrant. S57. They are expected to check the Docket Master (a database containing court dockets) to see if an OPCDC judge had granted an extension or accepted a payment unbeknownst to Collections, as well probation and local jail records. *Id*. If those sources reveal no information, Collections Agents issue an arrest warrant. *Id*. They do not complete affidavits or testify to the existence of facts supporting the issuance of the warrants, S59; do not present the warrants for review to OPCDC judges or other staff, S60; and do not inform the target individual that a warrant has been issued for his or her arrest, S62. They do, however, print a warrant from computer software and affix the signature of an OPCDC judge without even informing the judge that a warrant has been sought or issued for the person's arrest. S61.

### iii. Arrested Debtors Linger in Jail Until They or Their Families Pay the Collections Department

The Collections Department arrest warrants generally contain a predetermined money bail in the amount of $20,000 printed on the face of the warrant. S63. This means that, once an

11

individual is arrested on the warrant, she would have to pay $20,000 secured bond, or around $2,600 in unrecoverable fees to a commercial surety ($360 of which would go directly to the Judges) to be released on bail to contest the debt or her jailing pursuant to the debt.  S63; Ex. 15 at 24.  This amount of money is much more than one or two months' missed payments, and is more than many debtors owe in total.  S65.

The OPCDC Defendants do not expect most arrested individuals to be released on bail; they expect them to gain release by arranging payment to Collections through family or friends.  S66, 65.  The payment amount required varies case by case and is generally within Agents' or Judges' discretion.  S47, 67, 68.  By design, and in effect, arrested individuals are held for ransom.  S65, 66, 67, 68.  All of the plaintiffs were arrested on Collections Department Warrants with $20,000 bail amounts and jailed for more than 72 hours at the Orleans Parish Prison before being brought to the OPCDC for legal proceedings.  S64, 67.

At every step in this process, the OPCDC Defendants ignore their constitutional duty to ensure that people who owe debts to the OPCDC are not jailed just because they are poor.  They do not inquire into ability to pay total or monthly amounts of debt.  S40, S48-50.  When someone misses a payment, the message is pay or else, not please explain.  S54.  When someone is arrested, she is allowed to linger in jail for days or weeks before she is brought before an OPCDC judge for legal proceedings concerning the debt or the propriety of her detention for non-payment.  S67, 68.

## III.    Procedural History

Plaintiffs filed this case on September 17, 2015.  Rec. Doc. 1.  Plaintiffs filed a first amended complaint several days later.  Rec. Doc. 7.  Plaintiffs filed a motion to amend the complaint on July 6, 2016, Rec. Doc. 161, which the Court granted in part on February 3, 2017, Rec. Doc. 228.  Subsequent to the Court's decisions on multiple motions to dismiss and the motion to amend, the operative complaint now contains six live claims:  Counts One, Two, Four, Five, Six, and Seven.

Count One alleges that the OPCDC Defendants violate the Fourth and Fourteenth amendments to the U.S. Constitution when Collections Agents issue invalid arrest warrants for nonpayment of OPCDC debts.

Count Two alleges that the OPCDC Defendants' use of fixed secured money bonds on those arrest warrants, without individualized consideration of the arrestee's ability to pay, violates the Fourteenth Amendment.

Count Four alleges that Sheriff Gusman and the Judges violate due process by implementing a statutory scheme in which the OPCDC Judges receive a percentage of the money bail amounts set by the OPCDC Judges.

Count Five alleges that the Judges violate the Fourteenth Amendment by jailing Plaintiffs for failure to pay without any consideration of their ability to pay and by considering Plaintiffs' ability to pay (after jailing them) in debt-collection proceedings in which the decisionmaker has a financial conflict of interest in the outcome, in violation of due process.

Count Six alleges that the OPCDC Defendants' practices take advantage of their control over the machinery of the local jail to impose unduly harsh and punitive restrictions on debtors whose creditor is the government compared to those who owe money to private creditors.

Count Seven alleges Defendant Gusman wrongfully imprisoned the Plaintiffs.  All claims are against the Defendants in their official capacities.

Subject to and as limited by the Court's prior rulings, Plaintiffs Cain, Brown, Maxwell, and Reynajia Variste now bring all Counts.  Plaintiff Thaddeus Long brings only Count Seven.  *See* Rec. Doc. 228 (opinion) at 8, n.29 (regarding standing).

Plaintiffs have filed a motion for class certification.  Rec. Doc. 230.  The Court has stayed consideration of that motion until resolution of the parties' cross-motions for summary judgment.

## IV.     Standard of Review

A movant is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the moving party demonstrates "the absence of a genuine issue of material fact . . . the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 323, 325).  Although the Court views the facts in the light most favorable to the non-moving party, it does so "only 'when there is an *actual* controversy, that is, when both parties have submitted evidence of contradictory facts.'" *Salazar-Limon v. City of Houston*, 826 F.3d 272, 277 (5th Cir. 2016).  Moreover, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 276.

## V.     Argument

### 1.     The OPCDC Defendants Violate the Fourteenth Amendment by Failing to Inquire into Debtors' Ability to Pay and by Failing to Consider Alternatives to Jailing.

In Counts One, Two, and Five, Plaintiffs seek declaratory relief from the OPCDC Defendants' unconstitutional practices of issuing arrest warrants for nonpayment, requiring predetermined money bonds for arrested debtors, and generally jailing debtors for nonpayment in proceedings without making an inquiry into their ability to pay or considering alternatives to jailing.  Several of the same basic legal principles underlie each of these claims.

The Fourteenth Amendment prohibits jailing a person solely because she cannot afford to pay an amount of money.  *See Williams v. Illinois*, 399 U.S. 235, 240-41 (1970) (holding that a statute that permitted imprisonment resulting "directly from an involuntary nonpayment of a fine

or court costs" is "an impermissible discrimination that rests on ability to pay"); *Tate v. Short*, 401 U.S. 395, 398 (1971) (holding that subjecting petitioner to "imprisonment solely because of his indigency" works an invidious discrimination); *Bearden v. Georgia*, 461 U.S. 660, 665, 667-68 (1983) (holding that "[d]ue process and equal protection principles converge" to bar the government from "impos[ing] a fine as a sentence and then automatically convert[ing] it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full," and that "if the State determines a fine or restitution to be the appropriate and adequate penalty for the crime, it may not thereafter imprison a person solely because he lacked the resources to pay it").[5]

To deprive someone of her core bodily liberty based on her economic status is "contrary to the fundamental fairness required by the Fourteenth Amendment." *Bearden*, 461 U.S. at 672-73; *see also Alkire v. Irving*, 330 F.3d 802, 818 (6th Cir. 2003) (finding sufficient evidence to sustain a motion for summary judgment on claim against a municipality for actions of sole judge in ordering payments of fines and fees without inquiry into ability to pay and then routinely issuing bench warrants for contempt of court based solely on nonpayment); *Doe v. Angelina Cty., Texas*, 733 F. Supp. 245, 254 (E.D. Tex. 1990) (holding that because an "important liberty interest is implicated when the state determines to incarcerate a person for failure to pay a fine," and because of "the likelihood of unconstitutional conduct in the absence of process," the Constitution "clearly requires the institution of some form of pre-incarceration legal process for determining the reasons for a party's failure to pay a fine.").

---

[5] *See also Landry v. Hoepfner*, 840 F.2d 1201, 1216 n.30 (5th Cir. 1988) ("Nor generally can nonpayment result in *any* imprisonment where it is *bona fide* merely the result of financial inability." (citing *Bearden*)); *United States v. Payan*, 992 F.2d 1387, 1396 (5th Cir. 1993) ("Nothing in the language of the *Bearden* opinion prevents its application to any given enforcement mechanism."); *Pugh v. Rainwater*, 572 F.2d 1053, 1056 (5th Cir. 1978) (*en banc*) ("At the outset we accept the principle that imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible.").

Most fundamentally, when the government contemplates whether to imprison someone for nonpayment, it "must inquire into the reasons for the failure to pay." *Bearden*, 461 U.S. at 672. Unless a court finds that nonpayment to be willful, it must consider alternatives to imprisonment and can resort to jailing only "if alternate measures are not adequate to meet the State's interests in punishment and deterrence." *Id.*[6] The Supreme Court has, for decades, required courts to consider those alternatives to arrest and incarceration as the appropriate tools for enforcing court-imposed debts. *See e.g.*, *Williams*, 399 U.S. at 244-45 nn.21-22 (noting the availability of installment plans, work order, and garnishment, and explaining that any "further burden" to states is outweighed by "constitutional imperative").

The Supreme Court's most recent case on jailing for nonpayment, *Turner v. Rogers*, 131 S. Ct. 2507, 2518–20 (2011), emphasizes the importance of conducting a rigorous inquiry into ability to pay before jailing a person for not meeting a financial condition. *Turner* held that South Carolina's incarceration of a man for unpaid child support payments was unconstitutional because the lower court had jailed him without an inquiry into ability to pay. *Id.* at 2520. Whether in the context of the revocation proceeding in *Bearden*, the child-support contempt proceedings in *Turner*, or the debt-collection proceedings here, the Court explained the basic protections that a government must provide before jailing a person for non-payment:

> Those safeguards include (1) notice to the defendant that his "ability to pay" is a critical issue in the . . . proceeding; (2) the use of a form (or the equivalent) to elicit relevant financial information; (3) an opportunity at the hearing for the defendant to respond to statements and questions about his financial status, (*e.g.*, those triggered by his responses on the form); and (4) an express finding by the court that the defendant has the ability to pay.

---

[6] Note that, unlike in *Bearden*, the large majority of monetary assessments resulting in jailing by the Judges in this case are purely civil costs, not fines or restitution imposed for some valid penological purpose.

*Id.* at 2519.  Turner's imprisonment was unconstitutional because the court did not provide the inquiry or findings essential to "fundamental fairness."  *Id.* at 2520.

*Turner*'s holding reaffirms a straightforward legal principle that the Supreme Court has repeatedly articulated: absent "extraordinary situations," a person must be given a meaningful opportunity to be heard *prior* to a deprivation of liberty or property.  *Fuentes v. Shevin*, 407 U.S. 67, 90-92 (1972) (holding that the "truly unusual" situations that justify postponing notice and opportunity to be heard require that forgoing procedural protections be "directly necessary" to important interests, a "special need for very prompt action," and "narrowly drawn" specific standards to limit the deprivation); *Connecticut v. Doehr*, 501 U.S. 1, 15 (1991) (holding that due process is offended when a delayed hearing "would not cure the temporary deprivation that an earlier hearing might have prevented").[7]  The central point of *Bearden* and *Turner* is that the government cannot undertake the fundamental liberty deprivation inherent in jailing a person until it follows rigorous procedures.

As this Court has recognized, the government bears the burden to inquire into an individual's ability to pay before taking her liberty.  Rec. Doc. 136 at 15-16; *see also Bearden*, 461 U.S. at 672; *Payan*, 992 F.2d at 1396.  Other courts in this Circuit have similarly found that putting the burden on individual debtors to raise the issue on their own violates due process and

---

[7] *Mathews v. Eldridge,* 424 U.S. 319 (1976), sets forth a three-part balancing test to determine what process is due when an individual's liberty is threatened by government action: 1) the court considers the nature of the private right at stake; 2) the court examines the risk of erroneous deprivation given the procedures currently being employed and assesses the probable value of additional safeguards; and 3) the court evaluates the government's interest in avoiding additional procedural safeguards.  *Id.* at 335.  Here, the private right at stake is the most fundamental liberty interest that exists—the right to be free from a jail cell.  *See, e.g.*, *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982) ("[L]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action.").  Moreover, risk of erroneous deprivation is enormous.  Because nonpayment can be punished with imprisonment only if it is willful, the jailing of people prior to inquiring into their ability to pay (especially given that the overwhelming number of such people are and have already been found indigent) is highly likely to result in the wrongful deprivation of liberty.  Finally, the risk to the government of issuing a summons and holding a hearing prior to depriving a person of this fundamental liberty is nearly non-existent.

17

equal protection. *De Luna v. Hidalgo Cty., Tex.*, 853 F. Supp. 2d 623, 648 (S.D. Tex. 2012) ("[T]he absence of any inquiry into a defendant's indigency unless the defendant 'raises' it of his or her own accord does not provide the process due."); *Doe*, 733 F. Supp. at 254 ("In the absence of some procedure for determining the reasons for a party's failure to pay a fine, it is difficult to conceive how a governmental entity will avoid discriminating against indigents on the basis of their respective economic statuses.").

In light of this settled law prohibiting wealth-based detention, Plaintiffs seek a declaratory judgment that the OPCDC Defendants violate the Fourteenth Amendment by issuing arrest warrants solely for nonpayment (Count One), by requiring predetermined secured money bonds for arrested debtors without individualized consideration of ability to pay (Count Two), and by generally jailing debtors for nonpayment without inquiring into their ability to pay (Count Five).

### a.    Defendants' Use of Arrest Warrants for Failure to Pay Violates Due Process and Equal Protection (Count One)

The OPCDC Defendants' use of arrest warrants for nonpayment of court debts violates due process and equal protection.  It is undisputed that the Defendants issue warrants for nonpayment, S47, 57, and that Plaintiffs were arrested and confined in jail on those warrants, S64.  Because the use of these warrants directly resulted in deprivation of Plaintiffs' liberty without any pre-deprivation inquiry into whether Plaintiffs' failure to pay was willful (that is, that they could afford to pay), let alone without any findings on the issue after proper notice and opportunity to be heard, this practice violates the due process and equal protection principles set forth in *Bearden*, *Williams*, *Tate*, *Fuentes* and *Turner*. This is enough to find the practice unconstitutional.

### b.    Defendants' Warrant Process Violates the Fourth Amendment (Count One)

The OPCDC's issuance of arrest warrants to collect court-imposed debt also flies in the face of the Fourth Amendment's longstanding warrant requirements.

The Fourth Amendment provides that "no warrant shall issue except on probable cause, supported by Oath or affirmation." U.S. Const. amend. IV; *Mapp v. Ohio*, 367 U.S. 643 (1961) (affirming the applicability of the Fourth Amendment to states through the Fourteenth Amendment).  Probable cause must be found by a neutral and detached magistrate.  *Giordenello v. United States*, 357 U.S. 480, 485–86 (1958); *Johnson v. United States*, 333 U.S. 10, 14 (1948).  Moreover, the issuing magistrate "must be capable of determining whether probable cause exists for the requested arrest or search."  *Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972).

The OPCDC Defendants issue arrest warrants for nonpayment of court-imposed debt without making individualized findings of probable cause supported by oath or affirmation, *see infra* Part I.2.a, and without any consideration of the debtors' indigence and ability to pay.  *See infra* Part I.2.b.  Further,  the Collections Agents who issue the failure-to-pay warrants are not trained as magistrates and operate without any guidance as to what constitutes probable cause under the circumstances for a supposed violation of payment plan terms set by the Collections Agents themselves.  *See infra* Part I.2.c.

These practices violate the Fourth Amendment.

### i.    Defendants Issue Failure-to-Pay Warrants Without Oath or Affirmation

Central to the requirements of the Fourth Amendment is that a valid warrant be "supported by a sworn affidavit."  *Groh v. Ramirez*, 540 U.S. 551, 557 (2004).  The requirement of a sworn statement of fact is "not to be cavalierly brushed aside as an empty formality."  *Dow v. Baird*, 389 F.2d 882, 884 (10th Cir. 1968) (finding an affidavit that was signed but not sworn under oath "clearly and obviously invalid").  "Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp …."  *United States v. Ventresca,* 380 U.S. 102, 109 (1965).

Plaintiffs are entitled to declaratory relief because Defendants issue warrants without oath or affirmation to support a finding of probable cause. Plaintiffs requested all affidavits or other sworn statement of facts supporting the issuance of debt-collection warrants. Ex. 24 (Response No. 12). Defendants produced none. *Id.* By their own response, Defendants concede that Collections Department warrants were issued without the required documentation supporting a finding of probable cause. Each Plaintiff was arrested on a warrant that was neither accompanied by nor based on an affidavit or other sworn statement of facts establishing probable cause. S64. There was thus no basis on which a neutral magistrate could have determined probable cause to issue an arrest warrant—indeed, as a matter of standard practice, the warrants were printed by Collections Agents and "issued" without even a sworn assertion that a person had missed a payment. S57-61. This defect alone renders the warrants invalid under the Fourth Amendment.

## ii.     Defendants Issue Arrest Warrants Without Probable Cause

"Probable cause exists when the facts . . . would warrant a person of reasonable caution in the belief that an offense has been or is being committed and that the individual arrested was the guilty person." *United States v. Raborn*, 872 F.2d 589, 593 (5th Cir. 1989) (citing *Beck v. Ohio*, 379 U.S. 89, 96 (1964)); *see also Wong Sun v. United States*, 371 U.S. 471 (1963). A finding of probable cause must be based on at least some evidence supporting the elements of a particular offense, including the requisite mental state. *See United States v. Christian*, 187 F.3d 663, 667 (D.C. Cir. 1999) (finding there was no probable cause where police lacked evidence of intent and there was a "lawful explanation" for the conduct); *see also Williams v. City of Alexander, Ark.*, 772 F.3d 1307, 1312 (8th Cir. 2014) ("For probable cause to exist, there must be probable cause for all elements of the crime.").

Arrest warrants issued by Collections Department employees purport to authorize the subject's arrest for "contempt of court." S63. Under Louisiana law, any contempt of court

committed outside "the immediate view and presence of the court," of which the court lacks "personal knowledge," or which is not "a contumacious failure to comply with a subpoena or summons, proof of service of which appears of record," is considered to be a "constructive" contempt of court.  La. Code Crim. Proc. arts. 21, 23.  But constructive contempt of court requires "[w]ilful disobedience of [a] lawful judgment, order, mandate, writ, or process of the court."  *Id.* art. 23(1).  To commit this offense, a person must violate an order of the court "intentionally, knowingly, and purposely, without justifiable excuse."  *Rousset v. Rousset*, 14-663 (La. App. 5 Cir. 4/15/15), 170 So. 3d 253, 257. In other words, willfulness is a necessary element of the offense.  Accordingly, before issuing an arrest warrant, a Collections Agent must put forth some evidence establishing probable cause that the individual intentionally violated a court order and that the nonpayment was willful.

There is no genuine dispute that, when Collections Department issue arrest warrants for people who fail to pay, they do so without an individualized inquiry into the person's reasons for nonpayment and thus without information relevant to whether the nonpayment was willful.  The OPCDC Defendants admit that they neither seek nor consider information that would establish or undermine a finding of willful nonpayment.  S47-50, 57.  When a person does not make a payment, Collections Department employees issue an arrest warrant so long as the person's entry on the Collections Department computer system does not on its face disprove willfulness (*i.e.*, if an extension had been entered or if the person is in the local jail).  S57.  Payment Notices given by the Collections Department at Intake contain this warning of their policy: "If payment is not received by 3:00 p.m., a warrant will be issued for your arrest."  S52.  The message is clear: pay up or be arrested.  *Id.*  But absent evidence of willful nonpayment, the fact of nonpayment alone provides no more than a "bare suspicion" that a crime has been committed, which is not enough to

establish probable cause for an arrest.  *Brinegar v. United States*, 338 U.S. 160, 175 (1949); *see also Christian*, 187 F.3d at 667 (holding that officers lacked probable cause to arrest suspect for possessing dagger with intent to use unlawfully "[g]iven the possibility of a lawful purpose, and the absence of any evidence whatsoever that [the suspect] possessed the knife for an unlawful one").

Furthermore, the totality of the circumstances test requires that "the whole picture" be taken into account, *Alabama v. White*, 496 U.S. 325, 330 (1990) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)),and the "probabilities [of this] particular factual context[]," in which the vast majority of defendants appearing in the OPCDC are legally indigent for purposes qualifying for appointed counsel, lean heavily against a finding of willfulness. *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  One Defendant Judge acknowledged publicly that approximately 95 percent of all defendants appearing in the OPCDC cannot afford an attorney (which means they are less likely to be able to afford to pay court-imposed fines and fees), remarking: "If they can't afford an attorney, just imagine how difficult it's going to be for us to chase him around the block to try to get money from him."  S39(b).  Defendant Kazik, too, knows that most of the people he and the Collection Agents collect money are "indigent and unemployed."  S39(a).  As the OPCDC Accountant candidly told the City Council when explaining the difference between municipal or traffic court and the OPCDC Collection operation: "They're citizens that are paying fines and fees over there, versus, we're actually dealing with an indigent client base and ex-criminals that we're dealing with on our side."  S39(d).  The OPCDC Defendants thus have every reason to expect that, in the vast majority of cases, nonpayment indicates an inability to pay rather than an intentional, knowing, and purposeful decision not to pay.  *See Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988) ("As a corollary . . . of the rule that the police may rely on the totality of facts available to

them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause.").

Finally, because Collections Agents have authority to set payment plans, grant extensions, and issue and recall warrants themselves for partial payment, S47, it is entirely unclear what order a debtor supposedly violates by missing a payment.  Is it an instruction of the Collections Agent in a letter?  Exceeding a deadline that a Collections Agent allowed over the phone?  (Again, no one can tell because there are no facts entered by oath or affidavit supporting the issuance of the warrants.)  Because Collections Department Agents do not consider any information beyond an informally alleged failure to pay an amount of money the Agents have themselves told the person to pay by a certain date, it is clear that they issue warrants without "a substantial basis for determining the existence of probable cause" of any particular crime. *Gates*, 462 U.S. at 239.

Accordingly, Plaintiffs are entitled to judgment as a matter of law that OPCDC Defendants' practice of issuing arrest warrants based solely on nonpayment violates the Fourth Amendment.

### iii.   Defendants' Collections Agents are Not Neutral, Detached, and Capable Magistrates

The Fourth Amendment mandates that a warrant be issued by a "neutral and detached" magistrate who is "capable of determining whether probable cause exists for the requested arrest or search." *Shadwick*, 407 U.S. at 350.  To qualify as neutral and detached, a magistrate must have "severance and disengagement from activities of law enforcement" and no connections that would "distort the independent judgment the Fourth Amendment requires." *Shadwick*, 407 U.S. at 350-51; *Gerstein v. Pugh*, 420 U.S. 103, 112–13 (1975); *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326-27 (1979) (warrant invalid where magistrate acted as "adjunct law enforcement officer" and participated in the search he was asked to authorize).

The undisputed facts demonstrate that Collections Department employees fail to meet the constitutional requirements for "neutral and detached" magistrates because they perform the functions of both the complaining witness and the magistrate in issuing arrest warrants. Collections Agents monitor payment plans, collect fines and fees payments, track down defendants who have failed to pay, send warning letters to debtors in default, and determine when a debtor has failed to pay. S47.  They are the only "adjunct law enforcement officer[s]" who have the personal knowledge to attest to probable cause for the failure to pay. *Lo-Ji Sales*, 442 U.S. at 326-27; S57-60.  At the same time, Collections Agents serve as magistrates when they issue arrest warrants authorizing the debtor's arrest for nonpayment.  S57-61.  The OPCDC Judges have granted Collections Agents independent authority to issue warrants, so that the Agents need not consult with the Judges before issuing an arrest warrant.  S47, 57-61.  This is the kind of conflation of law enforcement and judicial functions that the Supreme Court held unconstitutional in *Lo-Ji Sales*.

Although the Fourth Amendment does not require the issuing magistrate to be a lawyer or a judge, a complete lack of training or instruction renders a person incapable of adducing the facts required for probable cause.  *See State v. Hoffman*, 141 Ohio St.3d 428 (2014) (finding clerks incapable of determining probable cause where there was no instruction in guidelines).  Here, the OPCDC Judges delegated authority to Collections Agents to issue arrest warrants without providing those Agents any training or instructions.  S47-50; Ex. 22 at 47 (p.48 of the .pdf). Collections Agents do not receive training on the meaning of "probable cause," nor are they given other standards to guide their conduct.  S48-50.  Collections Agents are not trained, ordered, or expected to determine the reason for an individual's missed payment before issuing arrest warrants.  S48-50; Rec. Doc. 1-2 at 23:30-32, 24:1-6.  There is no written or unwritten Collections

Department policy requiring Collections Agents to assess whether an individual who owes court-imposed debt has the ability to pay.  S48-50.  In fact, the Collection Department keeps no written rules, policies, or training manuals whatsoever.  S50.  All of this lack of formality exacerbates the fundamental vagueness and lack of clarity about what particular court order is at issue, what offense has been committed, and what particular elements of a particular crime are purportedly established as the predicate of the arrest warrant.

Accordingly, the Court should find that Collections Department employees are not the "neutral," "detached," and "capable" magistrates required by the Fourth Amendment.

### c. Defendants' Use of Fixed Money Bail Violates Due Process and Equal Protection (Count Two)

For essentially the same reasons discussed above, *supra* 14-17, the OPCDC Defendants' use of $20,000 predetermined secured money bond violates due process and equal protection. Defendant Kazik has conceded that "Judges who gave authority to Collections for the issuance of fines and fees capias warrants typically authorized a bond amount in advance."  Ex. 23 (Response No. 3, Supplemental).  It is undisputed that some of the Judges directed Collections Agents to issue these arrest warrants with a "predetermined bond," in the amount of $20,000.  S63.

All of the Plaintiffs were arrested on warrants requiring $20,000 secured bonds, S64, which dwarfed the size of their unpaid court debts, Rec. Doc. 248 ¶ 14.  After arrest, they were eligible for immediate release pending further legal proceedings, but they were kept in jail for days or weeks without any legal proceedings solely because could not afford the predetermined financial condition required for their release.  S67.  At no point did the Judges, or anyone at the OPCDC, consider the Plaintiffs' ability to pay the financial conditions of release, S40, 48-50, despite the

fact that each of the Plaintiffs had previously been determined legally indigent.[8]  S39(f).  And in no case was there any individualized consideration of non-financial alternative conditions of release pending further legal proceedings.  S67.  The experiences of the Plaintiffs are not unique: the OPCDC Defendants regularly impose $20,000 bonds with the understanding that somewhere between "most" and "95 percent" of the debtors before the court are indigent.  S39(b).

It is well established that requiring a predetermined monetary payment for a person's release from jail, without an individualized inquiry into ability to pay or consideration of non-financial alternatives, violates both the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  *See*, *e.g.*, *Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978) (en banc). The Fifth Circuit in *Pugh* explained that the utilization of a "master bond schedule," whereby a court conditions the defendant's release upon payment of a secured money bond of a fixed amount without "meaningful consideration of other possible alternatives" violates both the due process and equal protection requirements of the Fourteenth Amendment.  *Id*. at 1057.

*Pugh's* conclusion has been widely followed by other federal courts, and it has been applied in situations nearly identical to those presented in this case.  For example, in *Rodriguez v. Providence Cmty. Corr., Inc*., 155 F. Supp. 3d 758 (M.D. Tenn. 2015) (Sharp, C.J.)*, probationers accused of violations of their probation were arrested on warrants that included predetermined secured money bond amounts.  *Id.* at 762.  Upon arrest, if the person could not afford immediately to purchase her release, she was kept in jail for days or weeks without any inquiry into her ability to pay or consideration of non-financial alternatives.  *Id.* at 766. Thus, like the Plaintiffs in this

---

[8] The Judges concede that they have "no written policies or procedures" "related to assessing whether a person who owes fines and/or fees to the court has the ability to pay those fines and/or fees."  Ex. 22 (Response No. 14).  Rather, according to the Judges, the "general practice, which varies depending on the matter" is to review the circumstances relevant to the individual debtor's ability to pay court-imposed debt only when such information is raised to the court's attention by counsel or the unrepresented defendant-debtor.  *Id.*

case, while each was determined in advance to be eligible for immediate release, each was prevented from being released only if she could not make the required payment. *Rodriguez* reached the "constitutionally mandated conclusion" that the government cannot subject probationers to predetermined secured money bonds to secure release pending formal revocation hearings without individualized consideration of ability to pay and alternatives. *Id*. at 768-69. The simple reason, the court held, was that "[t]he Fourteenth Amendment precludes imprisoning someone because he or she does not have enough money." *Id.* at 768 (citing *Barnett v. Hopper*, 548 F.2d 550, 553 (5th Cir. 1977), *vacated as moot*, 439 U.S. 1041 (1978)).

Most recently, in *ODonnell v. Harris Cty.*, Civil Action No. H-16-1414, 2017 WL 1735456 (S.D. Tex. April 28, 2017) (Rosenthal, C.J.), the court preliminarily enjoined Harris County officials on due process and equal protection grounds from detaining misdemeanor arrestees who are otherwise eligible for release but cannot pay a predetermined money bond. *Id*. at *3. Harris County judges routinely required preset secured bonds without considering alternative means of ensuring defendants' presence at subsequent proceedings. *Id.* at *35. As in New Orleans, indigent arrestees who could not afford to purchase their release experienced "the multiplying effects of 'cumulative disadvantages' when they los[t] jobs, places to live, or family visitation rights because of . . . detention." *Id.* at *70. The court concluded that the Due Process and Equal Protection Clauses prohibited the government from jailing people because of their inability to pay a secured financial condition of release without certain procedural safeguards, including a hearing before a judge who must make findings on the record concerning the defendant's ability to pay and reasonable non-financial alternatives. *Id.* at *72. Without such individualized determinations of a defendant's circumstances, Harris County's pretrial secured money bond practices unconstitutionally "effectively function[ed] as detention orders only against the indigent." *Id.* at

*44.  As Chief Judge Rosenthal concluded: "[O]nce the County has chosen to impose a financial condition of pretrial release, the County may not use that condition to imprison defendants before trial because they lack the means to pay it."  *Id*. at *68.  All of the same principles apply with equal force to pre-hearing detention in debt-collection proceedings.

Courts throughout the country—including elsewhere in the Fifth Circuit—are in accord.  *See*, *e.g.*, *Thompson v. Moss Point*, No. 1:15cv00182LG-RHW, 2015 WL 10322003, at *1 (S.D. Miss. Nov. 16, 2015) (declaring that predetermined secured bail amounts applied to indigent defendants violate the Fourteenth Amendment's Equal Protection Clause); *Pierce v. City of Velda City*, No. 4:15-cv-570-HEA, 2015 WL 10013006, at *1 (E.D. Mo. June 3, 2015) (same); *Jones v. City of Clanton*, Civil Action No. 2:15CV34-MHT, 2015 WL 5387219, at *2 (M.D. Ala. Sept. 14, 2015) (declaring that the "use of a secured bail schedule to detain a person after arrest, without an individualized hearing regarding the person's indigence and the need for bail or alternatives to bail, violates the Due Process Clause of the Fourteenth Amendment"); *Williams v. Farrior*, 626 F. Supp. 983, 985 (S.D. Miss. 1986) ("[I]t is clear that a bail system which allows only monetary bail and does not provide for any meaningful consideration of other possible alternatives for indigent pretrial detainees infringes on both equal protection and due process requirements.").[9]

The Department of Justice and American Bar Association agree that the use of predetermined bail amounts is unconstitutional as applied to the indigent.  *See* Req. for Judicial Not. Exs. A-B, Amicus Brief of United States, *Walker v. City of Calhoun, Ga.*, No. 16-10521-HH, at 12 (11th Cir. Aug. 18, 2016) (recognizing that "a bail scheme that mandates payment of fixed

---

[9] While most of these courts other than *Rodriguez* considered the constitutionality of predetermined bonds in the context of pretrial detention, their reasoning applies with equal force in the context of arrest pursuant to a warrant for failure to pay court fines and fees.  *See Thompson*, 2015 WL 10322003, at *1 ("No person may, consistent with the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, be held in custody after an arrest because the person is too poor to post a monetary bond.").

amounts to obtain pretrial release, without meaningful consideration of an individual's indigence and alternatives that would serve the City's interests, violates the Fourteenth Amendment"); *id.* at 18 ("[F]ixed bail schedules that allow for the pretrial release of only those who can pay, without accounting for ability to pay and alternative methods of assuring future appearance, do not provide for such individualized determinations, and therefore unlawfully discriminate based on indigence."); Amicus Brief of American Bar Association, *Walker v. City of Calhoun, Ga.*, No. 4:15-cv-00170-HLM, at 4-5, 12 (11th Cir. July 25, 2016) (urging the elimination of inflexible money-bail systems on grounds that they are unconstitutional and "serve[] no legitimate public safety purpose, needlessly harm[] persons accused of crimes, and impose[] unnecessary costs on the public").

The OPCDC Defendants' practice of declaring all arrested debtors immediately eligible for release pending further proceedings but keeping people in jail for days and weeks if they could not pay the predetermined, $20,000 secured financial condition of release with no inquiry into ability to pay or consideration of alternative non-financial conditions of release is unconstitutional under the Due Process and Equal Protection clauses of the Fourteenth Amendment.[10]

### d.   Defendants' Failure to Consider Ability to Pay Violates Due Process and Equal Protection (Count Five)

While Counts One and Two are focused specifically on the issuance of arrest warrants and use of predetermined money bonds as particular methods of debt collection, Count Five more broadly alleges that, whatever proceedings and mechanisms are used for debt collection, they must satisfy certain basic due process and equal protection principles.

---

[10] This scheme had its benefits: because debtors who could not afford to purchase their release were confined in jail for lengthy periods prior to any chance to contest their confinement in legal proceedings, the Collections Department was able to convert its discretion to recall warrants into payments from friends and family. *See* S66, 67.

There is no genuine dispute that the OPCDC Defendants routinely jail poor people for nonpayment without prior inquiry into ability to pay and without considering alternatives to imprisonment.  For the reasons discussed above, Plaintiffs are therefore entitled to a declaration that the OPCDC Defendants must provide the procedures and findings required by *Bearden* and *Turner* in *any* legal proceedings at which Plaintiffs' fundamental liberty is at stake as a result of their nonpayment of court debts.  As discussed *infra* in the next Section, Plaintiffs are also entitled to a declaration that the tribunal providing these required constitutional procedures and factfinding be neutral and free from potential bias.

2.    **Financial Conflicts of Interest Prevent the Judges from Making the Unbiased Money Bond and Ability to Pay Determinations Required by Due Process (Counts Four and Five)**

In both Counts Four and Five, Plaintiffs seek relief for violations of the Due Process Clause's requirement that American legal proceedings be adjudicated by a neutral, unbiased decision-maker.   In Count Four, Plaintiffs seek declaratory relief against the Judges, and declaratory and injunctive relief against the Sheriff, on the ground that the Due Process Clause is violated when the Judges impose secured money bonds in which they have an institutional financial interest, and on the ground that the Sheriff is the state official charged by statute with enforcing the unconstitutional state law that mandates this institutional conflict of interest.   In Count Five, Plaintiffs allege that this basic due process right to a neutral judicial tribunal is violated when the Judges decide whether to jail someone for nonpayment—or decide the nature and content of a payment plan order or whether to allow non-financial alternatives to payment—while having a financial stake in the outcome of that judicial decision.   The fact that fundamental individual liberty is at stake during these proceedings makes the neutrality requirement all the more vital.

The Due Process Clause protects the basic neutrality of American courts.  *See Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821–22 (1986); *Connally v. Georgia*, 429 U.S. 245, 248–49

(1977); *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 491 (1976);

*Gibson v. Berryhill*, 411 U.S. 564, 579 (1973).

As the Supreme Court has held, due process requires that judges have neither a personal

interest in, nor executive control over, the money at stake in their cases.  Either flaw is fatal, so

long as the amount at stake is more than de minimus.  In *Tumey v. Ohio*, 273 U.S. 510, 522 (1972),

the Court invalidated an Ohio law that provided for trial before a village mayor who could levy

fines that would be used in part to cover his "fees and costs, in addition to his regular salary."  The

Court held the Ohio scheme unconstitutional on two independent grounds, "both because of [the

mayor's] direct pecuniary interest in the outcome, *and* because of his official motive to convict

and to graduate the fine to help the financial needs of the village."  *Id.* at 535 (emphasis added);

*see also* Rec. Doc. 228 at 55 (order denying motion to dismiss Count 4).  As the Court explained:

> There are doubtless mayors who would not allow such a consideration as $12 costs in each case to affect their judgment in it, but the requirement of due process of law in judicial procedure is not satisfied by the argument that men of the highest honor and the greatest self-sacrifice could carry it on without danger of injustice.  Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law.
>
> But the pecuniary interest of the mayor in the result of his judgment is not the only reason for holding that due process of law is denied to the defendant here. . . . The mayor . . . is charged with the business of looking after the finances of the village. . . . [T]he law is calculated to awaken the interest of all those in the village charged with the responsibility of raising the public money and expending it, in the pecuniarily successful conduct of such a court. . . . A situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him.

*Id.* at 533–34.

In *Ward v. Village of Monroeville* 409 U.S. 57 (1972), the Court reiterated the *Tumey*

standard.  *Ward* explained again that the due process neutrality principle goes beyond cases in

which a judge has a personal financial interest in a case.  More fundamentally, it protects against

institutional conflicts of interest that arise when judges have dual roles that could offer a "possible

temptation" to let fiscal executive responsibility affect judicial decision-making.  *Id*. at 60. The

Supreme Court made clear that the *Tumey* standard does not merely prohibit a judge from

"shar[ing] directly in the fees and costs" stemming from his cases, noting: "Plainly that 'possible

temptation' [to the average man as judge] may also exist when the mayor's executive

responsibilities for village finances may make him partisan to maintain the high level of

contribution from the mayor's court." *Id*.[11]

The Supreme Court's longstanding test therefore does not require Plaintiffs to prove that

any individual Judge used money at stake in her cases for *personal* enrichment.  Plaintiffs need

not even prove that the Judges were *in fact* tempted by their executive control over the money.

The standard is objective and is concerned with possible, not actual, bias.  *Ward*, 409 U.S. at 59–

60.  As the Fifth Circuit has explained:

> In *Tumey* and *Ward* the Supreme Court . . . was not as interested in the probity of
> an individual judge or perhaps even, of the great majority of judges.  It was
> interested rather in the inherent defect in the legislative framework arising from the
> vulnerability of the average man—as the system works in practice and as it appears

---

[11] *See also Gibson v. Berryhill*, 411 U.S. 564, 579 (1973) ("It is sufficiently clear from our cases that those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes. . . . And *Ward* . . . indicates that the financial stake need not be as direct or positive as it appeared to be in *Tumey*."); *Esso Standard Oil Co. v. Cotto*, 389 F.3d 212, 218–19 (1st Cir. 2004) ("As in *Gibson*, the adjudicative body stands to benefit financially from the proceeding because any fine imposed will flow directly to the [body]'s budget.  Although members of the [body's] Governing Board may not stand to gain personally in the same way that members of the Alabama Board of Optometry did, a pecuniary interest need not be personal to compromise an adjudicator's neutrality." (citing *United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 699 (7th Cir. 1982) ("[T]he Commission has a pecuniary interest in the outcome of the reverter proceedings, because . . . in the event of a subsequent sale of the property, the proceeds redound to the coffers of the Commission.  This is sufficient under the [] rule to mandate disqualification of the Commission . . . and require that the reverter proceedings provisions of the statute be held unconstitutional."))); *Alpha Epsilon Phi Tau Chapter Housing Ass'n v. City of Berkeley*, 114 F.3d 840, 843 (9th Cir. 1997) (holding that due process is offended under *Ward* "where decision-makers have an *institutional* financial interest that may lead them to make biased decisions" (emphasis added)); *Doolin Sec. Sav. Bank, F.S.B. v. F.D.I.C.*, 53 F.3d 1395, 1406 (4th Cir. 1995) (noting that "the Supreme Court has held that institutional pecuniary interests rendered the adjudicator unconstitutionally biased," citing *Ward*); *United Church*, 689 F.2d at 700 ("[*Ward*'s] principle of disqualification applies even if the pecuniary interest is only an indirect outgrowth of a public official's desire to protect official funds." (citation, quotations, and alterations omitted)).

> to defendants and to the public.  The Court's inquiry there and our inquiry here is
> not whether a particular man has succumbed to temptation, but whether the
> economic realities make the design of the fee system vulnerable to a "possible
> temptation" to the "average man" as judge.  Here we have no need to be solicitous
> of the honor of a particular judge; none has been questioned. . . . The *Tumey-Ward*
> test, in sum, is levelled at the system, not the individual judge.

*Brown v. Vance*, 637 F.2d 272, 284 (5th Cir. 1981); *see also DePiero v. City of Macedonia*, 180

F.3d 770, 782 (6th Cir. 1999) ("The Supreme Court's test does not call for proof of actual

temptation.  The mere *possibility* of temptation . . . is all that is required.").

Lower courts have made clear that the objective possibility of temptation can increase with

the extent of an adjudicator's control over the money at stake in her cases, or with the amount of

money controlled, or with both.  As the Sixth Circuit put it:

> The more substantial the amount (or percentage) of revenue produced from a
> mayor's court, the more reasonable it is to question the impartiality of a mayor who
> has any executive authority.  In similar fashion, the more executive authority vested
> in the mayor, the more reasonable it is to question the impartiality of a mayor who
> collected even a relatively minor amount of general fund revenue through a mayor's
> court.

*DePiero*, 180 F.3d at 780 (quoting *Rose*, 875 F. Supp. at 452 (holding that because the mayor had

"broad" executive authority, it was reasonable to question his impartiality "even if he collect[ed]

a fairly small amount of general fund revenue through the mayor's court")); *see also Esso Standard*

*Oil Co. v. Lopez-Freytes*, 522 F.3d 136, 147 (1st Cir. 2008) (finding a due process violation where

Environmental Quality Board had "complete discretion" over the funds formed, in part, by the

fines it imposed); *United Church*, 689 F.2d at 700 (holding that due process was violated when

decision maker about reversion of valuable real property was also entity to which real property

reverted, citing *Ward*); *Roemer*, 771 F. Supp. 1458 at 1473 (finding due process violation where

judges of the OPCDC and other courts "exercise or potentially exercise total control over the

amounts collected");  *State v. Brumfield*, 737 So. 2d 660, 688 (La. 1998) (citing *Roemer*, *Ward*,

and *Tumey* for the proposition that "if judges impose fines they will spend, [a] system offends [the]

33

Due Process clause"); *Meyer v. Niles Twp., Ill.*, 477 F. Supp. 357, 362 (N.D. Ill. 1979) (denying defendants' motion to dismiss where defendants were responsible for determining whether to pay medical benefits also had direct executive responsibility to preserve those funds, citing *Ward* and *Tumey*).

Under any reasonable reading of these precedents, this is not a close case. The financial conflicts of interest that pervade every aspect of judicial decision-making in this case are, as Defendants themselves have publicly claimed, intolerable. This Motion need not call the integrity of any particular judge into question. Rather, this case is about a system that creates inexcusable conflicts of interest. Due Process forbids judges to preside over cases that generate money over which they have potentially biasing executive control, whether or not they have in fact used it— or been tempted to use it—improperly. *Ward*, 409 U.S. at 59–60.

### a. Louisiana Revised Statute § 22:822 Impermissibly Biases the Judges and Violates Due Process (Count Four)

Louisiana law directs the Orleans Parish Sheriff to collect a fee equal to 3% of each monetary bond paid by a surety and to distribute a cut equal to 1.8% of the bond amount back to the OPCDC, resulting in what is referred to above as "Bond Fee" revenue. La. R.S. §§ 22:822, 13:1381.5; S29. The Judges can influence the amount of Bond Fee revenue by requiring people who appear before them to pay a secured money bail, rather than permitting release on an unsecured or nonmonetary bail condition, and by increasing or decreasing the amount of money bond required. S31; La. Code Crim. Proc. art 314 (authority to fix bail); art. 321 (types of bail).

The Judges control Bond Fee revenue, voting en banc as independently elected executive officials. S5, 8, 30. They can use this money "for any purpose connected with," or even "incidental to," the "administration or function of the court," La. R.S. § 13:1381.4(C), except to supplement their own salaries, La. R.S. §§ 13:691(B) (limiting sources of compensation for

judges); 13:1381.4(D) (barring use of funds for judicial salaries).  The Judges have described the

scope of their discretion to spend these funds as "extremely broad."  S30.  Pursuant to en banc

vote, each Judge also has independent executive control over $250,000 of Fund money annually—

again, a Fund filled in significant part by Bond Fees—to use, as he or she sees fit, for the salaries

and benefits of employees dedicated to his or her Section of court.  S18.

This District Court has already held this arrangement to be unconstitutional under *Tumey*

and *Ward* on facts indistinguishable from those here.  In *Augustus v. Roemer*, 771 F. Supp. 1458

(E.D. La. 1991), the Court held that due process was violated whenever judges set bond amounts

from which the Sheriff collected and distributed to them a percentage (then 2%).  *Id.* at 1473.

> The statutes themselves vest the judges with complete executive control of their
> respective 2% funds.  Although no one contests that the judges do not receive direct
> compensation from the funds raised by the 2% charge, the judges regardless
> exercise or potentially exercise total control over the amounts collected.  The fact
> that the judges exercise joint control does not serve to diffuse the significance of
> their power over the funds since no non-judicial parties share in that control.

*Id.* (footnote omitted).  Twenty-six years later, this structural financial conflict of interest persists.

The Judges still maintain complete executive control over the Bond Fees.  They can still increase

those Bond Fees by changing the terms of the bond orders of defendants before them.  That alone

is enough for this Court to declare Louisiana R.S. § 22:822 unconstitutional (again).

But the facts here are even more compelling than those in *Roemer*, reinforcing the

conclusion that the Judges' receipt of the Bond Fee money and executive control over it is

potentially biasing.  Not only do the Judges have complete control over the money but they collect

significant sums, S28, which have been called "critical" to the OPCDC's ability to meet payroll

and other operational functions on a monthly basis, S34.

The OPCDC receives approximately $1 million dollars per year—roughly a quarter of the

Fund—from Bond Fee revenue.  S28.  Other courts have found much smaller amounts and

percentages consistent with a due process violation.  *See*, *e.g.*, *DePiero*, 180 F.3d at 780 (explaining that although "[a]pproximately four percent of the general fund was derived from Mayor's Court fines," there was "no need to split hairs over what is a 'substantial' figure . . . if the mayor's executive authority and administrative responsibilities preclude him from serving as a neutral and detached decision maker"); *Rose*, 875 F. Supp. at 451 (finding it "manifest that an annual collection of funds in excess of $50,000, and which amount to over 10% of the Village of Peninsula's general fund," were "substantial and make up a major part of village income, just as was the case in *Ward*" (internal quotation marks omitted)).  This too, coupled with the Judges' complete executive control of the money, is enough to find the statute unconstitutional.

The Judges choose to use this money for payroll.  S30; Rec. Doc. 248 ¶ 29.  In a hearing before the City Council on October 28, 2013, an accountant speaking for the OPCDC told the City Council that the monthly Bond Fee payments the OPCDC receives from the Sheriff are "critical" to the OPCDC's ability to meet payroll.  S34.  In other words, without this money, the Judges would have trouble paying all the people around them.  And the Judges could only replace these funds with great difficulty, either by persuading City officials to increase appropriations, or by finding a way to squeeze more in Costs revenue from debtors.  If they were to begin lowering bonds, say, or permitting unsecured bonds, or nonmonetary bonds altogether, they might have to cut staff like their law clerks or secretaries.  S23.  An objective observer could not help but think that within this economic reality an average person might be tempted to keep secured money bail amounts at that steady, "critical" level.

Should any doubt remain that an average person in the Judges' position might be tempted to augment Bond Fee revenue, for many years the Judges actually used money from the Fund for personal gain.  Prior to 2012, the Judges spent hundreds of thousands of dollars annually from

Fund money on supplemental insurance premiums.  S10.  In November 2012, the Louisiana Legislative Auditor released an investigative audit of OPCDC judges' spending on supplemental insurance premiums.  S12.  During the Auditor's three-year period of investigation (January 1, 2009 to December 31, 2011), the OPCDC paid 100% of the premiums for 229 supplemental "health, dental, hospitalization, cancer, critical illness, long-term care, accidental death and dismemberment, and life insurance" policies, with each OPCDC judge having an average of 15 (2009), 19 (2010), and 18 (2011) policies each year.  *Id.*  "Eleven judges had separate long-term care policies for their spouses," and "[e]ight of these spouses had multiple long-term care policies," all paid for by the OPCDC.  *Id.*  One of the plans selected enabled each judge covered to receive up to $10,000 per year in reimbursement for out-of-pocket medical expenses (*e.g.*, co-payments and prescription drugs).  *Id.*  The judges cancelled these policies during the audit period.  *Id.*

The private insurance premium scandal caused public outcry once the appearance of impropriety was laid bare.  The controversy concerning the integrity of the judicial system got so intense that Defendant Buras even felt compelled to publish a formal apology in The Times-Picayune.  S13.  She wrote that "because of the public controversy my receipt of these benefits has caused, which cast doubt on the public trust in me as a judge and raised the appearance of impropriety, I have now begun repayment of the costs of [certain employment] benefits to the Judicial Expense Fund of the court."  *Id.*  This public scandal underscores the structural conflict of interest at work and illustrates the need to apply the objective *Tumey-Ward* standard vigilantly to eradicate potential bias from American courts of law and to ensure that the integrity and neutrality of our courts is beyond question (with no need to apologize).

Plaintiffs are entitled to summary judgment on Count Four.[12]   The plain language of Louisiana law regarding Bond Fees is not in dispute and that alone is enough.  Because the Sheriff enforces a state statute that is unconstitutional, he can be enjoined from enforcing it under *Ex parte Young*, 209 U.S. 123 (1908).  *See* Doc. 228 at 53.  And because the Judges set money bonds in which state law gives them an institutional financial interest, their setting of those bonds must be declared unconstitutional.

> **b.     Financial Conflicts of Interest Prevent the Judges from Being the Neutral Decisionmakers on Ability to Pay Required by Due Process (Count Five)**

For the same reasons, the Judges violate due process when they preside over debt-collection legal proceedings in which they have a structural financial interest in the money at issue. In Count Five, Plaintiffs allege that the basic due process right to a neutral judicial tribunal is violated when the Judges conduct an inquiry into ability to pay and decide whether to jail someone for nonpayment—or decide the nature and content of a payment plan or whether to allow non-financial alternatives to payment—while having a financial stake in the outcome.  The fact that fundamental individual liberty is at stake during these legal proceedings makes the neutrality requirement all the more vital.

Louisiana's statutory structure places the Judges in the intolerable position of having to fund the operations of their own court.  The reality of who is prosecuted in the system further compounds the problem by forcing the Judges to fund their employees and operations off the backs

---

[12] *See, e.g.*, *DePiero*, 180 F.3d at 782 (reversing district court's grant of summary judgment for the defendants and its denial of summary judgment for the plaintiff on the count alleging *Tumey-Ward* due process violations in trying plaintiff's contested traffic and criminal contempt charges); *Salcido v. Woodbury Cty.*, 119 F. Supp. 2d 900, 931 (N.D. Iowa 2000) (granting summary judgment against both the defendant county and state officials on a *Tumey–Ward* claim that, "both on the face of the pertinent statutory and administrative provisions, and as procedures were actually applied in [plaintiff]'s case," plaintiff was denied a neutral decision-maker); *Rose v. Vill. of Peninsula*, 875 F. Supp. 442, 444 (N.D. Ohio 1995) (granting summary judgment for the driver because the mayor's occupancy of two practically and seriously inconsistent positions resulted in due process violations in the trials held before him).

of the mostly poor people over whom they are supposed to preside as neutral arbiters of justice. Some of the Judges have forcefully condemned this structural problem.  Former OPCDC Judge Calvin Johnson publicly admitted the everyday distortion of justice: "I was as guilty of that as any when I was on the bench, but you have to fund yourself in some fashion.  And so you did it on the backs of the people who were least able to pay."  S39(e).  In a local news story on the assessments of "fines and fees" at the OPCDC, Defendant Flemings-Davillier stated: "Of course, I'd like [the OPCDC] to be funded another way. . . . But we've got to get funded. It is what it is."  S71.  The same story reported Defendant Hunter as stating:  "I think the way we fund criminal justice in New Orleans is a sin. We saw this happening in Ferguson (Missouri).  It's really happening around the county.  It's … backwards.  You're placing an additional burden on someone who (as a result) may end up back in jail."  *Id.* (some alterations in original).

An objective observer can see the strong "possibility" of temptation.  As described above, the Judges can generate Costs revenue for the OPCDC by imposing a variety of costs, fees, or fines when sentencing defendants before them.  All of the Plaintiffs were assessed costs returning to the OPCDC, in amounts ranging from $44.50 (Long) to $744.50 (Cain).  S43.  These costs become part of the Fund.  S37(a).  The Judges, voting en banc as administrators, have control of these funds as "independently elected officials," S5, and "extremely broad" discretion in how they may choose to spend it, S8.  An average person, under these circumstances, might be tempted "not to hold the balance nice, clear, and true" when considering how much money the Plaintiffs could afford to pay on any given day. *Tumey*, 273 U.S. at 532.  This alone is enough to find that Plaintiffs were denied the neutral decision-maker required by due process.

But knowing how dearly the Judges depend on Costs revenue to keep the OPCDC running, the *possibility* of temptation inherent in the Judges' control of these funds turns into an

overwhelming *likelihood*.  Since at least 2012, the OPCDC has taken in about as much money each

year in Costs revenue as it has in Bond Fees—about one million dollars every year, constituting

another quarter of the Fund.  This money, like the Bond Fees, is crucial to the Judges' ability to

keep the OPCDC running.  As put by Defendant Zibilich in 2015: "[W]e collect somewhere in the

neighborhood of about a million dollars a year through fines and fees, not counting restitution.

That million dollars probably represents fully a fourth of the monies that we need to be operational,

and if we are handcuffed in that particular regard, that money replacement's gonna have to come

from some place."  S72.[13]  Without it, the Judges would be faced with difficult decisions involving

cuts to the salaries or jobs of all the people they depend on, and likely short staffed.  S23; Ex. 10

(notes from 2013 meeting between Kazik and City Councilmember in which Kazik reported cuts

in benefits for OPCDC employees and elimination of four positions due to revenue drops); Ex. 11

(2014 letter from Kazik to Deputy Mayor and CAO for the City seeking increased appropriations

so that the Judges could "avoid further pay cuts" for their employees); Ex. 12 (2015 letter from

Deputy Mayor to Mayor relaying OPCDC request for more funds needed to "avoid laying off

staff").

    An objective observer could infer from the undisputed facts in this case that the Judges'

decision-making has been clearly influenced by their structural pecuniary interest in Costs revenue.

For example, the Judges' assessment and collection practices serve primarily to generate revenue

for the OPCDC.  Most people are not assessed fines or restitution (monies that do not fully revert

back to the Judges' control).  S37(b).  And though most people are assessed costs due to other

criminal justice actors at sentencing, S38, those costs are dwarfed by the Judges' assessments for

---

[13] Defendant Zibilich was discussing this lawsuit with City Councilmembers and indicating that the changes implied by Plaintiffs' claims would "handcuff" the Judges' collections work.  Ex. 17.

the OPCDC, Ex. 19 at Ex. B, 10-16, and the Judges have decided that payments are applied to those other actors only *after* all costs for the OPCDC, S46.  Indeed, most debtors owe most of the money assessed right back to the OPCDC.  S37(c); Ex. 10 at Ex. B, 10-16.[14]

A review of the Judges' assessment practices also shows a concerted effort since at least 2013 to increase Costs revenue.  S37.  These efforts followed a major drop in City Money from 2011 to 2012, Ex. 13, and a major drop in cases filed from 2012 to 2013, which continued in 2014 and 2015, Rec. Doc. 248 ¶ 17.  In 2013, the Judges' total Judicial Expense Fund Assessments (*i.e.*, those pursuant to La. R.S. § 13:1381.4(A)(2)) increased by 35% over 2012, despite a 22% drop in the total number of cases closed in 2013.  S37(h).  The Judges also began assessing hundreds of dollars in costs per conviction for the "Indigent Transcript Fund" ("ITF") in 2013.  Ex. 19 at Exs. B, 10-16; S37(f)-(g).  Total assessments for the ITF in 2012 were close to $10,000.  S37(f).  Total assessments in 2013 were about $270,000.  *Id.*  By 2015, when the Judges closed even fewer cases than in 2013, total assessments for the ITF went up to about $300,000, a nearly 3,000% increase over 2012.  S37(g).  There was also a steady downward trend in the number of Judges assessing fines—assessments that the Judges have to split with the D.A.— at all between 2012 and 2015.  S37(e).  In 2012, two Judges assessed no fines; by 2015 nine Judges assessed none.  *Id.*  These increases directly made up for budget shortfalls resulting from lower appropriations from the City.

Under fire to fund themselves from City officials, the Judges have also expressly reported efforts to increase Costs revenue at the back end, through changes in collections, to the City Council.  In a hearing before City Councilmembers on July 9, 2014, regarding the OPCDC's budget, OPCDC judges were asked about their court cost collections efforts.  S70.  Defendant

---

[14] Defendants sentenced by OPCDC judges sometimes also have costs imposed post-conviction for drug testing fees. S45; *see* Ex. 20 at *6 (sentence showing $500 and $190.50 costs imposed); at *5 (Collections Report issued years later showing $1,390.00 bill for "Drug Screening Fee," in addition to costs imposed at sentencing).  This means the total share of court-imposed debt due back to the OPCDC may even increase over time for certain defendants.  *Id.*

Willard explained that the judges were working "collectively and collaboratively" to try to "increase" collections, including by sharing ideas at meetings.  *Id*.  He noted that Defendant Zibilich, who was also at the hearing, is one of the OPCDC's "top collectors."  *Id*.  Defendant Zibilich interjected to explain his innovative methods:

> Basically all you can do is— I mean this is terrible to say, but it's about inconveniencing somebody into paying.  If I put them on the docket once a week and see if I can collect the twenty-five dollars, sooner or later, they're gonna say, 'wow it's costing me an hour-and-a-half, two-and-a-half hours every time I gotta go deal with Zibilich, so maybe, maybe I'll pay so I don't have to see him.'  S70.

Soon thereafter, Councilmember Guidry commented, "This is not at all the way that a court system should be funded."  *Id*.

The facts in the case show that the Judges' need to keep Costs collections up in order to fund the basic operation of the institution which state law mandates that they operate as the controlling executive, and that structure means their decision-making in this area is driven by that pecuniary need.  Systemic increased assessments since 2012 do not reflect new costs at the OPCDC or massive, coincidental changes in individual determinations about what justice requires or what court debtors can afford to pay—they simply reflect practical efforts to fill a budget hole.  Similarly, new efforts to "inconvenience" debtors into paying more, sooner, do not reflect changing attitudes about fair punishment.  The collections process has little to do with carefully calibrated criminal punishment, or justice.  It is driven by the mundane imperatives of debt collection for a bureaucratic budget.  As the OPCDC accountant summed up the situation to the City Council: "The biggest area that we can hopefully influence is gonna be the collection of fees . . . fines and fees."  S36.

Finally, the unconstitutional jailing scheme at the heart of this case, and the Judges' pervasive failure to consider individuals' ability to pay at any point in the process, despite the fact

42

that most individuals are indigent and the Judges' own belief that most are unemployed and indigent, S39, and despite longstanding Supreme Court precedent, is itself evidence that pecuniary pressures bias the Judges' decisions.  In 2014, Defendant Willard told City Councilmembers unambiguously that judges cannot "put somebody in jail simply because they have a debt that's owed to the court."  S70.  Defendant Flemings-Davillier, questioned by journalists about Costs, insisted: "We don't put people in jail (for failure to pay fines or fees).  We don't take their liberty or their property.  But we've got to get funded.  It is what it is."  S71.  Defendant Zibilich insisted in the same article: "They don't go to jail if they fail to pay with me."  *Id*.  In short, the Judges know they are not supposed to be jailing people who cannot afford to pay for nonpayment, and yet they have permitted a Collections Department process that does exactly that.  *See*, *e.g.*, S67, 68.  As members of a group of criminal justice stakeholders from around the Parish, Defendants Buras and Cantrell, representing the OPCDC, even *agreed* that actually considering individuals' ability to pay Costs at sentencing would result in *lower rates of imprisonment at the Parish prison*.  S40(b), 41.  But they insisted that City officials would have to make up the revenue that would also be lost in order for the Judges to agree to implement an ability to pay procedure.  S41.  This is a damning admission: at least two of the Defendants have explained that implementing constitutional procedures would result in less money collected.  An objective observer could find that a person who advocates implementing lawful procedures only if lost revenue can be compensated from other sources has been put in an institutional position in which she has lost "nice, clear, and true" balance that justice requires.

The Judges are impermissibly biased and unable neutrally to adjudicate an individual's ability to pay or the consequences or punishment that should flow from nonpayment.  Plaintiffs are thus entitled to a declaratory judgment on Count Five for essentially the same reasons set forth

above in connection with Count Four: Because the Judges preside over legal proceedings that generate money that they control and significantly rely on as executives—proceedings at which they make vital decisions about facts and law that could result in a person being jailed and at which the Supreme Court requires meticulous observance of procedural protections, including specific evidentiary requirements and fact-finding concerning the willfulness of the non-payment. *See Turner*, 564 U.S. at 448. An average person in their situation might possibly be tempted to consider their separate financial obligations when adjudicating these important issues.

Because these facts are not disputed—indeed, they are established by the Judges' own documents and public statements—Plaintiffs are entitled to summary judgment against the Judges on Count Five. The Court should declare that the Judges' financial incentives create an impermissible conflict of interest when they preside over the legal proceedings required by *Bearden*, *Turner*, and the Fourteenth Amendment prior to a deprivation of liberty for nonpayment.

### 3. The OPCDC Defendants' Unduly Harsh Collection Measures Violate Equal Protection (Count Six)

In Count Six, Plaintiffs seek a declaratory judgment that the OPCDC Defendants' failure to comply with basic legal protections for civil judgment debtors is an unduly harsh debt-collection method that singles out OPCDC debtors for treatment that would be unlawful against other debtors, merely because OPCDC debtors owe civil debts to a government entity.

As Plaintiffs have previously explained, *see* Rec. Doc. 70 at 25-29, the Supreme Court has directly addressed this issue. In *James v. Strange*, 407 U.S. 128, 138 (1972), the Court held that government officials could not use "unduly harsh or discriminatory terms" to collect court costs owed from a criminal case, "merely because the obligation is to the public treasury rather than to a private creditor." There, the Court struck down a Kansas recoupment statute that expressly denied indigent defendants who owed money to the State for indigent defense costs the basic wage

garnishment exemptions available to judgment debtors in civil cases under Kansas law.  *Id*. at 135, 141.  It recognized that "state recoupment statutes" embody "legitimate state interests," but reasoned that those interests "are not thwarted by requiring more even treatment of indigent criminal defendants with other classes of debtors."  *Id*. at 141.  "For Kansas to deny" the basic wage exemptions at issue was for it "to risk denying" a debtor "the means needed to keep himself and his family afloat."  *Id*. at 136.  The result was to "blight" in "discriminatory fashion the hopes of indigents for self-sufficiency and self-respect."  *Id*. at 141-42.  For these reasons, the Court struck down Kansas's "unduly harsh" debt-collection scheme.

In this case, the OPCDC Defendants' use of arrest warrants, jailing, and indefinite detention until payment is received singles out poor OPCDC debtors for treatment that would be unlawful were the debts owed to any other creditor.  A private creditor could not employ these methods of debt collection under Louisiana law.  The civil procedural equivalent—the writ of *capias ad satisfaciendum*—was abolished in Louisiana more than 175 years ago.  La. R.S. § 13:4281 (abolishing writ); *Frey v. Hebenstreit*, 1 Rob. (La.) 561, 562-63 (1842) (stating writ abolished in 1840); *cf.* Black's Law Dictionary, Capias ad satisfaciendum (10th ed. 2014) (a "postjudgment writ commanding the sheriff to imprison the defendant until the judgment is satisfied").[15]  A private creditor who wished to try to coerce payment would employ the procedures available for constructive contempt.  La. Code Civ. Proc. art. 225; *Ast v. Ast*, 2014-1282 (La. App. 3 Cir. 4/1/15), 162 So. 3d 720, 724 (upholding judgment of constructive contempt for failure to pay private money judgment).  Those procedures require that anyone charged with nonpayment of a money judgment be served a rule to show cause in the same manner as a subpoena at least forty-

---

[15] The writ was abolished in Louisiana in the midst of a nationwide wave of reforms aimed at abolishing debtors' prisons in the United States.  *See* Christopher D. Hampson, *The New American Debtors' Prisons*, 44 Am. J. Crim. L. 1, 18-19 (2016).

eight hours before the time assigned for trial of the rule, and may only be found guilty after a trial before a judge. La. Code Civ. Proc. art. 225. The rule to show cause must "state the facts alleged to constitute the contempt." *Id*. Those procedures help ensure that private debtors are afforded notice that they are in default and their ability to pay is a critical issue, as well as an opportunity to be heard on the allegations. *See Turner*, 131 S. Ct. at 2519–20 (explaining that due process similarly requires such notice and procedures prior to jailing for nonpayment of child support debts).

The OPCDC Defendants have similar procedures available to them under Louisiana law, La. Code Crim. Proc. art. 24 (procedure for constructive contempt), but they have chosen not to use them, even though Louisiana law specifically provides that these court debts may be collected like any other civil judgment. *See* La. Code Crim. Proc. art. 886(A).

The OPCDC debt-collection scheme is therefore even harsher than the statute at issue in *James* because it involves confining debtors in a jail cell as a way to extract debts from them. As in *James*, it "blight[s]" the "hopes of indigents for self-sufficiency and self-respect" by forcing them to choose between money that they need for the basic necessities of life and going to jail. *See*, *e.g.*, *Barker v. Wingo*, 407 U.S. 514, 532–33 (1972) ("The time spent in jail . . . has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness."). But Kansas's rule of excluding criminal defendants from some garnishment protections does not approach in severity the Collections Department's extraordinary use of police and jail systems to coerce the collection of debt that is often years old. In Kansas, criminal defendants were merely barred from claiming certain garnishment exemptions. Here, by contrast, the Collections Department does not merely evade garnishment protections; it has been using its access to the local police and jail to arrest people without regard to their ability to pay and without

46

following any of the required procedures for determining ability to pay, and then to keep them there for days or weeks until they or their families bargain or pay.  S57, 67.  The scheme lacks the essential protections present in every similar scheme upheld by the federal courts.  *See, e.g.*, *Fuller v. Oregon*, 417 U.S. 40, 47 (1974) (upholding Oregon scheme when "[t]he convicted person from whom recoupment is sought thus retains all the exemptions accorded other judgment debtors, in addition to the opportunity to show at any time that recovery of the costs of his legal defense will impose 'manifest hardship'"); *Olson v. James*, 603 F.2d 150, 154 (10th Cir. 1979) ("[T]he Court held that indigent defendants were entitled to evenhanded treatment in relationship to other classes of debtors."); *United States v. Bracewell*, 569 F.2d 1194, 1198–1200 (2d Cir. 1978) (discussing the need for individualized consideration of repayment so as not to require repayment that creates hardship in violation of *James* and *Fuller*); *Alexander v. Johnson*, 742 F.2d 117, 124 (4th Cir. 1984) (upholding scheme of payments for appointed counsel costs as long as the indigent defendant is not "exposed to more severe collection practices than the ordinary civil debtor").

Defendants fail to ensure the property exemptions that Louisiana provides to all civil judgment debtors in Louisiana Revised Statutes § 13:3881.  Section 13:3881(A) provides a list of basic "income or property of a debtor," including minimum wages, tools of a trade, equity in an automobile, etc., that "is exempt from seizure under any writ, mandate, or process whatsoever, except as otherwise provided" in that Section.

Further, under federal law, when a court orders garnishment, it cannot garnish more than 25% of a person's wages.  15 U.S.C. § 1673; *see also* La. Rev. Stat. § 13:3881.  Federal law also protects certain benefits from garnishment.  *See*, *e.g.*, 42 U.S.C. § 407 (protecting federal disability benefits from legal process); 42 U.S.C. § 1383(d)(1) (protecting federal Supplemental Security Income); 38 U.S.C. § 5301 (protecting veteran's benefits).  These protections recognize the

47

principle of fundamental fairness embodied in state law, federal law, and Supreme Court precedent, that the government cannot force a person to pay a debt when he or she cannot afford both to pay and to meet the basic necessities of life. *See Adkins v. E.I. DuPont de Nemours*, 335 U.S. 331, 339 (1948) (holding that statute cannot be interpreted to require that a person pay "the last dollar they have or can get, and thus make themselves and their dependents wholly destitute").

It is undisputed that no one at the OPCDC considers an individual debtor's ability to pay court-imposed debt before setting a payment plan or issuing arrest warrants when people cannot comply with Collections Department directives. S40, 48-50, 57. As a result, OPCDC Defendants inevitably coerce some individuals into paying court-imposed debt with property exempt from collection under federal law and La. R.S. § 13:3881 because they are desperate to avoid being jailed. *Id*. Just as in *James*, the OPCDC Defendants' scheme imposes an "unduly harsh or discriminatory ter[m] merely because the obligation is to the public treasury rather than to a private creditor," and so it should be declared unlawful. 407 U.S. at 138.

The essential inequality at the heart of the Collections Department scheme becomes evident when one considers what might happen if a person took out a private loan to pay off the OPCDC. If the person subsequently could not repay that loan, the private creditor could not fundamentally alter the debtor's life by having the person arrested and kept in jail for days or weeks pursuant to a $20,000 secured money bond unless or until the person or her family pays enough money to convince a Collections Agent to recall the warrant at the Agent's discretion. S63-66. But the OPCDC has taken it upon itself to impose those harsh debt collection practices because the debt is to an entity that also happens to control the machinery of the local jail.

### 4.   Defendant Sheriff Wrongfully Imprisoned the Plaintiffs Under State Law (Count Seven)

Plaintiffs seek monetary relief against Sheriff Gusman for wrongful arrest.  They allege that the Sheriff wrongfully imprisoned them by failing to timely and consistently report the fact of their arrest to the relevant actors at the OPCDC and by failing to bring them for initial appearances within 72 hours of their arrest, as required by Louisiana Code of Criminal Procedure § 230.1.  SAC ¶¶ 203-204.

Under Louisiana law, the tort of false imprisonment "consists of two elements: '(1) detention of the person; and (2) the unlawfulness of the detention.'"  *Waganfeald v. Gusman*, 674 F.3d 475, 480 (5th Cir. 2012) (quoting *Kennedy v. Sheriff of E. Baton Rouge*, 935 So. 2d 669, 690 (La. 2006)).  Specifically, as this Court has recognized, "Louisiana law provides that a law enforcement officer having custody of an arrested person shall bring him promptly 'and in any case within seventy-two hours from the time of the arrest, before a judge for the purpose of appointment of counsel."  Rec. Doc. 228 at 57 (quoting La. Code Crim. Proc. art. 230.1(A)).  Detention beyond this 72-hour period is illegal and gives rise to a claim of false imprisonment against the jailer.  *Id.* (citing *State v. Wallace*, 392 So. 2d 410, 413 (La. 1980)).  In its February 3, 2017 Order, the Court noted the Sheriff's "systematic incompetence" in handling Plaintiffs' detentions and held that Plaintiffs had asserted a plausible claim for false imprisonment.  Rec. Doc. 228 at 57.

All remaining Plaintiffs were detained in excess of 72 hours before being brought before a magistrate.  S67.  Ms. Cain was detained seven days; Mr. Brown, fifteen days; Ms. Reynajia Variste, seven days; Mr. Long, six days; and Ms. Maxwell, twelve days.  *See id.*  Accordingly, Plaintiffs must prevail on their individual claims for false imprisonment as a matter of law, and

the Court should enter judgment for the Plaintiffs on Count Seven as to liability.  The Court can then conduct further proceedings solely for the purpose of addressing damages.

### Conclusion

For the reasons explained above, Plaintiffs respectfully ask the Court grant their Motion for Partial Summary Judgment.

Dated: June 20, 2017                    Respectfully submitted,

*/s/ Alec Karakatsanis*
_____

Alec Karakatsanis (D.C. Bar No. 999294)
(Appearing *Pro Hac Vice*)
Civil Rights Corps
910 17th Street, N.W., 5th Floor
Washington, DC 20006
(202)-681-2409
alec@civilrightscorps.org

*/s/ Anna Lellelid*
_____

Anna Lellelid-Douffet
La Bar No. 35204
PO Box 19388
New Orleans, LA 70179
(504) 224-9670 (c)
lellelid.law@gmail.com

*/s/ Bill Quigley*
_____

William P. Quigley
La Bar No. 7769
7214 St. Charles Ave.
Campus Box 902
New Orleans, LA 70118
(504) 710-3074 (c)
quigley77@gmail.com

*/s/ Jon Greenbaum*
*/s/ Mateya Kelley*
*/s/ Hallie Ryan*
_____

Jon Greenbaum (D.C. Bar No. 489887)

Mateya Kelley (N.Y. Bar Reg. 5270400)
Hallie Ryan (V.A. Bar No. 85927)
(Appearing *Pro Hac Vice*)
Lawyers' Committee for Civil Rights Under Law
1401 New York Ave NW Suite 400
Washington, DC 20005
(202) 662-8315
jgreenbaum@lawyerscommittee.org
mkelley@lawyerscommittee.org
hryan@lawyerscommittee.org

*/s/ Jonathan P. Guy*
*/s/ Judy Kwan*
_____

Jonathan P. Guy (D.C. Bar No. 449031)
Judy Kwan (CA Bar No. 273930)
(Appearing *Pro Hac Vice*)
Orrick, Herrington & Sutcliffe, LLP
1152 15th Street, N.W.
Washington, D.C. 20005-1706
(202) 339-8516
jguy@orrick.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 20, 2017, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.


*/s/*      Judy Kwan_____