**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| ALANA CAIN, et al., <br><br>       Plaintiffs, <br> v. <br><br> CITY OF NEW ORLEANS, et al., <br><br>       Defendants. | Case No. 2:15-4479-SSV <br><br> (Class Action) <br> Judge Sarah S. Vance, Sec. R(2) <br> Mag. Judge Joseph C. Wilkinson, Div. 2 |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## I.     Introduction

Defendants' motion is a study in contradiction.  On the one hand, Defendants appear contrite, claiming they have ceased their practice of extracting the OPCDC's operating expenses from indigent debtors by attempting to recall outstanding fines and fees warrants and by revoking the authority of the Collections Department to issue such warrants without judicial review. Defendants claim that they will never again engage in such conduct.  On the other hand, Defendants are unrepentant, maintaining that they have done nothing wrong and that their actions were entirely proper.  Indeed, much of their motion is dedicated to defending the OPCDC's conflicted system of funding its operations from court costs and bail bond fees imposed by OPCDC judges.

Defendants' litigation tactics reveal that they understand the practices at issue here are unsupportable.  In an effort to avoid judgment on technical grounds, they have engaged in a campaign to "pick off" Plaintiffs in this case by recalling or "suspending" their debts and then asserting that the risk of future prosecution is speculative.  Defendants' mootness arguments fail. First, named Plaintiffs do owe outstanding debt to the OPCDC.  Second, where, as here, a plaintiff

seeks class certification prior to a defendant's effort to moot the litigation, she may serve as a class representative throughout the litigation even if her own claims become technically moot. To hold otherwise would be to allow an unconstitutional practice to continue merely because a defendant could withdraw the challenged practice as to individual plaintiffs but leave it intact as to thousands of other affected individuals. Similarly, Defendants' so-called "voluntary cessation" of their practice of permitting subordinates to issue warrants does not moot this case. Defendants have submitted no evidence that they will not resume this practice the minute this litigation is concluded, and they have therefore failed to meet their "heavy burden" under binding Supreme Court and Fifth Circuit precedent. *Parents Involved v. Seattle Sch. Dist.*, 551 U.S. 701, 719 (2007). In fact, Defendants' motion for summary judgment makes clear that they have rescinded this authority only grudgingly, as they continue to assert their practices were entirely lawful.

Defendants' remaining arguments are also meritless. Defendants' suggestion that mandamus is unavailable is irrelevant because Plaintiffs are not seeking a writ of mandamus. With respect to the OPCDC's practice of funding its operations from judicial decisions made by its judges, Plaintiffs' motion for summary judgment explains in substantial legal and factual detail why due process is violated where a judge has an institutional pecuniary interest in the outcome of certain decisions. *See generally* Rec. Doc. 251-1. For all the reasons set forth below and in Plaintiffs' motion, Defendants' motion should be denied.

## II.    Plaintiffs Have Standing Despite Defendants' Efforts to Moot Their Claims and Avoid Judgment

Defendants first contend that they have eliminated any justiciable controversy in this action by recalling Plaintiffs' warrants and debts. Rec. Doc. 250-1 at 3-5. Not so. "To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed

by a favorable decision.'" *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015). "A case becomes moot . . . only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.  As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016) (internal quotation marks and citations omitted) (holding that an unaccepted offer of a judgment cannot moot a case).  Plaintiffs, who at the time of the filing of this lawsuit owed debts and faced imminent and illegal jailing due to Defendants' unconstitutional policies and practices, easily meet these requirements.  As a preliminary matter, Plaintiffs Cain and Brown still owe debts to the OPCDC.  Although Defendants claim to have "suspended" those debts, they have pointed to no legal authority for what "suspension" means, and the very nature of the term implies that Defendants can reinstate them at any time—indeed, for months after Defendants claimed to have "suspended" these debts, they continued to instruct Plaintiff Cain to make debt payments, and they continued to collect those payments.  *See* Rec. Doc. 230-3 (payment receipts for Cain and Brown); *see also* Rec. Doc. 230-1 at 12 (Pls. Memorandum in Support of Motion to Certify Class). More fundamentally, as explained below, despite Defendants' efforts to moot their individual claims, Plaintiffs maintain a concrete interest in this litigation because they have vigorously pursued class certification on issues that are capable of repetition yet evading review, and because they have asserted viable claims for compensatory damages for false imprisonment under Louisiana law.

Defendants assert that Plaintiffs' claims are moot because Plaintiffs have paid their debts, their debts have been cancelled, or because Defendants have changed their policies.  Rec. Doc. 250-1 at 2.  Defendants rely on the Declaration of Robert Kazik, who states that "no named plaintiff, in this case, currently owes fines or fees to the Judicial Defendants," and that, since the filing of this lawsuit, Vanessa Maxwell paid her debt in full and Defendants one-by-one suspended

3

or waived the remaining balances of Plaintiffs Alana Cain, Ashton Brown, and Reynajia Variste. Rec. Doc. 250-3 at ¶ 18, at pp. 22, 23, 25.   As explained above, it is plain by the terms of Defendants' own evidence that Plaintiffs Cain and Brown, whose debts are merely "suspended," still owe money to the OPCDC.  *Id*. at 22, 23; *see also* Rec. Doc. 230-3 (payment receipts for Cain and Brown).  Defendants also contend that they have mooted Plaintiffs' claims by purportedly implementing a number of policy changes, including as recently as April 2017.  Rec. Doc. 250-3 at ¶ 27.  As explained below, Defendants' own facts show that they have not mooted Plaintiffs' claims.  Even assuming, however, that Defendants actually enacted the claimed policy changes, since Plaintiffs filed their motion for class certification on February 10, 2017,[1] Defendants have also attempted to "pick off" Plaintiffs by satisfying small claims to moot this case and thereby thwart class certification.  But Defendants' actions cannot defeat Plaintiffs' standing to represent a class of similarly-situated individuals under these circumstances.

The named Plaintiffs, who indisputably had standing at the time this suit was filed, can serve as class representatives throughout the litigation regardless of whether Defendants withdraw their debts.  The Supreme Court has held that "[t]here may be cases in which the controversy involving the named plaintiffs is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion."  *Sosna v. Iowa*, 419 U.S. 393, 402 (1975).  This occurs in two principal situations, either of which is enough to defeat a claim of mootness.  First, it occurs in cases that are by their nature transitory, and are, therefore, capable of repetition yet evading review, but where there is a "constant existence of a class of persons suffering the deprivation."  *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975).  And second, it occurs in cases where the defendant tries to "pick off" plaintiffs by satisfying small claims to frustrate class

---

[1] The Court has since denied Plaintiffs' motion for class certification without prejudice so that it may be re-urged on the schedule imposed by the Court. Rec. Doc. 237.

certification. *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1050 (5th Cir. 1981). Both situations are present here. In either circumstance, "the certification can be said to 'relate back' to the filing of the complaint." *Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 919 (5th Cir. 2008) (quoting *Sosna*, 419 U.S. at 402). This case falls squarely within the *Gerstein* exception, as there is a constant class of people being assessed court debts in the OPCDC, and because the nature of their claims is inherently transitory, as they last only so long as their debts remain unpaid or Defendants choose whether or not to waive them.

With respect to the second set of circumstances, the Fifth Circuit recognized in *Zeidman* that by tactically picking off successive named plaintiffs by redressing individual claims, "the defendants would have the option to preclude a viable class action from ever reaching the certification stage." *Zeidman*, 651 F.2d at 1050. The court found that the plaintiffs maintained a personal stake in the controversy because they vigorously advocated for their right to a class action. *Id.* at 1043. Under those circumstances, the Fifth Circuit reasoned, courts should apply the relation back doctrine to address the defendants' "purposive acts." *Id.* Accordingly, where a motion for class certification is pending, a class action may not be dismissed for mootness simply because the defendants have purportedly redressed the named plaintiffs' individual claims. *Id.* at 1051.[2]

---

[2] The Fifth Circuit has held that Zeidman remains good law after *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523 (2013). In *Fontenot v. McCraw*, the Fifth Circuit discussed the impact of *Genesis Healthcare* on *Zeidman*. *See* 777 F.3d 741, 750-51 (2015). Specifically, in *Genesis Healthcare*, the Supreme Court discussed how mootness applies to collective actions under the Fair Labor Standards Act, holding that those cases involving the "inherently transitory" relation back rationale did not apply to the respondent's case for damages because "a claim for damages cannot evade review." 133 S. Ct. at 153. The Fifth Circuit expressly held that *Genesis Healthcare* "does not foreclose the broader *Zeidman* approach to the relation back doctrine," but rather that dicta in the case undermined some of *Zeidman*'s holdings with respect to "money damages cases." *Id.* at 750. The Fifth Circuit declined to address whether *Genesis Healthcare* overruled *Zeidman* because the issue was not before the court, as *Zeidman* was factually dissimilar. *Genesis Healthcare* therefore has no bearing on *Zeidman*'s application to Plaintiffs' claims for equitable relief, which, unlike claims for money damages, do have a tendency to evade review, especially where, as here, Defendants have attempted to moot Plaintiffs' claims. *See also Suttles v. Specialty Graphics, Inc.*, No. A–14–CA–505 RP, 2015 WL 590241, at *4-6 (W.D. Tex. Feb. 11, 2015) (addressing *Fontenot* and *Genesis* and holding that *Zeidman* is still good law where motion to certify class related back to the filing of the original complaint and the offer of judgment did not moot the plaintiff's individual or class complaint).

*Zeidman* applies squarely to the present case.  Here, Plaintiffs continue to have a personal stake in the controversy.  First, as was critical to the Fifth Circuit's decision in *Zeidman*, Plaintiffs' motion for class certification was filed on February 10, 2017, before many of Defendants' efforts to moot Plaintiffs' case.  *See* Rec. Doc. 230; Defs.' UMF 42-47; Kazik Decl. ¶¶ 25-27, Exs. 10-11 (describing that as recently as February through April 2017, efforts were made to change policies and practices to address Plaintiffs' allegations).  While it is true that on April 21, 2016, the Court previously dismissed Plaintiffs Variste and Long because they had no outstanding debts and were no longer incarcerated, Rec. Doc. 109 at 18-21, this occurred before Plaintiffs moved for certification and before it became apparent the Defendants were attempting to pick off Plaintiffs in an effort to eliminate the class action.[3]  Because Plaintiffs continue to have a stake in this litigation, the relation back doctrine applies and Plaintiffs' claims brought individually and on behalf of the class are not mooted.  *See also Henderson v. Eaton*, No. CIV. A. 01-0138, 2001 WL 969105, at *6 (E.D. La. Aug. 23, 2001) (Vance, J.) (applying *Zeidman* to deny a motion to dismiss for mootness where Plaintiff filed a motion to certify prior to the defendants' attempt to moot the case); *Sarmiento-Perez v. Las Colinas Intern., Inc.*, 2015 WL 3539571 (N.D. Tex. June 5, 2015) (holding that, under *Zeidman*, plaintiffs continued to have a legally cognizable interest in the outcome of the litigation because their motion for conditional certification was pending when the defendants attempted to moot their claims).

Relying on a handful of inapposite, single-plaintiff cases, Defendants argue that Plaintiffs "cannot" show that they have suffered a concrete and particularized injury.  Rec. Doc. 250-1 at 4.

---

[3] Plaintiffs also have active claims for damages against the Sheriff for false imprisonment under Louisiana law because they were detained beyond a 72-hour period before being brought before a judge, a concrete injury that Defendants have not even attempted to redress.  *See* Rec. Doc. 228 at 57 (holding that Plaintiffs stated a plausible claim for false imprisonment because they were held in excess of 72 hours before being brought before a tribunal); *see also* Pls.' Mot. for Summ. J., Rec. Doc. 251-1 at 49-50.

6

However, the cases Defendants cite are not class actions, and in fact expressly distinguish cases like the present one where there is a class generating a continuing controversy and the named plaintiffs had standing when the suit was filed. *See, e.g., Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1288 (5th Cir. 1992) ("This case differs from those in which the Court has found that the presence of a class generates a continuing controversy even though the claim of the named plaintiff has become moot. . . . Here, there is neither a certifiable class of similarly situated individuals nor a real and immediate threat to such a class."); *see also County of Riverside v. McLaughlin,* 500 U.S. 44 (1991); *United States Parole Comm'n v. Geraghty,* 445 U.S. 388 (1980); *Sosna v. Iowa,* 419 U.S. 393 (1975). Accordingly, Plaintiffs concrete interest in the litigation persists and the authority cited by Defendants does not apply to this action. The Court should deny Defendants' motion for summary judgment.

## III.   Defendants' Purported "Voluntary Cessation" Does Not Moot This Action

Defendants also contend that Plaintiffs' claims have been mooted because Defendants have voluntarily ceased the challenged collection practices. Specifically, Defendants claim that they have rescinded the Collections Department's authority to issue warrants, recalled all fines and fees warrants issued solely for a failure to pay, "written off" money owed to the Criminal Court, and worked with the Sheriff to bring arrestees to court in a timely manner. Rec. Doc. 250-1 at 11 & n.69.

As an initial matter, much of Defendants' cited evidence does not support their claims. For example, Defendants cite no evidence for their assertion that they have "[m]ade careful study of all criminal court systems to identify all active fines and fees warrants and recalled those issued at any time, by any one (Collections Department, current or former judges) when the ground was solely a failure to pay." *Id.* at 11. To the contrary, Defendants' statement of facts shows that the

7

Judges did *not* recall warrants issued by the Collections Department or a judge where "it was determined that the warrant was also for failure to … pay restitution." Rec. Doc. 250-2 ¶¶ 45, 46. Thus, Defendants themselves make clear that warrants for failure to pay, issued by the Collections Department or a judge, remain outstanding. *Id*. And Defendants' cited evidence for the proposition that they rescinded the Collection Department's authority to issue warrants is an article about Justice Gorsuch not using a Supreme Court clerk pool. *Id.* at n.69.

Most importantly, Defendants do not even claim to have mooted several of Plaintiffs' claims. Defendants do not (and cannot) claim to have mooted any of the claims related to institutional financial conflicts of interest (and indeed, they vigorously defend their practices on this score). Moreover, Defendants do not claim that they have stopped using warrants for failure to pay altogether, have stopped collecting oaths or affidavits for those warrants, or have stopped setting fixed money bonds on those warrants, and they do not claim that they have begun to employ the exemptions and protections that federal and state law require. Thus, the only behavior that Defendants claim to have stopped is the automatic issuance of arrest warrants by Collections Agents without judicial review.

Indeed, with respect to prospective changes, it appears that Defendants have modified their behavior in only that way. In the course of reviewing certain case dockets, Plaintiffs happen to have come across the following minute entry from October 14, 2015:

```
>THE DEFENDANT, WESTON WILLIAMS: *CDC COLLECTION DEPT FILED>
DEFENDANT DETAIL COLLECTION REPORT, WITH REQUEST TO ISSUE ALIAS
CAPIAS. -SENTENCING DATE: 2/12/15. -PROBATION EXPIRATION
DATE:2/12/20. -ASSESSMENT TOTAL: $800.00. -4 PAYMENTS POSTED-
TOTAL-$400.00- LAST PAYMENT 7/01/15. THE DEFENDANT DID NOT
RESPOND TO THE MAILED NOTICE. UPON REVIEW BY THE COURT; >THE
COURT ISSUED AN ALIAS CAPIAS FOR HIS ARREST WITH NO BOND OR
ROR. >CONTINUED WITHOUT DATE.
```

*See* Exhibit A, Third Kelley Decl. ¶ 20.  It appears from this docket entry that Defendants are collecting outstanding debts in essentially the same manner as before this suit was filed, but with the addition of judicial review.

To the extent Defendants deny any of this, this Court should still deny Defendants' motion because Plaintiffs have been unable to test Defendants' purported policy changes through discovery.  Third Kelley Decl., ¶¶ 15-19.  Discovery has been stayed since well before Defendants even made this argument.  *Id.* ¶ 16.  Plaintiffs have thus been unable to confirm whether, how, and to what extent Defendants have actually undertaken any of the claimed changes.  Accordingly, under Rule 56(d) the Court cannot grant Defendants' motion because Plaintiffs "cannot present facts essential to justify [their] opposition."  *See* Fed. R. Civ. Proc. 56(d); Third Kelley Decl. ¶¶ 15-19.  Plaintiffs' inability to rebut Defendants' claims with evidence is a separate and independent basis on which to deny Defendants' motion.  *See* Fed. R. Civ. Proc. 56(d) (where facts essential to a nonmovant's opposition are unavailable, court may deny motion for summary judgment).

Finally, regardless of whether Defendants have withdrawn the Collection Department's authority to issue warrants or recalled the offending warrants, courts sensibly recognize that a defendant cannot defeat jurisdiction by claiming a sudden policy shift.  The Supreme Court has noted that "voluntary cessation of a challenged practice rarely moots a federal case."  *City News and Novelty v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001); *see Knox v. Serv. Employees Int'l Union*, 132 S. Ct. 2277, 2287 (2012); *Parents Involved v. Seattle Sch. Dist.*, 551 U.S. 701, 719 (2007).  As Defendants concede, a defendant who asserts mootness on the basis of voluntary cessation "bears the formidable burden of showing that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  Rec. Doc. 250-1 at 10; *Friends of the Earth, Inc. v. Laidlaw Environmental Serv. (TOC), Inc.*, 528 U.S. 167, 190 (2000); *Parents*

*Involved*, 551 U.S. at 719 (holding that municipal defendant failed to meet "heavy burden" to show mootness). "In keeping with these Supreme Court decisions, this Court also employs this standard, even for government actors." *Doe v. Wooten*, 747 F.3d 1317, 1322 (11th Cir. 2014).

Here, Defendants have provided no evidence that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190. Instead, Defendants merely claim that they are "resolved to the fact" that the Collections Department will not issue warrants and that they have "completely and irrevocably eradicated" the prior Collections Department system. Rec. Doc. 250-1 at 11-12. But there is no actual evidence supporting these claims. Indeed, as explained above, Defendants own facts are to the contrary. Rec. Doc. 250-2 ¶¶ 45, 46. Defendants are simply asking the Court to accept their word, which is not enough. As this Court has stated, "A defendant's 'bare assurance' that it will not engage in the conduct again is insufficient to meet its burden." *Advocacy Ctr. for Elderly & Disabled v. Louisiana Dep't of Health & Hosps.*, 731 F. Supp. 2d 583, 598 (E.D. La. 2010). There is no evidence that once this suit is dismissed Defendants will not return to these practices, particularly if the institutional funding conflicts of interest described in Plaintiffs' motion for summary persist, because it was those pressures that led to the policies in the first place. Rec Doc. 251-1 at 2-13. If Defendants leave the bench, new judges could reinstitute these practices. If Defendants truly intended to never repeat these practices again, they would not object to a consent order being entered to that effect. That Defendants are vociferously fighting an order declaring these practices unconstitutional—and the fact that they have consistently defended this practice on the merits through multiple motions to dismiss and argument throughout this case—renders them unable to prove that the violations will not recur. It is reasonable, indeed likely, that the challenged practices will resume if this lawsuit is mooted without a final judgment.

In any event, the Supreme Court has held that defendants cannot meet their "heavy burden" when they simultaneously "vigorously defend" the constitutionality of their actions.  *See Parents Involved*, 551 U.S. at 719 (declining to find mootness where "the [defendant] vigorously defends the constitutionality" of its policy); *Knox*, 132 S. Ct. at 2287 ("[S]ince the union continues to defend the legality of the Political Fight–Back fee, it is not clear why the union would necessarily refrain from collecting similar fees in the future."); *Rich*, 716 F.3d at 532 ("Florida 'continue[s] to press on appeal that the voluntarily ceased conduct should be declared constitutional' and has 'never promised not to resume the prior practice.'" (quoting *Jager v. Douglas Cty. Sch. Dist.*, 862 F.2d 824, 833-34 (11th Cir. 1989))).   Here, Defendants' motion for summary judgment is unrepentant from its very first paragraph: "[E]ven on the merits, the Judicial Defendants believe no constitutional infirmity exists."  Rec. Doc. 251-1 at 1; *see also id.* at 15 ("What the judges did was delegate certain authority to their subordinate employees.  Judges are allowed to delegate.").[4] In light of Defendants' insistence throughout their motion (and throughout this entire case) that their actions were entirely proper, they cannot meet their "heavy burden" as a matter of law.  A judgment is needed to protect Plaintiffs' rights.[5]

Defendants' case authority does not support their position.  In *Spence v. Nelson*, 533 F. App'x 368, 371 (5th Cir. 2013), the plaintiff's claim was mooted where there no evidence that the

---

[4] Contrary to Defendants' assertions, the Supreme Court has never applied a rebuttable presumption in favor of government actors in voluntary cessation cases.  Rather, government defendants are held to the same standard as other defendants.  *See Parents Involved*, 551 U.S. at 719.  Even where lower courts have applied such a presumption, it is rebutted when the government defendant still maintains the constitutionality of its original actions.  *See, e.g.*, *Rich*, 716 F.3d at 532.

[5] Plaintiffs recently became aware of a new law, Louisiana House Bill 249, that makes various changes to state law and, among other things, requires courts to determine whether the imposition of "financial obligations" on a felony defendant "would cause substantial financial hardship to the defendant or his dependents."  The law also permits modification of financial obligations during times of hardship.  H.B. 249 was passed on June 15, 2017 and will not become law for nearly 13 months (effective August 1, 2018).  *See* https://legiscan.com/LA/bill/HB249/2017.  This law does not eliminate the need for a ruling from this Court, because Plaintiffs' claims are broader than the issues addressed by H.B. 249, and any judgment from this Court would be in harmony with H.B 249's text and objectives, as the new law only applies to felony cases and does not go into effect for nearly 13 months.

defendant prison's cessation of its practice of prohibiting packages from Iran was a sham or mere litigation posturing, and where it was too speculative that the practice might be resumed.  Here, the institutional funding conflict whereby the court's operations are funded by the fees it assesses remains, and, as noted above, Defendants continue to maintain that their actions were proper, which is inconsistent with a good-faith cessation of their unconstitutional collections practices. *See*, *e.g.*, Rec. Doc. 250-1 at 16 ("Nothing prohibits a judge from pre-determining that a capias may issue if certain circumstances occur.").  In addition, from the outset of this case, Defendants have attempted to eliminate Plaintiffs' standing by recalling any warrants or outstanding fines and fees owed while making public comments concerning the need for them to collect money to fund their own budget.  Defendants have therefore demonstrated that they are willing to manipulate the Court's jurisdiction to achieve the dismissal of this litigation.[6]

## IV.  Defendants' Mandamus Argument Fails Because Plaintiffs Are Not Seeking Mandamus

Defendants' argument that this Court has no power to direct the state courts in performance of their duties is meritless.  *See* Rec. Doc. 250-1 at 6-7.  Plaintiffs have not sought mandamus, and all of the cases Defendants cite are therefore inapposite.  The limitations placed on federal courts to "direct[] state courts or their judicial officers in the performance of their duties" serve to protect state proceedings from federal interference based solely on a claim that a state court has not performed its duties under state law.  *See, e.g.*, *In re Campbell*, 264 F.3d 730, 731 (7th Cir. 2001) ("We can issue mandamus against a state judicial officer . . . .  But we cannot, as a general rule anyway . . . , use our power to issue mandamus to a state judicial officer *to control or interfere*

---

[6] Defendants' other cases are inapposite.  In *Davis v. Biggers*, No. CIV.A. H-12-1173, 2013 WL 5703616, at *2 (S.D. Tex. Oct. 17, 2013), the court found that a claim for a wheelchair-accessible van was rendered moot once the defendant obtained the van, and in *Tectrans, Inc. v. New Orleans Aviation Bd.*, 695 F. Supp. 2d 313, 322 (E.D. La.), aff'd, 464 F. App'x 199 (5th Cir. 2010), the plaintiff's claim relating to an unsuccessful taxi services bid was mooted when all bids were rejected.  *Davis* and *Tectrans* are nothing like this case.

with state court litigation . . . ." (emphasis added)).  Plaintiffs' Second Amended Class Action Complaint is not a petition for a writ of mandamus.  Rather, it involves claims that the policies and practices of state governmental actors violate the *federal constitution*.  Indeed, it involves claims *this Court has already determined to state sufficient violations of federal law*.  For these federal constitutional violations, Plaintiffs seek declaratory relief.  Defendants' argument is inapplicable and should be disregarded by the Court.

## V.     This Action Does Not Arise Under the Declaratory Judgment Act and *Trejo* Therefore Does Not Apply

Although this Court has already rejected Defendants' argument, Defendants continue to ask the Court to abstain from exercising jurisdiction over this case because it allegedly fails to satisfy the requirements of the Declaratory Judgment Act.  Rec. Doc. 250-1 at 8-9.  This request is misguided.  Title 28 U.S.C. § 1331, not the Declaratory Judgment Act, provides the basis for subject matter jurisdiction in this action, and the Court lacks discretion to refuse to exercise jurisdiction over Plaintiffs' claims.

Plaintiffs' federal claims arise under the civil rights statute 42 U.S.C. § 1983, and their supplemental claims arise under Louisiana tort law.  Because Plaintiffs have a cause of action arising under federal law, this Court has original jurisdiction under 28 U.S.C. § 1331.  *See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. California*, 463 U.S. 1, 27–28 (1983) ("Congress has given the lower federal courts jurisdiction to hear . . . those cases in which a well-pleaded complaint establishes . . . that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.").  This Court therefore does not need to predicate its jurisdiction on the Declaratory Judgment Act, 28 U.S.C. § 2201.

In contrast to the present case, under some circumstances federal courts may decline to exercise jurisdiction where a suit arises purely under the Declaratory Judgment Act. For example, in *Trejo* the court recognized it had discretion to abstain from exercising subject matter jurisdiction over an action under the Declaratory Judgment Act. *Trejo*, however, involved a claim for declaratory judgment of the plaintiff's rights and responsibilities *under Texas law*. *See St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 587 (5th Cir. 1994). The Fifth Circuit established various factors for courts to consider when determining whether they should decline subject matter jurisdiction, many of which focus on whether the state court is better equipped forum to adjudicate the action. *Id.* at 590-91. Those factors do not apply here because subject matter jurisdiction in the present action is based on the federal civil rights statute. While it is true that Plaintiffs seek declaratory relief as a remedy, they seek a declaration of Defendants' obligations and responsibilities under the United States Constitution.

Moreover, even if *Trejo* did apply, this Court has already weighed those factors in favor of exercising jurisdiction over this action. Even though Plaintiffs' § 1983 claims sufficed for federal question jurisdiction, out of an abundance of caution Plaintiffs originally included the Declaratory Judgment Act among the grounds for jurisdiction in their First Amended Complaint. *See* Rec. Doc. 7, ¶ 5. Accordingly, the Court weighed the *Trejo* factors in denying the Judges' motion to dismiss the declaratory claims against them. *See* Rec. Doc. 119 at 15-19; *id.* at 17 ("Having considered the relevant factors, the Court will exercise its discretion to hear plaintiffs' claims for declaratory relief.").

## VI.   The Court Has Already Rejected the Argument That Plaintiffs Bear the Burden of Affirmatively Asserting Indigence

Defendants again claim that Plaintiffs must claim indigence to assert their claims. The Court has already rejected this argument. *See* Rec. Doc. 136 at 15-16 ("Defendants do not explain

in what form and/or at what proceeding plaintiffs were expected to [affirmatively assert their indigence]. No court has held that indigent debtors are required to initiate proceedings to request a modification of their financial obligations or otherwise risk imprisonment for nonpayment."). Plaintiffs incorporate by reference their prior arguments on this issue. *See* Rec. Doc. 100 at 2-6. It is also worth noting that although this is Defendants' second swing at this argument, they provide no citation to support their claim that "Louisiana cases suggest that since the criminal defendant must affirmatively plead inability to pay, the burden is with him/her." Rec. Doc. 250-1 at 16. Even if that were true as a matter of state law, it would do nothing to change the overriding requirements of the federal Constitution, which this Court recognized in rejecting Defendants' arguments. *See* Rec. Doc. 136.

## VII.   Plaintiffs' Official Capacity Claims Against the OPCDC Defendants Are Proper

Defendants also claim that the Eleventh Amendment bars claims against the OPCDC Defendants in their official capacity. Rec. Doc. 250-1 at 9-10. Assuming for the sake of argument that the OPCDC Defendants are acting as state officials rather than municipal officers in this context, Defendants are simply mistaken that "[s]uing a state official in their official capacity is no different than suing the state directly." *Id.* at 10. As this Court has recognized, under *Ex parte Young* and similar cases, suits against state officials for prospective relief, unlike suits against states, are not barred by the Eleventh Amendment. *See*, *e.g.*, Rec. Doc. 228 at 53 ("[A] court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002))). As Judge Boudin explained in a decision cited by this Court, Rec. Doc. 228 at 50:

> [I]n the sovereign immunity context, the Supreme Court has repeatedly said that an official who acts unconstitutionally can be enjoined even though the state is

immune from damages.  *E.g.*, *Ex parte Young*, 209 U.S. 123, 159 (1908).  While one might at first suppose that these were injunctions against the official in his personal capacity (based on the fiction that unconstitutional action is not "official"), the Court has stated that the injunction can be issued against the official in his official capacity.  In *Will* itself, 491 U.S. at 71 n.10 (1989), the Court said that "of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State."  *Accord Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985).

*Dirrane v. Brookline Police Dep't*, 315 F.3d 65, 71–72 (1st Cir. 2002).

In general, a federal court can issue an injunction against a state official in her official capacity, but not against the state she represents.  It logically follows that a suit for prospective relief against a state official is not the same as a suit against the entity she represents.  Accordingly, Plaintiffs' official capacity claims against the OPCDC Defendants are not barred by the Eleventh Amendment.

This well-established distinction between state officials in their official capacities and states themselves with respect to prospective relief should not be obscured by the notion that official-capacity claims against municipal officials are in some sense equivalent to claims against their municipalities.  In *Turner v. Houma Mun. Fire & Police Civil Serv. Bd.* (cited by this Court in its Order and Reasons dismissing the Orleans Parish Criminal District Court and Judicial Administrator Robert Kazik in his official capacity, Rec. Doc. 123 at 4), the Fifth Circuit did say that "[i]n any case in which a defendant government official is sued in his . . . official capacity, and the city or state is also sued . . . the official-capacity claims and the claims against the governmental entity essentially merge."  229 F.3d 478, 485 (5th Cir. 2000).  *Turner*, however, involved only municipal defendants. Accordingly, this statement is (incorrect) dicta as to state officials.  As explained above, an official-capacity claim against a state official for prospective relief is *not* the same as a claim against the state. Insofar as *Turner*'s dicta says otherwise, Plaintiffs

respectfully submit that it is mistaken.  In any event, because the statement in *Turner* is mere dicta, it is not binding on this court and the Fifth Circuit could recognize as much without needing to formally overturn itself.[7]

**VIII.  The OPCDC Defendants Do Not Meaningfully Defend The Structural Financial Conflict of Interest Alleged in Count Five**

Undercutting their cries of voluntary cessation and mootness, Defendants mount a full-throated defense of the financial conflict of interest alleged in Count Five of Plaintiffs' Complaint and argued in Plaintiffs' motion.  In essence, Defendants argue that the federal courts should trust them, that the institutional conflict can have no impact on their decisions, and that such conflicts are not limited to Orleans Parish.  These defenses fail to engage with the applicable legal standards that Plaintiffs cited and that this Court must apply.

Defendants' basic defense is startling in its cynicism: "[F]ederally assessed fines and costs are collected by the U.S. Attorneys, who in turn replenish the public treasury. . . . To one extent or another, every court is funded by poor but guilty criminal defendants.  Does it really make a constitutional difference that this particular money is funneled through the government's general fund and is then appropriated back to a court?"  Rec. Doc. 250-1 at 20.  Of course, it is not accurate to state that the same money assessed by federal courts is "appropriated back to" them.  Funds are commingled into a general purpose fund, but budget appropriations to the federal courts are entirely separate from what fines and fees federal judges assess in individual cases, and federal judges do not have the responsibility of raising the money to pay for their own courthouses or law clerks.  In other words, there is an entire Congressional and Presidential budgetary process that

---

[7] This Court relied on this same language from *Turner* in dismissing Plaintiffs' claims against Defendant Kazik in his official capacity.  *See* Rec. Doc. 123 at 4 (inferring, from its conclusion that the OPCDC is a state entity with sovereign immunity, that Plaintiffs' official-capacity claims against Kazik must also fail).  For all the reasons set forth above, Plaintiffs respectfully submit that this inference was in error.  But this does not affect the Court's power to rule on the pending motions.

determines the funding of federal courts.  By contrast, a quarter of the OPCDC's general operating expenses come directly from the costs and fines that it assesses and collects.  Rec. Doc. 251-1- at 2-9.  The inherent financial conflicts of interest in the OPCDC are nothing like the United States federal court system.

Defendants admit, as they must, their dependence on the fees they assess: "In the absence of this method, every year every court would be in Baton Rouge and before its local government making a pitch for funding."  Rec. Doc. 250-1 at 18.  It is no defense that their system "seems efficient."  *Id.*  Nor does it help that "[t]he judges divide the resources evenly by court sections." *Id.*  What matters is that a quarter of the funds used to pay for the OPCDC's operating expenses (including the salaries of judges' staff) is derived from the costs and fines (largely costs) collected by the judges and their staff.  *See* Rec. Doc. 251-1- at 2-9.  The judges therefore rely directly on the collection of these costs.  Defendants' argument that "[n]o plaintiff claimed that the presiding judge was biased against them when their guilty pleas were accepted and sentence imposed" is a red herring and irrelevant under the binding constitutional precedent that Plaintiffs cite.  *Id.*  And Plaintiffs' claims are prospective: They did not waive their constitutional right to a neutral tribunal in future debt-collection proceedings concerning whether they should be jailed for non-payment simply because they did not object previously to the assessment of court debts at sentencing.

Defendants also raise a variety of irrelevant facts in support of their practice of assessing fines and fees, such as that the Fund is audited, and that Defendants can be voted out of office every six years.  *Id*. at 17-19.  Again, Plaintiffs do not challenge the initial assessments of court debts.  Further, to the extent these arguments apply to Defendants' collection practices, it does not matter than an unconstitutional practice is potentially subject to public scrutiny.  Plaintiffs' claim is not that the money collected from poor defendants has been spent wastefully or that these

particular Defendants are undeserving of their judgeships.  Nor does it help that the Judges' interest in the money they assess "is not personal." *Id*. at 19.  As Plaintiffs explain at length in their motion for partial summary judgment, "the due process neutrality principle goes beyond cases in which a judge has a personal financial interest in a case.   More fundamentally, it protects against institutional conflicts of interest that arise when judges have dual roles that could offer a 'possible temptation' to let fiscal executive responsibility affect judicial decision-making."  Rec. Doc. 251-1 at 31-33.  The Supreme Court made clear that the *Tumey-Ward* standard does not merely prohibit a judge from sharing directly in the fees and costs stemming from his cases: "Plainly that 'possible temptation' may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court." *Ward v. Vill. of Monroeville, Ohio*, 409 U.S. 57, 60 (1972); *Brown v. Vance*, 637 F.2d 272, 284 (5th Cir. 1981) ("The Court's inquiry [is] whether the economic realities make the design of the fee system vulnerable to a 'possible temptation' to the 'average man' as judge."); *see also* Rec. Doc. 251-1 at 31-34; 38-44; n.11.

Likewise, Defendants' reliance on their oaths or a presumption of honesty and integrity is misplaced.  Rec. Doc. 250-1 at 21.  "The *Tumey-Ward* test, in sum, is levelled at the system, not the individual judge.  This is the reason it speaks of temptation to the average man." *Brown*, 637 F.2d at 284.

Defendants ask, "If the judges do not run the courthouse, who should?"  Rec. Doc. 250-1 at 19.  But no one questions that judges may "run" a courthouse.  The narrow problem presented in this case is whether a conflicting duty of administering and funding the courthouse's operations is so inextricably bound up with a separate duty to fairly adjudicate indigent debtors' ability to pay court-imposed debt that it offends due process.  Although Defendants acknowledge the *Tumey-*

*Ward* standard, *id*. at 21, they go on to suggest that the Fifth Circuit applies a standard that is more permissive on its face:

> The Supreme Court has consistently enforced this basic procedural right and held that decision makers are constitutionally unacceptable in the following circumstances: (1) where the decision maker has a direct personal, substantial, and pecuniary interest in the outcome of the case; (2) where an adjudicator has been the target of personal abuse or criticism from the party before him; and (3) when a judicial or quasi-judicial decision maker has the dual role of investigating and adjudicating disputes and complaints.

Rec. Doc. 250-1 at 21 (citing *Bigby v. Dretke*, 402 F.3d 551, 559 (5th Cir. 2005)). But this language, drawn from *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1052 (5th Cir. 1997), should not be read as implying that those three circumstances are the only ones in which decisionmakers are constitutionally unacceptable. What the Fifth Circuit has actually held is:

> In an effort to prevent "even the probability of unfairness," courts have identified situations in which the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable. Such situations *include* circumstances in which the adjudicator has a *direct, personal, substantial, and pecuniary* interest in the outcome of the case or in which the adjudicator has been the target of personal abuse or criticism from the party before him, or "situation[s] . . . which would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true."

*Baran v. Port of Beaumont Nav. Dist. of Jefferson Cty. Tex.*, 57 F.3d 436, 444 (5th Cir. 1995) (emphasis added) (footnotes omitted). Significantly, the list in *Baran* captures the broader *Tumey-Ward* standard, rather than the more specific examples described in *Valley*. Nowhere did the *Baran* court state that the three particular circumstances later articulated by *Valley* were exhaustive. Defendants attempt to capitalize on this false narrowing by claiming that "[o]nly Category One is at issue." Rec. Doc. 250-1 at 21. But this a specious argument. What is actually at issue here is the general category described by the Supreme Court in *Tumey* and *Ward*, and by the Fifth Circuit in *Baran*: those situations where the adjudicator has an interest in the outcome of their adjudications.

**IX.     The Bond Statutes Create an Unconstitutional Financial Incentive for the Judges**

With respect to the bond fees and the inherent bias they create for the OPCDC Defendants, as alleged in Count Four of Plaintiffs' Complaint, Defendants argue that "this very Court, in legal analysis adopted and affirmed by the Fifth Circuit, has previously addressed and rejected virtually identical *Roemer*-based arguments that Louisiana's bail bond statutes violate the Fourteenth Amendment's due process clause or are otherwise unconstitutional."  Rec. Doc. 250-1 at 24 (citing *Broussard v. Par. of Orleans*, No. CIV. A. 00-2318, 2001 WL 1335289 (E.D. La. Oct. 29, 2001)). But this is simply not the case.

First, Plaintiffs addressed and disposed of this argument when it was made by the Sheriff. *See* Doc. 35 at 7-9.  And this Court has already agreed.  Doc. 228 at 56.  In short, *Broussard* did not so much as mention the statute Plaintiffs challenge here, La. R.S. § 22:822; *see* Rec. Doc. 251-1 at 34, and had *nothing* to do with the judicial financial conflict of interest alleged in this lawsuit. *Broussard* did not concern a suit against any judges.  Rather, it was a lawsuit only against Louisiana Sheriffs and the Clerk of the OPCDC alleging that "the statutes at issue tempt sheriffs to impose multiple bookings upon arrestees to raise revenue for the sheriff's office in violation of the principles of *Tumey* and *Ward*."  *Broussard*, 2001 WL 1335289, at *6.  Indeed, the court in *Broussard* expressly distinguished *Tumey* and *Ward* on, among other grounds, the fact that neither the Sheriffs nor the Clerk acted as *judges* in the plaintiffs' cases:

> *The Clerk acts as neither a prosecutor nor a judge in handling appearance bonds, and the Sheriff is not performing a judicial function when he decides on the number of charges on which he will book a defendant*.  In *Brown v. Edwards*, 721 F.2d 1442, 1451 (5th Cir. 1984), the Fifth Circuit held that an arrestee's due process rights were not violated when he was arrested by a constable who was compensated under Mississippi law for each arrest that resulted in a conviction.  The Court found *Ward* and *Tumey* to be inapplicable because the constable was not expected to be neutral, and he performed no judicial function.  The same reasoning applies here.

*Broussard*, 2001 WL 1335289, at *6 (emphasis added).  The opposite is true here.  Plaintiffs complain about the inherent *judicial* financial conflict of interest—the issue decided in *Roemer* and never raised in *Broussard*.

## X.      Defendants Misunderstand *Broussard* and Count IV

Defendants also ask the Court to dismiss Count Four against the Sheriff under *Broussard*. Rec. Doc. 250-1 at 27-30.  To be clear, Plaintiffs do not allege that the potential partiality of the *Sheriff* is unconstitutional, but instead challenge his role as the state-law enforcer of an unconstitutional statute that establishes an unconstitutional *judicial* conflict of interest.  The statute at issue here, La. R.S. § 22:822, creates an impermissible conflict of interest for the judges because they receive an institutional pecuniary benefit from its enforcement, and the Sheriff is charged with enforcing the statute.  As this Court has explained at length, the Sheriff is a defendant in this case not because the Sheriff's own financial conflict of interest is unconstitutional, but because he is the *Ex parte Young* actor charged with enforcing the state statute that creates the judicial conflict of interest.  *See* Doc. 228 at 53-55.

## XI.     Conclusion

For the reasons explained above, Plaintiffs respectfully ask the Court to deny Defendants' Motion for Summary Judgment.

Dated: July 5, 2017                      Respectfully submitted,

*/s/ Alec Karakatsanis*
_____

Alec Karakatsanis (D.C. Bar No. 999294)
(Appearing *Pro Hac Vice*)
Civil Rights Corps
910 17th Street, N.W., 5th Floor
Washington, DC 20006
(202)-681-2409
alec@civilrightscorps.org

22

*/s/ Anna Lellelid*

---

Anna Lellelid-Douffet
La Bar No. 35204
PO Box 19388
New Orleans, LA 70179
(504) 224-9670 (c)
lellelid.law@gmail.com

*/s/ Bill Quigley*

---

William P. Quigley
La Bar No. 7769
7214 St. Charles Ave.
Campus Box 902
New Orleans, LA 70118
(504) 710-3074 (c)
quigley77@gmail.com

*/s/ Jon Greenbaum*
*/s/ Mateya Kelley*

---

Jon Greenbaum (D.C. Bar No. 489887)
Mateya Kelley (N.Y. Bar Reg. 5270400)
 (Appearing *Pro Hac Vice*)
Lawyers' Committee for Civil Rights Under Law
1401 New York Ave NW Suite 400
Washington, DC 20005
(202) 662-8315
jgreenbaum@lawyerscommittee.org
mkelley@lawyerscommittee.org

*/s/ Jonathan P. Guy*
*/s/ David P. Fuad*

---

Jonathan P. Guy (D.C. Bar No. 449031)
David P. Fuad (CA Bar No. 265193)
(Appearing *Pro Hac Vice*)
Orrick, Herrington & Sutcliffe, LLP
1152 15th Street, N.W.
Washington, D.C. 20005-1706
(202) 339-8516
jguy@orrick.com
dfuad@orrick.com

*Attorneys for Plaintiff*

23

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 5, 2017, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.


*/s/*      David P. Fuad