UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ALANA CAIN, ET AL.                                           CIVIL ACTION

VERSUS                                                       NO. 15-4479

CITY OF NEW ORLEANS, ET AL.                        SECTION "R" (2)

## ORDER AND REASONS

Plaintiffs Alana Cain, Ashton Brown, Reynaud Variste, Reynajia Variste, Thaddeus Long, and Vanessa Maxwell filed this civil rights putative class action under 42 U.S.C. § 1983, challenging the manner in which the Orleans Parish Criminal District Court collects post-judgment court debts from indigent criminal defendants. Before the Court are the parties' cross-motions for partial summary judgment.[1] These motions turn on justiciability, the constitutionality of defendants' debt collection practices, and the constitutionality of the legislative framework that vests both judicial and executive power in the judges of the Orleans Parish Criminal District Court. For the following reasons, the Court grants in part and denies in part each motion.

---

[1]      R. Docs. 250, 251.

# I.    BACKGROUND

Plaintiffs are former criminal defendants in the Orleans Parish Criminal District Court (OPCDC).  Each named plaintiff pleaded guilty to various criminal offenses between 2011 and 2014.[2]  All named plaintiffs, except Reynaud Variste, were appointed counsel.[3]  The Court previously dismissed Reynaud Variste's and Long's claims for equitable relief.[4]  Thus, only Cain, Brown, Reynajia Variste, and Maxwell have live claims for equitable relief.

The remaining defendants are OPCDC Judges Laurie A. White, Tracey Flemings-Davillier, Benedict Willard, Keva Landrum-Johnson, Robin Pittman, Byron C. Williams, Camille Buras, Karen K. Herman, Darryl Derbigny, Arthur Hunter, Franz Zibilich, and Magistrate Judge Harry Cantrell (collectively, the Judges); OPCDC Judicial Administrator Robert Kazik; and Orleans Parish Sheriff Marlin Gusman.

## A.    Fines and Fees Imposed by OPCDC

The Judges impose various costs on convicted criminal defendants at their sentencing.  First, the Judges may impose a fine, which is divided evenly between OPCDC and the District Attorney (DA).    La. Rev. Stat.

---

[2]    R. Doc. 248 at 4-5.
[3]    R. Doc. 59-3 at 2, 6, 9, 18, 23; R. Doc. 95-7 at 1.
[4]    *See* R. Doc. 109 at 19-21.

§ 15:571.11(D). Second, the Judges may order a criminal defendant to pay restitution to victims. La. Code Crim. Proc. art. 883.2. Third, the Judges impose various fees that go to OPCDC:

- A mandatory $5 fee, La. Rev. Stat. § 13:1381.4(A)(1);

- Additional fees up to $500 on a misdemeanant and $2,500 on a felon, *id.* § 13:1381.4(A)(2);

- Court costs up to $100, *id.* § 13:1377(A);

- A fee of $14 for the Indigent Transcript Fund, *id.* § 13:1381.1(B), which "compensate[s] court reporters for the preparation of all transcripts for indigent defendants," *id.* § 13:1381.1(A); and

- Additional costs under Louisiana Code of Criminal Procedure Article 887(A) for the Indigent Transcript Fund.[5]

Fourth, the "court costs" imposed by Judges also include fees that go to other entities, such as the Orleans Public Defender, the DA, and the Louisiana Supreme Court.[6] After sentencing, OPCDC may further assess criminal defendants for the costs of drug treatment and drug testing. La. Rev. Stat. § 13:5304.

---

[5]    For example, both Alana Cain and Ashton Brown were assessed $100 for the Indigent Transcript Fund as a condition of their probation. R. Doc. 248 at 4.

[6]    *See* R. Doc. 248-1 at 5 (breakdown of court costs that go to OPCDC and other entities).

Separately, the Sheriff collects a 3% fee on bail bonds secured by commercial sureties. *Id.* § 22:822(A)(2). Sixty percent of this fee, or 1.8% of the bonds, goes to OPCDC. *Id.* §§ 22:822(B)(3), 13:1381.5(B)(2)(a).

As a result of their criminal convictions, the named plaintiffs were assessed fines and fees ranging from $148 (imposed on Long) to $901.50 (imposed on Cain).[7] Cain pleaded guilty to felony theft on May 30, 2013.[8] At sentencing, the court stated that payment of fines and fees was a special condition of probation.[9] The court directed Cain to make the first $100 payment at the courthouse on July 8, 2013, and stated, "[e]ven if you don't have the money, you have to come here to the courtroom . . . for an extension."[10] The court later ordered Cain to pay $1,800 in restitution.[11]

Brown received a 90-day suspended sentence after pleading guilty to misdemeanor theft on December 16, 2013.[12] The court imposed $500 in fees: $146 for the Judicial Expense Fund, $100 for the Indigent Transcript Fund, $234 in court costs, and a $20 special assessment for the DA.[13] As with Cain,

---

[7]    R. Doc. 248 at 4-5.
[8]    R. Doc. 255-3 at 2, 16.
[9]    *Id.* at 13.
[10]   *Id.* at 19.
[11]   R. Doc. 59-3 at 2.
[12]   R. Doc. 255-4 at 2, 4, 11.
[13]   *Id.* at 11, 15. Again, "court costs" include fees that go to other entities besides OPCDC. *See* R. Doc. 248-1 at 5.

the court instructed Brown to make his first $100 payment at the courthouse on January 13, 2014.[14] The judge told Brown that if he could not pay on that date, he should go to the judge's courtroom and request an extension.[15]

Reynajia Variste was sentenced to two years of probation after she pleaded guilty to aggravated battery on October 21, 2014.[16] Variste was assessed fees in the amount of $886.50: $286.50 in court costs, $200 for the Indigent Transcript Fund, and $400 for the Judicial Expense Fund.[17] The judge warned Variste that "[f]ailure to make those payments will result in contempt of Court proceedings."[18]

Vanessa Maxwell was sentenced to eighteen months imprisonment for battery and six months for simple criminal damage after pleading guilty on March 6, 2012.[19] Maxwell was assessed $191.50 in court costs, although the judge did not specify this amount at sentencing.[20]

---

[14]     R. Doc. 255-4 at 15.
[15]     *Id.* at 16.
[16]     R. Doc. 95-6 at 8-9, 13.
[17]     *Id.* at 13.
[18]     *Id.*
[19]     R. Doc. 95-8 at 8, 12, 15.
[20]     *Id.* at 1, 15; R. Doc. 248 at 5.

## B.    The OPCDC Budget

The Judges manage the budget of OPCDC.[21]  From 2012 through 2015, the court's revenue ranged from $7,567,857 (in 2012) to $11,232,470 (in 2013).[22]  Some of this revenue could be used only for specified purposes and went into a restricted fund; unrestricted revenue went into OPCDC's Judicial Expense Fund, which is the general operating fund for court operations.[23] *See* La. Rev. Stat. § 13:1381.4.  The Judges exclusively control this fund and may use it "for any purpose connected with, incidental to, or related to the proper administration or function of the court or the office of the judges thereof."  *Id.* § 13:1381.4(C).  They may not use it to supplement their own salaries.  *Id.* § 13:1381.4(D).  Most money for salaries and benefits of OPCDC employees (apart from the Judges) comes from the Judicial Expense Fund.[24]

From 2012 through 2015, the Judicial Expense Fund's annual revenue was approximately $4,000,000.[25]  Roughly half of this revenue came from other governmental entities, especially the City of New Orleans.[26]  About

---

[21]    R. Doc. 251-2 at 3; R. Doc. 255-5 at 5.
[22]    R. Doc. 248 at 2.
[23]    *Id.*; R. Doc. 251-2 at 3.  The Judicial Expense Fund is also known as the General Fund.  R. Doc. 248 at 2.
[24]    R. Doc. 251-2 at 5; R. Doc. 255-5 at 9.
[25]    R. Doc. 248-1 at 1-4.  Specifically, the Judicial Expense Fund had $4,090,707 in revenue in 2012; $4,100,413 in 2013; $3,928,025 in 2014; and $3,940,535 in 2015.
[26]    *Id.* at 1-3.

$1,000,000 came from bail bond fees, and another $1,000,000 from fines and other fees.[27]  Since at least 2013, all fines and fees revenue has gone to the Judicial Expense Fund.[28]

### C.    OPCDC's Debt Collection Practices

All named plaintiffs were subject to OPCDC's debt collection practices. At least until September 18, 2015, the Judges delegated authority to collect court debts to the Collections Department, which the Judges and Administrator Kazik jointly instructed and supervised.[29]  The Collections Department created payment plans for criminal defendants, accepted payments, and granted extensions.[30]  Some Judges also delegated authority to the Collections Department to issue alias capias warrants against criminal defendants who failed to pay court debts.[31]

Before the Collections Department issued these alias capias warrants, its agents were trained to send two form letters to criminal defendants who had missed payments.[32]  The first letter stated: "Recently, at your sentencing in court, you were given probation.  At such time the Judge instructed you,

---

[27]    R. Doc. 248 at 2.
[28]    R. Doc. 251-2 at 12.
[29]    R. Doc. 248 at 7.
[30]    *Id.*
[31]    *Id.*
[32]    R. Doc. 251-2 at 20; R. Doc. 255-5 at 27; R. Doc. 1-2 at 6.

that as a condition of probation you were to report to our office and make arrangements to pay your fines that are now delinquent." The letter also directed its recipient to appear at the court "to resolve this matter" by a given date. "Failure to comply with the conditions of probation," the letter warned, "will result in your immediate arrest."[33] The second letter stated: "Unless arrangements are made with [the collections agent] or payment is received in full within 72 hours[,] . . . we will request your immediate arrest."[34]

The Collections Department then checked court dockets to determine whether the court had granted an extension on or accepted a payment toward an individual's court debts.[35] The Collections Department also checked probation and local jail records.[36] If these checks revealed no reason for an individual's failure to pay, the Collections Department issued an alias capias warrant for the individual's arrest.[37]

These alias capias warrants stated that the individual named in the warrant was charged with contempt of court.[38] The warrants usually set surety bail at the predetermined amount of $20,000.[39] Although the Judges

---

[33] R. Doc. 251-5 at 328.
[34] *Id.* at 329.
[35] R. Doc. 248 at 7.
[36] *Id.*
[37] *Id.*; R. Doc. 251-5 at 330 (example of a blank alias capias warrant).
[38] R. Doc. 251-5 at 330.
[39] *Id.*; R. Doc. 248 at 7.

did not review these warrants, the Collections Department affixed a judge's signature to each one.[40]   OPCDC's Collections Department issued such warrants to arrest the named plaintiffs for failure to pay fines and fees.[41]

Individuals arrested pursuant to these warrants ordinarily remained in jail until their family or friends could make a payment on their court debt, or until a judge released them.[42]   The named plaintiffs were imprisoned for periods ranging from six days to two weeks.[43]

Alana Cain was arrested pursuant to an alias capias warrant on March 11, 2015.[44]   Apparently unable either to make a payment or to post the $20,000 bond, she spent a week in jail before she obtained a court hearing on March 18.[45]   At that hearing, the judge asked Cain when she would be able to continue making payments.[46]   Cain explained that she had missed a payment after giving birth a few weeks earlier, but could continue making payments upon her release.[47]   The judge ordered her release and directed her

---

[40]     R. Doc. 251-2 at 21; R. Doc. 255-5 at 28; R. Doc. 1-2 at 8.
[41]     R. Doc. 248 at 4.
[42]     R. Doc. 251-2 at 22; R. Doc. 255-5 at 25; R. Doc. 1-2 at 12-13.
[43]     R. Doc. 251-2 at 23; R. Doc. 255-5 at 25.
[44]     R. Doc. 251-5 at 369; *see also* R. Doc. 59-3 at 2 (warrant issued on March 4, 2015).
[45]     R. Doc. 251-2 at 23; R. Doc. 255-5 at 25.
[46]     R. Doc. 95-3 at 30.
[47]     *Id.* at 29-31.

to return to court for a status update two weeks later.[48] OPCDC suspended Cain's court debts on April 7, 2016,[49] although Cain made further payments toward her court debts after that date.[50]

Ashton Brown spent two weeks in jail before his family secured his release by making a $100 payment to OPCDC.[51] An alias capias warrant issued on July 16, 2015, and Brown was arrested on July 23.[52] Brown appeared in court without counsel on August 6; the court agreed to release Brown upon payment of $100 to OPCDC.[53] Brown's family made this payment the next day, and Brown was released.[54] OPCDC suspended Brown's court debts on September 23, 2016,[55] although Brown, like Cain, made further payments after that date.[56]

Reynajia Variste was arrested pursuant to an alias capias warrant on May 28, 2015.[57] On June 2, a family member paid $400 to OPCDC in order

---

[48]    *Id.* at 32.
[49]    R. Doc. 250-3 at 22
[50]    *See* R. Doc. 230-3 at 1-2 (payment receipts dated August 26, 2016, and October 12, 2016).
[51]    R. Doc. 251-2 at 23; R. Doc. 255-5 at 25.
[52]    R. Doc. 59-3 at 6.
[53]    *Id.*
[54]    *Id.*
[55]    R. Doc. 250-3 at 23.
[56]    R. Doc. 230-3 at 3 (payment receipt dated February 10, 2017).
[57]    R. Doc. 95-6 at 1.

to secure her release.[58]  Although Variste did not appear before a judge on that date, her attorney did.[59]  OPCDC waived Variste's outstanding debt on August 31, 2016.[60]

Vanessa Maxwell was arrested on May 10, 2015, on an alias capias warrant.[61]  On May 12, she filed a grievance with the Orleans Parish Sheriff's Office seeking a new date to make a payment.[62]  The office responded that she did not yet have a court date, and that to secure her release she just needed to "get someone to go to fines and fees to make arrangements."[63]  Maxwell filed another grievance two days later, asking the Sheriff's Office to place her on the court's docket; the office again directed Maxwell to "get a family [member] to go over and make arrangements with fines n fees [sic]. Explain you have been incarcerated[;] they will make some type of arrangements for payments."[64]  Maxwell finally appeared before a judge,

---

[58]  *Id.* at 1-2, 22.
[59]  *Id.* at 1.
[60]  R. Doc. 250-3 at 25.
[61]  R. Doc. 251-5 at 370.
[62]  *Id.* at 362.
[63]  *Id.*
[64]  *Id.*

with counsel, on May 22, 2015.[65]  The judge ordered her release without payment.[66]  Maxwell paid off her court debt on June 2, 2016.[67]

After this suit was filed, the Judges revoked the Collections Department's authority to issue warrants.[68]  The Judges also recalled all active fines and fees warrants issued by the Collections Department before September 18, 2015, unless restitution remained unpaid or the individual had failed to appear in court.[69]  In doing so, the Judges wrote off $1,000,000 in court debts.[70]  Each Judge now "handles collection-related matters on their respective dockets."[71]

Nevertheless, at least some active warrants for failure to pay restitution still exist.[72]  And the Judges themselves now issue alias capias warrants for failure to pay fines and fees.[73]  There is no evidence that the Judges now consider, or have ever considered, ability to pay before imprisoning indigent criminal defendants for failure to pay fines and fees.  Indeed, the Judges do not routinely solicit financial information from criminal defendants who fail

---

[65]     R. Doc. 95-8 at 2.
[66]     *Id.*
[67]     R. Doc. 250-3 at 24.
[68]     R. Doc. 250-2 at 13, 76; R. Doc. 250-3 at 3.
[69]     R. Doc. 250-3 at 4.
[70]     *Id.*
[71]     *Id.* at 5.
[72]     *Id.*
[73]     *See, e.g.*, R. Doc. 250-3 at 16, 21.

to pay court debts,[74] though they state that they do consider ability to pay when the issue is brought to their attention.[75]

## D.  Procedural History

Plaintiffs filed this civil rights action under 42 U.S.C. § 1983, alleging violations of their Fourth and Fourteenth Amendment rights, and violations of Louisiana tort law.  Plaintiffs brought this action on behalf of themselves and all others similarly situated.[76]  The first amended complaint, filed shortly after the initial complaint, named the following defendants: (1) The City of New Orleans, (2) OPCDC, (3) Sheriff Gusman, (4) Clerk of Court Arthur Morrell, (5) Judicial Administrator Kazik, and (6) the Judges.  The Court has summarized plaintiffs' seven counts as follows:

> (1)     Defendants' policy of issuing and executing arrest warrants for nonpayment of court debts is unconstitutional under the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment;

---

[74]     R. Doc. 251-2 at 17.
[75]     R. Doc. 250-2 at 12; R. Doc. 259-1 at 8.
[76]     Although plaintiffs moved for class certification on February 10, 2017, *see* R. Doc. 230, the Court stayed all motion practice—and thus denied plaintiffs' class certification motion without prejudice—pending further order, *see* R. Doc. 237.

(2) Defendants' policy of requiring a $20,000 "fixed secured money bond" for each Collections Department warrant (issued for nonpayment of court debts) is unconstitutional under the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment;

(3) Defendants' policy of indefinitely jailing indigent debtors for nonpayment of court debts without a judicial hearing is unconstitutional under the Due Process Clause of the Fourteenth Amendment;

(4) Defendants' "scheme of money bonds" to fund certain judicial actors is unconstitutional under the Due Process Clause of the Fourteenth Amendment. To the extent defendants argue this scheme is in compliance with Louisiana Revised Statutes §§ 13:1381.5 and 22:822, governing the percentage of each surety bond that judicial actors receive, those statutes are unconstitutional;

(5) Defendants' policy of jailing indigent debtors for nonpayment of court debts without any inquiry into their ability to pay is unconstitutional under the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment, and the

Judges' authority over both fines and fees revenue and ability-to-pay determinations violates the Due Process Clause;

(6) Defendants' policy of jailing and threatening to imprison criminal defendants for nonpayment of court debts is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment because it imposes unduly harsh and punitive restrictions on debtors whose creditor is the State, as compared to debtors who owe money to private creditors;

(7) Defendants' conduct constitutes wrongful arrest and wrongful imprisonment under Louisiana law.

Plaintiffs' request for relief seeks: (1) declaratory judgments that defendants' actions violate plaintiffs' Fourth and Fourteenth Amendment rights; (2) an order enjoining defendants from enforcing the purportedly unconstitutional policies; (3) money damages for the named plaintiffs; and (4) attorney's fees under 42 U.S.C. § 1988.

After a round of motions, all claims against the City of New Orleans, the Sheriff, and OPCDC were dismissed, along with Count Three and claims against the remaining defendants for monetary and injunctive relief.[77] The Court then granted plaintiffs' leave to re-plead Counts Four and Seven

---

[77] R. Docs. 119, 123-26.

against the Sheriff in plaintiffs' second amended complaint.[78]  The Court also consolidated this case with *LaFrance v. City of New Orleans*, 16-14439.[79]

Now, plaintiffs seek declaratory relief against the Judges in their official capacity on Counts One, Two, Four, Five, and Six; declaratory relief against Administrator Kazik in his individual capacity on Counts One, Two, and Six; injunctive and declaratory relief against Sheriff Gusman in his official capacity on Count Four; and injunctive and declaratory relief as well as damages against the Sheriff on Count Seven.

As ordered by the Court, the parties have submitted cross-motions for summary judgment on Counts One, Two, Four, Five, and Six.[80]

## II.    STANDARD OF REVIEW

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069,

---

[78]    R. Doc. 228.
[79]    R. Doc. 249.
[80]    R. Doc. 237.  The Court has stayed all other motion practice.  In contravention of the Court's order, plaintiffs have moved for summary judgment on Count Seven.  Plaintiffs' summary judgment motion is DENIED WITHOUT PREJUDICE to the extent it seeks relief on Count Seven.

1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or "showing that the moving party's

evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (quoting *Celotex*, 477 U.S. at 322)).

## III.  DISCUSSION

### A.    Justiciability

Defendants' motion for summary judgment challenges the justiciability of this action on several grounds. First, defendants argue that

the named plaintiffs lack standing. Second, they argue that certain claims are moot in light of defendants' voluntary cessation of challenged conduct. Third, defendants argue that plaintiffs impermissibly seek a writ of mandamus against state judicial officers. Fourth, defendants argue that the Court cannot grant declaratory relief in this case. Finally, defendants argue that the Eleventh Amendment bars official-capacity claims against state judicial officers.

### 1. *Standing and Mootness*

Article III of the U.S. Constitution limits federal jurisdiction to cases or controversies. U.S. Const. art. III, § 2. To satisfy this case-or-controversy requirement, a plaintiff must have a personal stake in the suit she commences. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732-33 (2008). This personal stake must exist both at commencement and throughout the life of the suit. *Id.* ("To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997))). If a plaintiff does not have the requisite personal stake at the commencement of the suit, she lacks standing. If her once-sufficient personal stake dissipates during the life of the suit such that Article III is no longer satisfied, her claims become moot.

*See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180, 189 (2000) (first addressing standing at the commencement of suit and then addressing mootness).

Defendants confuse these two doctrines—standing and mootness—in their motion for summary judgment. First, they argue that the named plaintiffs lack standing because their debts have been "suspended" or "waived."[81] Second, defendants argue that their voluntary cessation of certain debt collection practices moots plaintiffs' claims challenging those practices.[82] Neither argument applies to plaintiffs' damages claim under Louisiana law, in which plaintiffs obviously have a continuing interest.

The waiver or suspension of plaintiffs' court debts after the commencement of this suit relates to mootness, not standing. Plaintiffs have standing to bring suit as long as they "had the requisite stake in the outcome when the suit was filed." *Davis*, 554 U.S. at 734. Standing to bring suit, however, has no bearing on whether plaintiffs' claims became moot during the life of the suit. *See, e.g.*, *County of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (distinguishing standing from mootness). Whether the

---

[81]   R. Doc. 250-1 at 4.
[82]   *Id.* at 10.

"suspension" or "waiver" of plaintiffs' court debts destroyed their interest in the outcome of this suit is properly addressed as a question of mootness.

## 2. *Plaintiffs Had Standing to Bring Suit*

The Court is nonetheless obligated to determine whether the parties had standing to bring suit. *Laidlaw*, 528 U.S. at 180. Standing consists of three elements: (1) the plaintiff must have suffered an injury-in-fact, which is an invasion of a legally protected interest that is concrete and particularized as well as actual or imminent; (2) the injury must be fairly traceable to the challenged conduct of the defendant; and (3) it must be likely that the plaintiff's injury will be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). With regard to "equitable relief for past wrongs, a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future." *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992). As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing each element of standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

In support of their standing argument, defendants note that this Court dismissed Reynaud Variste's and Thaddeus Long's claims for equitable relief because neither plaintiff owed outstanding courts debts for which they could

21

be imprisoned.[83]  But those plaintiffs lacked standing to seek equitable relief because they faced no imminent injury *when the suit commenced*.  The amended complaint itself acknowledged that both plaintiffs had already paid their court debts, and thus no longer faced an imminent threat of injury from defendants' debt collection policies and practices.[84]

The Court is satisfied that the other named plaintiffs—Alana Cain, Ashton Brown, Reynajia Variste, and Vanessa Maxwell—had standing to bring suit.  Defendants do not contest that these plaintiffs owed court debts when this suit was filed in September 2015.  Thus, there is no dispute that these plaintiffs were subject to defendants' debt collection policies and practices when this suit began.

Plaintiffs demonstrated a concrete and imminent injury arising from defendants' policies and practices: the risk of arrest and imprisonment for failing to pay outstanding court debts.  This risk was not hypothetical or speculative; plaintiffs themselves were arrested and imprisoned for that very reason shortly before the suit commenced.  *Compare Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 543 (5th Cir. 2008) (concluding that "because some Plaintiff bar owners have been charged under the ordinance and all

---

[83]    R. Doc. 109 at 20.
[84]    R. Doc. 7 at 15 ¶ 48, 18 ¶ 67.

Plaintiff bar owners face the real potential of immediate criminal prosecution, they have standing to bring their claims"), *with Soc'y of Separationists*, 959 F.2d at 1285-86 (holding that the likelihood of plaintiff juror again being selected for jury service and again assigned to defendant judge was too slim to permit prospective relief against defendant). Finally, plaintiffs' requested relief—a declaration that defendants' debt collection policies and practices are unconstitutional—would redress the threat of injury they faced. The Court now turns to whether plaintiffs' personal stake in the litigation, sufficient to support Article III standing at commencement, dissipated over time.

### 3. Defendants' Voluntary Cessation Moots Counts One, Two, and Four

The Court first addresses whether any claims are moot in light of defendants' voluntary cessation of certain debt collection practices. As a general rule, "any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot," *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006), and requires that the case be dismissed, *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013). Although "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice,'" *Laidlaw*, 528 U.S. at

189 (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)), this rule is not absolute. "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)). Additionally, "[w]ithout evidence to the contrary, [courts] assume that formally announced changes to official governmental policy are not mere litigation posturing." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009). Nonetheless, a defendant's burden of showing mootness by virtue of its voluntary cessation is "formidable." *Laidlaw*, 528 U.S. at 190.

Defendants, through an affidavit by Administrator Kazik, state that they have taken the following actions in response to this lawsuit:[85]

- Defendants rescinded the Collections Department's authority to issue warrants.[86]

- Defendants identified all Collections Department fines and fees warrants based solely on failure to pay fines and fees (other than restitution) and directed Sheriff Gusman to recall these warrants.[87]

---

[85] R. Doc. 250-1 at 11.
[86] R. Doc. 250-2 at 13, 76; R. Doc. 250-3 at 3.
[87] R. Doc. 250-2 at 13-14; R. Doc. 250-3 at 4.

- Defendants have "written off" approximately $1,000,000 in fines and fees owed to the court.[88]

- Defendants have worked together "to implement new procedures to correct complaints about delays in getting arrestees timely to court."[89]

The Collections Department's practice of issuing fines and fees warrants forms the basis of Counts One, Two, and Four. Count One asserts that defendants issue arrest warrants for failure to pay fines and fees without probable cause, without review by a neutral magistrate, and without oath or affirmation.[90] The allegations in support of Count One relate solely to warrants issued by the Collections Department.[91] Similarly, Counts Two and Four relate to the fixed, $20,000 money bail imposed on individuals who are arrested on Collections Department warrants.[92] Counts Five and Six, by

---

[88]  R. Doc. 250-2 at 13-14; R. Doc. 250-3 at 4.

[89]  R. Doc. 250-1 at 11; R. Doc. 250-3 at 6, 29.

[90]  R. Doc. 161-4 at 56-57 ¶¶ 185-86; R. Doc. 251-1 at 18-25.

[91]  *See, e.g.*, R. Doc. 161-4 at 34 ¶ 118 ("Pursuant to Collections Department policy and practice, if a person fails to make the payments determined by the Collections Department, Collections Department employees will seek a warrant for the debtor's arrest. . . . The 'warrants' are never presented to a judge or neutral magistrate for review, and no judicial officer is even aware of any particular warrant application or issuance. They are not supported by oath or affirmation.").

[92]  *See id.* at 27 ¶ 95 ("The OPCDC Defendants impose an automatic $20,000 secured money bond on anyone illegally arrested and imprisoned on a Collections Department warrant for non-payment or late payment of

contrast, do not depend on abandoned Collections Department practices. Count Five asserts that the Judges fail to consider ability to pay before imprisoning plaintiffs for failure to pay court debts.[93] Count Five further asserts that the Judges do not provide a neutral tribunal to determine ability to pay because their financial interest in fines and fees revenue deprives plaintiffs of due process.[94] Count Six broadly alleges that defendants' practice of imprisoning criminal defendants for failure to pay fines and fees is invidious discrimination.[95] Thus, if it is absolutely clear that the Collections Department's warrant practices have ceased and cannot reasonably be expected to recur, then Counts One, Two, and Four, but not Counts Five and Six, would be moot.

Defendants insist that the Collections Department "will never again issue warrants."[96] The Court does not doubt defendants' sincerity. But the

---

court debts."); *id.* at 57 ¶ 191 ("The Defendants violate the Plaintiffs' rights by placing and keeping them in jail prior to any debt-collection proceedings when they cannot afford to pay the preset amount of money required for release after a Collections Department nonpayment arrest . . . ."); *id.* at 58 ¶ 195 ("Defendants operate a system of money bond in which the OPCDC Defendants set a bond amount on Collections Department warrants that the Defendants know will result in their collecting and controlling 1.8% of the bond amount if it is ultimately paid.").

[93] *Id.* at 59 ¶¶ 198-99.
[94] *Id.* at 59-60 ¶ 200.
[95] *Id.* at 60 ¶ 202.
[96] R. Doc. 250-1 at 11.

Fifth Circuit has cautioned that "allegations by a defendant that its voluntary conduct has mooted the plaintiff's case require closer examination than allegations that happenstance or official acts of third parties have mooted the case." *Fontenot*, 777 F.3d at 747-48 (quoting *Envt'l Conservation Org. v. City of Dallas*, 529 F.3d 519, 528 n.4 (5th Cir. 2008)).

Upon close examination, the Court is satisfied that defendants' voluntary conduct has mooted plaintiffs' claims related to Collections Department fines and fees warrants. A memorandum issued by Administrator Kazik on September 18, 2015 stated: "Pursuant to the En Banc directive issued earlier today, all Collections Agents for Criminal District Court may no longer issue an Alias Capias for non-payment of fines and fees or for failure to appear. This is effective immediately."[97] The Court must assume that this "formally announced change[] to official governmental policy [was] not mere litigation posturing." *Sossamon*, 560 F.3d at 325. Moreover, the Judges reviewed all active fines and fees warrants issued by the Collections Department before September 18, 2015, and recalled all such warrants unless restitution remained unpaid or the individual had failed to appear in court.[98] In doing so, the Judges wrote off $1,000,000 in court

---

[97]     R. Doc. 250-2 at 76.
[98]     R. Doc. 250-3 at 4.

debts.[99]  Each Judge now "handles collection-related matters on their respective dockets," according to Administrator Kazik.[100]

Admittedly, the timing of these policy changes suggests that they were made in response to this litigation.  Administrator Kazik states in his affidavit that the Judges decided to revoke the Collections Department's authority to issue warrants on "the day the Judges first heard about this lawsuit."[101]  Furthermore, there is no indication that defendants' new policy will be binding on future OPCDC judges and administrators.  *Cf. Lewis v. La. State Bar Ass'n*, 792 F.2d 493, 496 (5th Cir. 1986) (finding no reasonable expectation that the alleged violation would recur because defendant bar association had changed its policy, and the state supreme court would need to approve any subsequent policy change).  There is also precedent for stopping and restarting the Collections Department's warrant process: in October 2012, the former chief judge of OPCDC directed the Collections Department to discontinue issuing fines and fees warrants, but reversed course in February 2013.[102]

---

[99]  *Id.*
[100]  *Id.* at 5.
[101]  *Id.* at 3.
[102]  R. Doc. 250-2 at 77-78.

Nevertheless, the Court finds that defendants' voluntary policy changes make it absolutely clear that Collections Department practices could not reasonably be expected to recur. Defendants have formally revoked the Collections Department's authority to issue warrants. The sincerity of this policy change is reflected in defendants' decision to rescind all warrants issued by the Collections Department for failure to pay fines and fees, other than for restitution. Defendants have met their formidable burden of showing that their voluntary conduct has mooted Counts One, Two, and Four.

### 4. Defendants' Voluntary Cessation Does Not Moot Counts Five and Six

As discussed earlier, Counts Five and Six focus on what the Judges do, not what the Collections Department did, when criminal defendants fail to pay fines and fees. Specifically, Count Five challenges the Judges' practice of failing to inquire into ability to pay before plaintiffs are imprisoned for nonpayment, and the Judges' conflict of interest in deciding plaintiffs' ability to pay.[103] Count Six challenges the Judges' practice of imprisoning criminal defendants for failure to pay fines and fees as invidious discrimination.[104] The predicate constitutional injuries underlying both of these claims are that

---

[103]    R. Doc. 161-4 at 59-60 ¶¶ 198-200.
[104]    *Id.* at 60 ¶ 202.

plaintiffs are subject to imprisonment for failure to pay court debts, and that the Judges do not inquire into plaintiffs' ability to pay before their imprisonment.

A defendant's voluntary cessation of challenged conduct moots a claim only if it is absolutely clear that the challenged conduct could not reasonably be expected to recur. *Laidlaw*, 528 U.S. at 189. Here, to moot Counts Five and Six, defendants must show that plaintiffs are no longer subject to imprisonment for nonpayment of court debts, or at least that the Judges inquire into plaintiffs' ability to pay before their imprisonment.

The Court finds that defendants have not met their formidable burden of showing mootness on Counts Five and Six. First, and most importantly, the Judges do not represent that they have ceased imprisoning individuals for failure to pay court debts by some means other than Collections Department warrants. Nor do they represent that they now consider ability to pay before imprisoning such individuals. Unlike the en banc directive withdrawing the Collections Department's authority to issue warrants, there is no formal statement in the record indicating that the Judges' challenged practices have changed.

Defendants principally rely on the affidavit of Administrator Kazik to show mootness. But Administrator Kazik cannot—and does not—represent

what the Judges' current practices are, nor what the Judges will do going forward. Instead, Administrator Kazik states that "[t]o the best of Judicial Defendants' ability, no fines and fee warrants issued by a currently sitting or prior judge exist, unless there was a determination that other good cause existed in the court record supporting the warrant, such as a failure to appear in court or a failure to pay restitution."[105] At most, this carefully worded affidavit shows only that at one point in time—when Administrator Kazik made this statement—there were no active fines and fees warrants purely for failure to pay court debts, other than restitution. Defendants' corrective efforts to recall fines and fees warrants do not suffice to show a change in the Judges' practices. Indeed, as discussed later, the Judges still have enormous incentives to collect fines and fees. Without evidence of an actual policy change, the Court cannot simply assume that the Judges have altered their debt collection practices.

Second, the Judges now handle collection efforts on their respective dockets,[106] and there is evidence in the record that these efforts include issuing alias capias warrants against criminal defendants for nonpayment of fines and fees.[107] Defendants produced worksheets listing all alias capias

---

[105]    R. Doc. 250-3 at 5.
[106]    *Id.* at 5.
[107]    *See id.* at 16, 21.

warrants issued by Sections G and I of OPCDC as of May 18, 2017.[108]  Both sections had issued (and apparently then recalled) alias capias warrants for failure to pay fines and fees as late as April 2017.[109]  Moreover, in early 2017, the Judges met en banc to discuss issues with securing court appearances for arrestees in a timely manner.  The Judges requested that "arrestees be placed on our respective jail lists on the day of or the next day after their arrest on a capias [warrant]."[110]  This request suggests that criminal defendants are still subject to imprisonment on alias capias warrants issued by OPCDC, with no pre-imprisonment court hearing.

Third, defendants' corrective efforts are so riddled with exceptions and omissions as to cast doubt on the sincerity of their actions.  Administrator Kazik's affidavit concedes the existence of active warrants for failure to pay restitution and for failure to appear on court dates related to fines and fees. And the police continue to arrest individuals on these warrants.  Plaintiffs sought to join one such individual—Monique Merren—as a named plaintiff in this case.[111]  An alias capias warrant issued against Merren in 1999 after

---

[108]     *Id.* at 12-21.
[109]     *Id.* at 16, 21.
[110]     *Id.* at 29.
[111]     *See* R. Doc. 161.

she failed to pay restitution for a 1998 conviction.[112]   Merren was arrested and imprisoned on this warrant in June 2016.[113]   Defendants offer no explanation for treating criminal defendants who owe restitution differently from those who don't.   Additionally, OPCDC still operates a Collections Department.   And, as discussed earlier, the Judges stopped the Collections Department's warrant process in 2012 before restarting it in 2013.   This policy reversal undercuts a finding that the Judges have changed their practices for good.[114]

Understandably, the Judges would like to see this lawsuit go away.   But they have not done enough to show institutional change.   Again, the Judges have not indicated that they have ceased imprisoning criminal defendants for failure to pay, or that they now inquire into those criminal defendants' ability to pay.   Evidence in the record confirms that plaintiffs still face the

---

[112]   R. Doc. 161-7 at 1.  The Court takes judicial notice of Merren's OPCDC docket sheet, attached as an exhibit to plaintiffs' motion for leave to file their second amended complaint.

[113]   *Id.*

[114]   The Court did not find this policy reversal sufficient to defeat mootness on Counts One, Two, and Four in light of the Judges' en banc directive revoking the Collections Department's warrant authority and their follow-up efforts rescinding Collections Department warrants.  Here, the Judges have not issued any formal statement indicating that they have changed their practices of imprisoning plaintiffs for nonpayment and not inquiring into plaintiffs' ability to pay.  Additionally, the Judges' follow-up efforts were aimed principally at eliminating Collections Department warrants.

possibility of alleged constitutional injury if they fail to pay their court debts. For these reasons, defendants' voluntary conduct does not moot Counts Five and Six.

### 5. The Named Plaintiffs' Claims Are Not Moot

The Court next addresses whether plaintiffs' claims are moot in light of the apparent cancellation of their court debts. A case will become moot when "there are no longer adverse parties with sufficient legal interest to maintain the litigation," or "when the parties lack a legally cognizable interest in the outcome" of the litigation. *In re Scruggs*, 392 F.3d 124, 128 (5th Cir. 2004) (quoting *Chevron, U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1153 (5th Cir. 1993)). The purpose of this personal stake requirement is to ensure that the case involves "sharply presented issues in a concrete factual setting and self-interested parties vigorously advocating opposing positions." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 403 (1980).

A case should not be declared moot so "long as the parties maintain a 'concrete interest in the outcome' and effective relief is available to remedy the effect of the violation." *Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 227 (5th Cir. 1998) (quoting *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 571 (1984)). The bar to overcome mootness is lower than the bar to establish standing: "there are circumstances in which the prospect that a

defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Laidlaw*, 528 U.S. at 190.

Defendants assert that OPCDC suspended the remaining balance of court debts owed by Alana Cain and Ashton Brown, and waived that of Reynajia Variste.[115]  Additionally, defendants contend that Vanessa Maxwell's court debts have been paid in full.[116]  Plaintiffs do not contest these facts.[117]  Instead, plaintiffs make two arguments: (1) at least Cain and Brown retain a personal interest in the outcome of the litigation; and (2) the named plaintiffs' claims cannot be mooted because a motion for class certification is pending.[118]

Plaintiffs first argue that defendants may reinstate Cain's and Brown's suspended debts.  While OPCDC suspended Cain's and Brown's court debts, it waived Maxwell's.  The Court presumes that a state court uses language decidedly, and that OPCDC used suspension and waiver to describe different actions.

---

[115]  R. Doc. 250-2 at 12.
[116]  *Id.*
[117]  *See* R. Doc. 259-1 at 8.
[118]  R. Doc. 259 at 4.

To suspend a debt implies that OPCDC has temporarily ceased enforcing its claim against an individual for her court debts. *See Merriam-Webster Dictionary* Online, www.merriam-webster.com (defining suspend as "to cause to stop temporarily"; "to defer to a later time on specified conditions"; "to hold in an undetermined or undecided state awaiting further information"). By contrast, to waive a debt suggests a decision permanently to forgo debt collection. *See id.* (defining waive as "to refrain from pressing or enforcing (something, such as a claim or rule): forgo · waive the fee"); *see also Veverica v. Drill Barge Buccaneer No. 7*, 488 F.2d 880, 883 (5th Cir. 1974) (holding that deferral of payment for a salvage operation did not *waive* the resulting maritime lien, "but merely *suspend[ed]* the remedy on the lien" until payment came due (emphasis added)). Thus, the plain meanings of "suspend" and "waive" indicate that defendants may reinstate Cain's and Brown's, but not Maxwell's, court debts.

Supreme Court precedent makes plain that temporary relief from injury does not moot a plaintiff's claim for permanent equitable relief. In *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), the Supreme Court reviewed a district court injunction against the use of chokeholds by police officers. After the Court granted certiorari, the city imposed a moratorium on chokeholds. *Id.* at 100. As the Court stated in a later opinion, this

moratorium "surely diminished the already slim likelihood that any particular individual would be choked by police." *Laidlaw*, 528 U.S. at 190. Nevertheless, the Supreme Court held that the city's moratorium did not moot the case because "the moratorium by its terms [was] not permanent." *Lyons*, 461 U.S. at 101. By the same logic, this Court finds that temporarily suspending Cain's and Brown's court debts does not moot their claims for declaratory relief.

Moreover, the record shows that defendants continued to collect payments from Cain and Brown after suspending their debts. According to a docket sheet, Cain's court debts were suspended on April 7, 2016.[119] Nevertheless, a payment receipt dated October 12, 2016, states that Cain owes a balance of $251.50 and that the next payment is due on October 31, 2016.[120] Similarly, a minute entry shows that Brown's court debts were suspended as of September 23, 2016,[121] but a payment receipt dated February 10, 2017, shows a balance of $432.50.[122] This evidence indicates that suspension of a court debt does not bar defendants from trying to collect that debt. Because plaintiffs Cain and Brown remain subject to defendants'

---

[119] R. Doc. 250-3 at 22.
[120] R. Doc. 230-3 at 2.
[121] R. Doc. 250-3 at 23.
[122] R. Doc. 230-3 at 3.

debt collection policies and practices, including the Judges' practices that form the basis of Counts Five and Six, they have not been "divested of all personal interest in the result" of the litigation. *Dailey*, 141 F.3d at 227.

At oral argument, the parties represented that Cain has received a reimbursement check from OPCDC. It is unclear, however, when or why Cain received the reimbursement check, or which court costs it reimbursed. The check is not in the summary judgment record, and the Court cannot simply assume that OPCDC has reimbursed Cain for all payments made after the date her debts were suspended. Moreover, defendants have not asserted that Brown—or anyone else whose debts were suspended—received a reimbursement check from OPCDC. Cain's reimbursement check does not affect the Court's analysis.

That OPCDC continued to collect payment from Cain and Brown after suspending their debts also shows that the "capable of repetition, yet evading review" exception applies. *Ctr. for Individual Freedom*, 449 F.3d at 661. This "exception can be invoked if two elements are met: '(1) [T]he challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.'" *Id.* (alteration in original) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149

(1975)).  Defendants suspended Cain's court debts in April 2016—merely seven months after this proceeding began.  Seven months was too short a time to resolve this complicated suit.  Additionally, defendants' actual debt collection efforts after suspending Cain's and Brown's debts creates a reasonable expectation that these plaintiffs will again be subject to defendants' debt collection practices in the future.  Thus, even if defendants' suspension of Cain's and Brown's court debts otherwise moots their individual claims, the capable of repetition, yet evading review exception applies.

Plaintiffs also argue that the named plaintiffs' claims cannot be mooted because a motion for class certification is pending.[123]  Generally, "a class action becomes moot when the putative representative plaintiff's claim has been rendered moot before a class is certified."  *Fontenot v. McCraw*, 777 F.3d 741, 748 (5th Cir. 2015).  But, as the Supreme Court has noted,

> There may be cases in which the controversy involving the named plaintiffs is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion.  In such instances, whether the certification can be said to 'relate back' to the filing of the complaint may depend upon the circumstances of the particular case and especially . . . [whether] otherwise the issue would evade review.

---

[123]     R. Doc. 259 at 4.

*Sosna v. Iowa*, 419 U.S. 393, 402 n.11 (1975); *see also Genesis Healthcare*, 569 U.S. at 75 ("[A]n inherently transitory class-action claim is not necessarily moot upon the termination of the named plaintiff's claim.") (internal quotation marks omitted)).  An example of such a claim is a constitutional challenge to pretrial detention, which "is by nature temporary." *Gerstein v. Pugh*, 420 U.S. 103, 111 n.11 (1975).  The Court in *Gerstein* noted: "It is by no means certain that any given individual, named as plaintiff, would be in pretrial custody long enough for a district judge to certify the class." *Id.*  In such a case, "the termination of a class representative's claim does not moot the claims of the unnamed members of the class." *Id.*

The Supreme Court again addressed a challenge to pretrial detention in *McLaughlin*.  The named plaintiffs in *McLaughlin* were incarcerated and had not yet received a probable cause hearing when they filed suit.  500 U.S. at 48-49.  Before the district court certified the class, the named plaintiffs either received a probable cause determination or were released.  "That the class was not certified until after the named plaintiffs' claims had become moot [did] not deprive [the Court] of jurisdiction," however.  *Id.* at 52 (citing *Gerstein*, 420 U.S. at 110 n.11).  As in *Gerstein*, the Court held that the

relation back doctrine "preserve[d] the merits of the case for judicial resolution." *Id.*

While *Sosna*, *Gerstein*, and *McLaughlin* all applied the relation back doctrine to inherently transitory claims, the Fifth Circuit has further applied the doctrine to claims "rendered moot by purposive action of the defendants." *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1049 (5th Cir. Unit A July 1981). The *Zeidman* court held that, when "the plaintiffs have filed a timely motion for class certification and have diligently pursued it, the defendants should not be allowed to prevent consideration of that motion by tendering to the named plaintiffs their personal claims before the district court reasonably can be expected to rule on the issue." *Id.* at 1045. The court reasoned that defendants should not "have the option to preclude a viable class action from ever reaching the certification stage" by "picking off" the named plaintiffs, whose claims would otherwise become moot.[124] *Id.* at 1050.

---

[124] The Fifth Circuit has since cast doubt on whether the core holding of *Zeidman* remains good law as to claims for money damages. Specifically, the court has stated that *Genesis Healthcare* "undermines, at least in money damages cases, *Zeidman*'s analogy between the 'inherently transitory' exception to mootness and the strategic 'picking off' of named plaintiffs' claims." *Fontenot*, 777 F.3d at 750. In *Genesis Healthcare*, the Supreme Court declined to apply the "inherently transitory" exception to a claim for money damages, which "cannot evade review," "[u]nlike claims for injunctive relief challenging ongoing conduct." 569 U.S. at 77. Where, as

Plaintiffs' claims for equitable relief tend to evade review, especially if defendants can pick off the named plaintiffs by suspending or waiving their court debts. Moreover, plaintiffs timely moved for class certification.[125] The Court stayed this motion pending resolution of the parties' cross-motions for summary judgment.[126] Plaintiffs—both named and unnamed—should not be punished by the order in which the Court has addressed issues in this case, or by defendants' willingness to suspend or waive the court debts of the named plaintiffs.

Nevertheless, the Court does not rely on the relation back exception in determining that this case is not moot. The relation back exception applies to a class certification motion that is adjudicated after the named plaintiffs' claims become moot. *See Fontenot*, 777 F.3d at 748. The Court is not aware of any authority for applying this exception to summary judgment motions. To the contrary, the *Zeidman* court made clear that "[a] named plaintiff whose individual claim has been rendered moot may in no event argue the merits of the case before a class has properly been certified; prior to that time the plaintiff may at most argue the class certification question." *Id.* at 1045;

here, plaintiffs seek equitable relief, the "inherently transitory" exception still applies and *Zeidman* remains good law.

[125]    R. Doc. 230.

[126]    R. Doc. 237.

*see also Geraghty*, 445 U.S. at 404 ("A named plaintiff whose claim expires may not continue to press the appeal on the merits until a class has been properly certified.").

The Court therefore finds that the named plaintiffs' claims are not moot for two reasons. First, Alana Cain and Ashton Brown still owe court debts; defendants' temporary suspension of these debts does not destroy Cain's or Brown's personal stake in the litigation. Second, with respect to Cain's and Brown's debts, defendants' debt collection practices are capable of repetition, yet evading review.

### 6. *Plaintiffs Do Not Request Mandamus*

Defendants argue that plaintiffs' claims for declaratory relief against the Judges and Administrator Kazik are tantamount to requests for a writ of mandamus.[127] It is well-established that "federal courts have no general power to issue writs of mandamus to direct state courts and their judicial officers in the performance of their duties." *Lamar v. 118th Judicial Dist. Court of Tex.*, 440 F.2d 383, 384 (5th Cir. 1971); *see also In re Campbell*, 264 F.3d 730, 731 (7th Cir. 2001) (discussing when mandamus against state judicial officers may be appropriate). But federal courts may grant declaratory and injunctive relief against state judicial officers. *See Pulliam*

---

[127] R. Doc. 250-1 at 6.

*v. Allen*, 466 U.S. 522, 541-42 (1984); *Holloway v. Walker*, 765 F.2d 517, 525 (5th Cir. 1985). Indeed, Section 1983 explicitly recognizes the availability of such remedies. *See* 42 U.S.C. § 1983 (providing that, "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable").

Plaintiffs' summary judgment motion clearly frames the claims against the Judges and Administrator Kazik as requests for declaratory relief. But defendants argue that plaintiffs essentially want this Court to direct defendants in the exercise of their judicial duties. Specifically, according to defendants, plaintiffs seek a court order directing the Judges to hold hearings on ability to pay, to cease delegating warrant authority to the Collections Department, and to stop issuing capias warrants.[128]

A writ of mandamus compels the defendant to perform a certain act. *See Mandamus*, Black's Law Dictionary (10th ed. 2014). By contrast, the declaratory judgments plaintiffs seek on Counts One, Two, Four, Five, and Six would merely state that certain of defendants' practices are unconstitutional.[129] The Supreme Court has recognized the authority of

---

[128]    R. Doc. 250-1 at 7-8.
[129]    *See* R. Doc. 161-4 at 61.

federal courts to issue such relief against state judges.  *See Pulliam*, 466 U.S. at 526 (affirming attorneys' fees award in case where district court declared magistrate's practice of "requir[ing] bond for nonincarcerable offenses . . . to be a violation of due process and equal protection and enjoined it").  Thus, the Court rejects defendants' argument that plaintiffs' claims for declaratory relief are in fact requests for a writ of mandamus.

### 7. *Declaratory Relief Is Appropriate*

Defendants further argue that the Court lacks the authority to entertain plaintiffs' claims for declaratory relief.[130]  The Declaratory Judgment Act, 28 U.S.C. § 2201, is "an enabling act, which confers a discretion on the courts" to decide or dismiss a declaratory judgment suit, "rather than an absolute right upon the litigant" to bring such a suit.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952)); *accord Sherwin-Williams Co. v. Holmes County*, 343 F.3d 383, 387, 389 (5th Cir. 2003).  In analyzing claims under the Act, a court must determine "(1) whether the declaratory action is justiciable; (2) whether the court has the authority to grant declaratory relief; and (3) whether to

---

[130]     R. Doc. 250-1 at 8-9.

exercise its discretion to decide or dismiss the action."[131] *Sherwin-Williams*,
343 F.3d at 387.

Defendants argue that declaratory relief is not appropriate because this
case is no longer justiciable. As explained earlier, Counts Five and Six are
not moot. Thus, the Court may entertain these claims for declaratory relief.

### 8. The Eleventh Amendment Does Not Bar Plaintiffs' Official-Capacity Claims

Defendants' final justiciability challenge relates to whether the Judges
enjoy sovereign immunity on plaintiffs' official-capacity claims against them.
Defendants argue that suing a state official in her official capacity is the same
as suing the state directly.[132] This proposition is true for retrospective relief,
but not for prospective relief. Under *Ex parte Young*, 209 U.S. 123 (1908),
plaintiffs may sue state officials in their official capacity for prospective relief.
*See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) ("Of course
a state official in his or her official capacity, when sued for injunctive relief,
would be a person under § 1983 because 'official-capacity actions for
prospective relief are not treated as actions against the State.'" (quoting

---

[131] The Court has already addressed, and rejected, the argument that it should exercise its discretion not to decide this case. R. Doc. 119 at 14-19. Defendants do not renew this argument in their motion for summary judgment.

[132] R. Doc. 250-1 at 10.

46

*Kentucky v. Graham*, 473 U.S. 159, 167, n.14 (1985))). Prospective relief includes both injunctive and declaratory relief. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (allowing plaintiff to seek both injunctive and declaratory relief "against the individual commissioners in their official capacities, pursuant to the doctrine of *Ex parte Young*"). Thus, defendants' Eleventh Amendment argument is meritless.

* * *

Because Counts One, Two, and Four are moot, defendants are entitled summary judgment on these counts. Having found that Counts Five and Six remain justiciable, the Court turns to the merits of these claims.

### B. The Judges' Practice of Imprisoning Individuals for Failure to Pay Court Debts Without Considering Ability to Pay Is Unconstitutional

The core of plaintiffs' constitutional challenge to the Judges' debt collection measures is that the Judges imprison poor debtors solely because they cannot afford to pay court debts. Count Five specifically challenges the Judges' practice of failing to inquire into indigent debtors' ability to pay court debts before the debtors are imprisoned for nonpayment.[133]

---

[133] As discussed in the next section, Count Five also challenges the constitutionality of the legislative framework that vests both judicial and executive power in the Judges.

### 1. The Judges Have a Policy or Practice of Failing to Conduct Any Inquiry into Plaintiffs' Ability to Pay Court Debts Before Plaintiffs Are Imprisoned for Nonpayment

The facts related to Count Five are undisputed. Most importantly, the Judges do not routinely solicit financial information from criminal defendants who fail to pay their court debts,[134] though they do consider ability to pay when the issue is brought to their attention.[135] As discussed earlier, plaintiffs continue to face the possibility that they will be imprisoned for failure to pay court debts.[136] Thus, it is the Judges' practice not to inquire into plaintiffs' ability to pay such debts even though plaintiffs may be imprisoned for failure to pay.

---

[134] R. Doc. 251-2 at 17. Plaintiffs posed the following interrogatory: "Please describe any and all policies, procedures, and practices related to assessing whether a person who owes fines and/or fees to the court has the ability to pay those fines and/or fees?"; defendants responded: "There are no written policies or procedures; the general practice, which varies depending upon the matter, includes input from defense counsel and/or the defendant when brought to the Court's attention." R. Doc. 251-5 at 297. Although defendants deny that the Judges fail to routinely solicit information about criminal defendants' ability to pay, *see* R. Doc. 255-5 at 14, they neither point to contrary evidence in the record nor show that plaintiffs' evidence is too sheer to support summary judgment. *See* Fed. R. Civ. P. 56(c)(1); *Int'l Shortstop*, 939 F.2d at 1265. Defendants therefore fail to carry their summary judgment burden of showing a genuine dispute of fact.

[135] R. Doc. 250-2 at 12; R. Doc. 259-1 at 8.

[136] *See supra* Part III.A.4.

The evidence in the record confirms this practice. Each named plaintiff was imprisoned for failure to pay court debts. But at no point—not at sentencing, not before their imprisonment, not at a hearing while they were imprisoned—did a judge inquire into their ability to pay. By way of example, Ashton Brown was imprisoned for failure to pay court fees from July 23 to August 7, 2015.[137] No judge inquired into his ability to pay before his imprisonment.[138] Brown did secure an appearance in court, without counsel, on August 6.[139] The judge refused to release Brown, who lived in poverty and struggled to support himself and his nine-month-old daughter, unless he paid $100 to OPCDC.[140] There is no indication in the record that the judge asked about Brown's income or ability to pay. Brown had to ask his grandmother for help, and only after she made a $100 payment was Brown released.[141]

---

[137] R. Doc. 59-3 at 6.

[138] The court did advise Brown at sentencing that if he did not have the money to make his first payment, he should seek an extension. R. Doc. 255-4 at 16. To be clear, plaintiffs are not challenging the imposition of fines and fees at sentencing without an ability-to-pay inquiry; their challenge is focused on the Judges' practice of not providing this inquiry at any point before plaintiffs are imprisoned for failure to pay.

[139] R. Doc. 59-3 at 6.

[140] *Id.*; R. Doc. 8-3 at 1.

[141] R. Doc. 8-3 at 1; R. Doc. 59-3 at 6.

Alana Cain was imprisoned for failure to pay restitution and fees from March 11 to March 18, 2015.[142]  There is no indication that any judge inquired into her ability to pay before her imprisonment.  She appeared before a judge while in jail; at that hearing, the transcript of which is in the record,[143] the judge did not ask Cain whether she could pay her court debts, nor did he ask her about her income.[144]  If the judge had inquired into Cain's ability to pay, he would have learned that Cain—who had given birth to her first child a few weeks earlier—made only $200 per month and struggled to afford food and clothes.[145]  The judge did ask Cain *when* she would be able to continue making payments.[146]  After Cain stated that she could continue making payments upon her release, the judge ordered her release and directed her to return to court for a status update two weeks later.[147]

Some criminal defendants who appeared before a judge while they were imprisoned for failure to pay fines and fees were sent back to jail, apparently because they could not make a payment.  For example, Tyrone Singleton was arrested for failure to pay fines and fees on November 11,

---

[142]    R. Doc. 59-3 at 2; R. Doc. 251-5 at 369.
[143]    R. Doc. 95-3 at 27-35.
[144]    R. Doc. 8-2 at 1-2.
[145]    *Id.* at 1.
[146]    R. Doc. 95-3 at 30.
[147]    *Id.* at 29-32.

2013.[148]  He appeared before a judge two weeks later, on November 25, but was sent back to jail for another week before his release.[149]

This evidence suggests that the Judges do not release criminal defendants imprisoned for failure to pay court debts without a payment, or some promise of payment.[150]  Defendants cite no statutory authority for the Judges' actions.[151]  This process most resembles contempt of court in which an individual is imprisoned until she complies with a court order—here, an order to pay fines and fees.  Because plaintiffs may secure their release by making a payment, their imprisonment for nonpayment is a conditional penalty.  *Hicks v. Feiock*, 485 U.S. 624, 633 (1988).  Contempt of court that imposes a conditional penalty is civil, rather than criminal, "because it is specifically designed to compel the doing of some act," rather than to punish.  *Id.*

---

[148]    R. Doc. 251-5 at 411.  The Court takes judicial notice of the facts contained within this exhibit, which were taken from publicly available docket sheets.

[149]    *Id.*

[150]    *See* R. Doc. 251-2 at 22; R. Doc. 255-5 at 25.

[151]    Because OPCDC sometimes includes payment of court debts as a condition of probation, the court could revoke an individual's probation for failure to pay.  *See* La. Code Crim. Proc. art. 895.1 (authorizing courts to require payment of restitution and certain fees as a condition of probation); *id.* arts. 899, 900 (describing procedures for revoking probation).  But there is no indication in the record that OPCDC's debt collections practices generally, or ever, involve probation revocation.

There is no genuine dispute, therefore, that the Judges have a practice of not inquiring into plaintiffs' ability to pay court debts when plaintiffs are essentially held in civil contempt and imprisoned for nonpayment.

>    **2.    The Judges' Failure to Inquire into Plaintiffs' Ability to Pay Court Debts Before Plaintiffs Are Imprisoned for Nonpayment Violates Due Process**

Plaintiffs argue that the Judges' failure to inquire into plaintiffs' ability to pay court debts violates the Fourteenth Amendment.[152]  Although "[d]ue process and equal protection principles converge" in cases involving the criminal justice system's treatment of indigent individuals, *Bearden v. Georgia*, 461 U.S. 660, 665 (1983), plaintiffs' argument sounds in procedural due process.  Thus, the familiar framework set out in *Mathews v. Eldridge*, 424 U.S. 319 (1976), applies.  *See Turner v. Rogers*, 564 U.S. 431, 444-45 (2011) (applying *Mathews v. Eldridge* to civil contempt proceedings).  The *Mathews v. Eldridge* framework calls for the Court to consider three factors: "(1) the nature of 'the private interest that will be affected,' (2) the comparative 'risk' of an 'erroneous deprivation' of that interest with and without 'additional or substitute procedural safeguards,' and (3) the nature and magnitude of any countervailing interest in not providing 'additional or

---

[152]    R. Doc. 251-1 at 38-39.

substitute procedural requirements.'" *Id.* (quoting *Mathews*, 424 U.S. at 335).

Supreme Court precedent speaks directly to the kind of procedural protections the Judges must provide to plaintiffs. This precedent is grounded in the well-established principle that an indigent criminal defendant may not be imprisoned solely because of her indigence. *See Tate v. Short*, 401 U.S. 395, 398 (1971); *see also United States v. Voda*, 994 F.2d 149, 154 n.13 (5th Cir. 1993) ("Constitutionally, courts are limited in the penalty they can impose for nonpayment of criminal fines because of inability to pay."). Admittedly, there is nothing necessarily unconstitutional about imprisoning a convicted criminal defendant for failing to pay fines and fees. As the Supreme Court recognized, this custom "dates back to medieval England and has long been practiced in this country." *Williams v. Illinois*, 399 U.S. 235, 239 (1970) (footnote omitted). But the Supreme Court has imposed constitutional limits on this practice when applied to indigent criminal defendants. In *Williams*, for example, the Court held that "an indigent criminal defendant may not be imprisoned in default of payment of a fine beyond the maximum [term of imprisonment] authorized by the statute regulating the substantive offense." 399 U.S. at 241. Such

imprisonment constitutes "impermissible discrimination that rests on ability to pay." *Id.*

Following *Williams*, the Supreme Court addressed a constitutional challenge to a state's method of collecting fines from an indigent criminal defendant. *Tate*, 401 U.S. 395. The criminal defendant in *Tate* had accumulated fines for traffic offenses, which were punishable only by fine. *Id.* at 396-97. Because the defendant was indigent when the state court imposed the fines, the court sentenced him to a term of imprisonment—each day counted as five dollars toward the defendant's outstanding fines. *Id.* The Court invalidated this practice as violating equal protection, explaining that "the Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full." *Id.* at 398 (citation omitted).

Over a decade later, in *Bearden*, the Supreme Court addressed a similar challenge to a probation revocation proceeding. There, the Court held that an indigent defendant's probation cannot be revoked (and thus converted into a jail term) for his failure to pay a court-imposed fine or restitution "absent evidence and findings that the defendant was somehow

responsible for the failure or that alternative forms of punishment were inadequate." 461 U.S. at 665. The Court further held:

> [A] sentencing court must inquire into the reasons for the failure to pay. If the probationer willfully refused to pay or failed to make sufficient bona fide efforts legally to acquire the resources to pay, the court may revoke probation and sentence the defendant to imprisonment . . . . If the probationer could not pay despite sufficient bona fide efforts to acquire the resources to do so, the court must consider alternate measures of punishment other than imprisonment. Only if alternate measures are not adequate to meet the State's interests in punishment and deterrence may the court imprison a probationer who has made sufficient bona fide efforts to pay. To do otherwise would deprive the probationer of his conditional freedom simply because, through no fault of his, he cannot pay the fine.

*Id.* at 672-73. The state court imprisoned Bearden "because he could not pay the fine, without considering the reasons for the inability to pay or the propriety of reducing the fine or extending the time for payments or making alternative orders." *Id.* at 674. In this way, "the court automatically turned a fine into a prison sentence." *Id.*

More recently, the Supreme Court in *Turner* reiterated the importance of the ability-to-pay determination prior to imprisonment, this time in the context of a civil contempt proceeding. The Court applied the *Mathews v. Eldridge* framework to determine whether an indigent defendant has "a right to state-appointed counsel at a civil contempt proceeding, which may lead to his incarceration." *Turner*, 564 U.S. at 441. The Court noted "the

importance of the interest at stake"—the defendant's interest in preventing the "loss of [his] personal liberty through imprisonment." *Id.* at 445. Given the importance of this interest, the Court stated, "it is obviously important to assure accurate decisionmaking in respect to the key 'ability to pay' question." *Id.* The Court held that due process does not require state-appointed counsel so long as the state provides other procedural safeguards equivalent to "adequate notice of the importance of ability to pay, fair opportunity to present, and to dispute, relevant information [concerning ability to pay], and court findings." *Id.* at 448.

The Court finds that *Bearden* is controlling, and that *Turner* is instructive. Admittedly, there are some differences between those cases and this one. For example, unlike the court in *Bearden*, OPCDC does not impose a term of imprisonment upon criminal defendants for failure to pay their court debts. And OPCDC's debt collection procedures appear to operate independently from revocation of probation. *See State v. Kenniston*, 976 So. 2d 226, 227 (La. App. 4 Cir. 2008) (noting that OPCDC issued two alias capias warrants for failure to pay court debts, and that the state later initiated probation revocation proceedings); *see also* La. Code Crim. Proc. arts. 899-900 (describing probation revocation procedures). But "[n]othing in the language of the *Bearden* opinion prevents its application to any given

enforcement mechanism." *United States v. Payan*, 992 F.2d 1387, 1396 (5th Cir. 1993). And civil contempt in this case, like probation revocation in *Bearden*, works the same constitutional injury: plaintiffs, like the criminal defendant in *Bearden*, are subject to imprisonment for failure to pay court-imposed fines and fees.

Like the defendant in *Turner*, plaintiffs are subject to imprisonment as the result of civil contempt-like proceedings. Admittedly, neither party in *Turner* was represented by counsel during the civil contempt proceeding, and the complaining party was not the state, 564 U.S. at 448-49; here, by contrast, the complaining party—OPCDC—is both an organ of the state and represented by counsel (the Judges), and the criminal defendants generally are also represented by counsel. But *Turner* does stand for the broader proposition that the ability-to-pay inquiry required by *Bearden* must have some procedural safeguards.

Bearing in mind that *Bearden* and *Turner* speak directly to the procedural requirements of an ability-to-pay inquiry, the Court now turns to the application of the *Mathews* framework to the facts of this case. First, plaintiffs' interest in securing their "freedom 'from bodily restraint[]' lies 'at the core of the liberty protected by the Due Process Clause.'" *Turner*, 564 U.S. at 445 (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). Plaintiffs'

liberty interest weighs heavily in favor of procedural safeguards provided before imprisonment.

Second, the risk of erroneous deprivation without an inquiry into ability to pay is high. At least some criminal defendants, including the named plaintiffs, are subject to imprisonment for failure to pay fines and fees despite their indigence. OPCDC necessarily determined that all named plaintiffs, except Reynaud Variste, were indigent when it appointed counsel for them during their criminal proceedings.[153] Moreover, Louisiana courts presume that a criminal defendant who cannot afford counsel is indigent for purposes of ability to pay court debts. *See State v. Williams*, 288 So. 2d 319, 321 (La. 1974) (noting that appointment of counsel established defendant's indigence); *State v. Morales*, 221 So. 3d 257, 258 (La. App. 3 Cir. 2017) (noting that appointment of counsel is "presumptive evidence of indigence"); *State v. Hebert*, 669 So. 2d 499, 502 (La. App. 4 Cir. 1996) ("[A] defendant represented by appointed counsel . . . is presumed indigent and cannot be ordered to serve additional jail time in lieu of the payment of costs."). The inquiry itself surely must involve at least notice and opportunity to be heard,

---

[153] *See* R. Doc. 228 at 6; R. Doc. 251-2 at 17; R. Doc. 255-5 at 24; La. Rev. Stat. § 15:175(A)(1)(b) ("A person will be deemed 'indigent' who is unable, without substantial financial hardship to himself or to his dependents, to obtain competent, qualified legal representation on his own.").

as suggested by *Turner*; an ability-to-pay inquiry without these basic procedural protections would likely be ineffective.

Third, the Judges fail to point to any countervailing interest in not inquiring into plaintiffs' ability to pay before imprisonment. According to Administrator Kazik, the Judges consider ability to pay if a criminal defendant raises the issue.[154] But *Bearden* and *Turner* require more. *Bearden* commands that before a court imprisons an individual for failure to pay a court-imposed fine or fee, the court must inquire into her reasons for failure to pay. 461 U.S. at 672. If the individual is unable to pay the court debts despite sufficient bona fide efforts to do so, then the court must consider alternative measures. *Id.* *Turner* holds that this ability-to-pay inquiry must have at least some procedural safeguards. The record shows that at least until 2015, the Collections Department gave notice to criminal defendants before issuing alias capias warrants for failure to pay, and these criminal defendants usually appeared before a judge while they were imprisoned for failure to pay. The Judges therefore provided notice and an opportunity to be heard to plaintiffs—just not "in respect to the key 'ability to pay' question." *Turner*, 564 U.S. at 445. In light of this limited notice and

---

[154] R. Doc. 250-3 at 5 (Kazik Affidavit stating that "[i]f a criminal defendant raises the issue of their ability to pay, the judges consider it").

opportunity to be heard formerly provided by OPCDC, the Court cannot discern any state interest in the Judges' failure to provide notice and an opportunity to be heard on ability to pay before imprisonment.

Moreover, there is no authority for the proposition that a criminal defendant must raise the issue of her inability to pay. As the Court explained in an earlier order, the Judges' reliance on *Garcia v. City of Abilene*, 890 F.2d 773 (5th Cir. 1989), and *Sorrells v. Warner*, 21 F.3d 1109 (5th Cir. 1994) (unpublished), is unavailing.[155] In both cases, the criminal defendant had an opportunity to claim indigence but squandered it by failing (or repeatedly failing) to appear, in person, at scheduled court hearings. *Sorrells*, 21 F.3d at *1; *Garcia*, 890 F.2d at 775; *see also Doe v. Angelina County*, 733 F. Supp. 245, 253 (E.D. Tex. 1990) (distinguishing *Garcia* because "a party cannot fail to appear if no provision is made for such a proceeding" in the first place); *De Luna v. Hidalgo County*, 853 F. Supp. 2d 623, 646-47 (S.D. Tex. 2012) (citing *Doe v. Angelina County*). Regardless, *Turner* clearly suggests that the *state* provide the procedural protection of notice that ability to pay is important; a contrary rule, requiring the criminal defendant to raise the issue on her own, would undermine *Bearden*'s command that a criminal

---

[155] R. Doc. 136 at 15-16.

defendant not be imprisoned solely because of her indigence. 461 U.S. at 672-73.

It is undisputed that the Judges provide no ability-to-pay inquiry, nor any further procedural safeguards, to indigent criminal defendants who are subject to imprisonment for failure to pay court debts. Under *Bearden* and *Turner*, the Judges must inquire into plaintiffs' ability to pay before their imprisonment. This inquiry must involve certain procedural safeguards, especially notice to the individual of the importance of ability to pay and an opportunity to be heard on the issue. If an individual is unable to pay, then the Judges must consider alternative measures before imprisoning the individual.

Plaintiffs are entitled summary judgment on Count Five to the extent they seek a declaration that the Judges' practice of not inquiring into plaintiffs' ability to pay before they are imprisoned for nonpayment violates the Fourteenth Amendment.

## C. The Judges' Control over Both Fines and Fees Revenue and Ability-to-Pay Determinations Violates Due Process

Count Five also challenges the dual role the Judges play: they are responsible for both determining criminal defendants' ability to pay fines and fees and managing a portion of the revenue derived from those fines and

fees.[156]   Plaintiffs argue that the Judges' power over this revenue creates a financial conflict of interest, depriving criminal defendants of a neutral tribunal to determine their ability to pay.[157]

### 1.    *Legal Background*

"Trial before an unbiased judge is essential to due process." *Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 217 (5th Cir. 2001) (quoting *Johnson v. Mississippi*, 403 U.S. 212, 216 (1971)); *see also Brown v. Edwards*, 721 F.2d 1442, 1451 (5th Cir. 1984) ("The right to a judge unbiased by direct pecuniary interest in the outcome of a case is unquestionable.").  Although due process requires a judge's disqualification "only in the most extreme of cases," *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986), the Supreme Court has found due process violations when judges maintained pecuniary interests in cases before them.

In *Tumey v. Ohio*, 273 U.S. 510 (1927), a defendant was convicted of possessing liquor in violation of Ohio's Prohibition Act.  The Act provided for trial in a "liquor court," in which the village mayor served as judge.  *Id.* at 521.  The money raised by fines levied in these courts was divided between the state, the village general fund, and two other village funds.  *Id.* at 521-

---

[156]    Plaintiffs do not challenge the Judges' initial assessment of fines and fees, and the Court does not address it.
[157]    R. Doc. 251-1 at 38.

22.  One of these other funds covered expenses associated with enforcing the Prohibition Act, including nearly $700 paid to the mayor "as his fees and costs, in addition to his regular salary." *Id.* at 522.  The Supreme Court overturned Tumey's conviction, and held that the mayor, acting as judge, was disqualified from deciding Tumey's case "both because of his direct pecuniary interest in the outcome, and because of his official motive to convict and to graduate the fine to help the financial needs of the village." *Id.* at 535.

In *Ward v. Village of Monroeville*, 409 U.S. 57 (1972), the Court considered a challenge to traffic fines imposed by another Ohio mayor's court.  Fines generated by the mayor's court at issue in *Ward* provided a "major part" of the total operating funds for the municipality that the mayor oversaw.  *Id.* at 58.  The Court viewed the case as controlled by *Tumey* and noted, "that the mayor [in *Tumey*] shared directly in the fees and costs did not define the limits of the principle" of judicial bias articulated in that case.  *Id.* at 60.  Instead, the Court offered a general test to determine whether an arrangement of this type compromises a criminal defendant's right to a disinterested and impartial judicial officer:

> [T]he test is whether the [judge's] situation is one "which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which

> might lead him not to hold the balance nice, clear, and true between the state and the accused."

*Id.* (quoting *Tumey*, 273 U.S. at 532). In holding that the mayor's court in *Ward* violated due process, the Court found that the impermissible temptation "[p]lainly . . . may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court." *Id.*

In some cases, a judicial officer's institutional interest may be too remote to create an unconstitutional conflict of interest. In *Dugan v. Ohio*, 277 U.S. 61 (1928), for example, a mayor with judicial functions also served as one of five commissioners. Collectively, these commissioners exercised the legislative power of the city, and shared executive powers with the city manager (who was the "active executive"). *Id.* at 63. The Court held that the mayor's relation "to the executive or financial policy of the city" was too "remote" to interfere with his judicial functions. *Id.* at 65.

The Fifth Circuit applied *Tumey* and *Ward* to strike down Mississippi's system of compensating justices of the peace. *Brown v. Vance*, 637 F.2d 272 (5th Cir. Jan. 1981). By law, the justices of the peace were paid based on the volume of cases filed in their courts. *Id.* at 274. No evidence of "actual judicial bias" was necessary "to hold the fee system constitutionally infirm." *Id.* at 282. Instead, the incontrovertible possibility that the justices of the

peace would "compete for business by currying favor with arresting officers or taking biased actions to increase their caseload . . . deprive[d] criminal defendants of their due process right to a trial before an impartial tribunal." *Id.*

### 2. The Judges Face a Conflict of Interest When They Determine Ability to Pay Fines and Fees

It is undisputed that the Judges are responsible for both managing fines and fees revenue and determining whether criminal defendants are able to pay those same fines and fees, once imposed. Fines and fees revenue goes into the Judicial Expense Fund,[158] which the Judges may use "for any purpose connected with, incidental to, or related to the proper administration or function of the court or the office of the judges thereof," La. Rev. Stat. § 13:1381.4(C), except to supplement their own salaries, *id.* § 13:1381.4(D). In their capacity as administrators and executives of OPCDC, the Judges exercise total control over the Judicial Expense Fund.[159] The Judges use this money primarily to fund their own staffs.[160]

Various statutes give the Judges authority over revenue from fines and fees. First, Louisiana law directs the Sheriff to allocate half of all fines and

---

[158]    R. Doc. 251-2 at 12; R. Doc. 251-5 at 382.
[159]    R. Doc. 251-2 at 3; R. Doc. 255-5 at 1.
[160]    R. Doc. 251-2 at 5-6; R. Doc. 255-5 at 2; *see also* R. Doc. 248 at 3.

forfeitures to an "account to be administered by the judges of the criminal district court of Orleans Parish." *Id.* § 15:571.11(D). This revenue is "to be used in defraying the expenses of the criminal courts of the parish, extraditions, and such other expenses pertaining to the operation of the criminal court of Orleans Parish." *Id.*

Second, the Judges may impose costs of up to $100 on convicted criminal defendants (other than those who are indigent); Louisiana law directs the Judicial Administrator to place these sums in a "Criminal Court Cost Fund" to be administered by the Judges. *Id.* § 13:1377. Each of the Judges may authorize disbursements from this fund "to assist in the operation and maintenance" of OPCDC. *Id.* § 13:1377(C).

Third, and most importantly, the Judges may impose a fee of up to $500 on a misdemeanant and up to $2,500 on a felon; Louisiana law directs the Judicial Administrator to place these sums in the Judicial Expense Fund. *Id.* § 13:1381.4. The same provision also imposes a $5 fee on every convicted criminal defendant, and directs the Judicial Administrator to place these sums in the Judicial Expense Fund. *Id.* § 13:1381.4(A)(1).

Fourth, the Judges may impose a $14 fee on convicted, non-indigent criminal defendants; this cost goes into an Indigent Transcript Fund "to compensate court reporters for the preparation of all transcripts for indigent

defendants." *Id.* § 13:1381.1(A). Louisiana law authorizes the Judges, sitting *en banc*, to pay "deputy court reporters for the transcription of indigent defendant cases" out of the Indigent Transcript Fund. *Id.* § 13:1381.1(C). Evidently, the Judges impose additional costs under Louisiana Code of Criminal Procedure Article 887(A) for the Indigent Transcript Fund.[161]

Fifth, the Judges (or presiding judge) may establish a drug division and may administer a probation program for criminal defendants charged with an alcohol- or drug-related offense. La. Rev. Stat. § 13:5304. Louisiana law requires that individuals in this program pay for their own drug testing, "unless the court determines that he is indigent." *Id.* § 13:5304(B)(3)(e).

Although several of these fees appear to be dedicated to certain purposes, the revenue all goes into the Judicial Expense Fund.[162] Approximately $1,000,000 from various fines and fees goes into the OPCDC budget each year.[163] This funding structure puts the Judges in the difficult

---

[161]    R. Doc. 248 at 4.

[162]    R. Doc. 251-2 at 12. In support of this fact, plaintiffs point to spreadsheets showing that from 2013 through 2015, all fines and fees revenue went to the general fund (*i.e.*, the Judicial Expense Fund) rather than the restricted fund. R. Doc. 251-5 at 382-83. In 2012, some of these fines and fees, including indigent transcript fees, went into the restricted fund. *Id.* Defendants do not contradict this evidence.

[163]    Specifically, OPCDC obtained $830,384 in fines and fees revenue in 2012, $973,311 in 2013, $1,084,968 in 2014, and $1,188,420 in 2015. R. Doc. 248 at 2.

position of not having sufficient funds to staff their offices unless they impose and collect sufficient fines and fees from a largely indigent population of criminal defendants.

The Judges' power over fines and fees revenue creates a conflict of interest when those same Judges determine (or are supposed to determine) whether criminal defendants are able to pay the fines and fees that were imposed at sentencing. As explained earlier, the Judges have a constitutional obligation to inquire into criminal defendants' ability to pay court debts. But the Judges have a financial stake in the outcome of ability-to-pay determinations; if they determine that a criminal defendant has the ability to pay, and collect money from her, then the revenue goes directly into the Judicial Expense Fund. *Cf. United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 699 (7th Cir. 1982) ("In this case the Commission has a pecuniary interest in the outcome of the reverter proceedings, because if the Commission finds a nonuse or disuse, the property reverts to the Commission . . . . This is sufficient . . . to mandate disqualification of the Commission in the reverter proceeding . . . ."). The Judges therefore have an institutional incentive to find that criminal defendants are able to pay fines and fees.

The Judges' dual role, as adjudicators who determine ability to pay and as managers of the OPCDC budget, offer a possible temptation to find that indigent criminal defendants are able to pay their court debts. This "inherent defect in the legislative framework" arises not from the bias of any particular Judge, but "from the vulnerability of the average man—as the system works in practice and as it appears to defendants and to the public." *Brown*, 637 F.2d at 284.

The Judges' practice of failing to inquire into ability to pay is itself indicative of their conflict of interest. *Cf. Esso Standard Oil Co. v. Cotto*, 389 F.3d 212, 219 (1st Cir. 2004) (noting that evidence of actual bias includes "procedural irregularities in the decision to assess [a] fine"). As is the dramatic increase in assessments for indigent transcript fees between 2012 and 2013—from $9,841.50 to $271,581.75—when OPCDC shifted revenue from such fees from the restricted fund to the Judicial Expense Fund.[164] Defendants insist that they do not benefit from this revenue, which solely aids indigent criminal defendants.[165] This assertion is undercut by financial statements for the Judicial Expense Fund, which show expenditures on transcripts of $0 in 2013 and 2015 and $7,044 in 2014.[166]

---

[164] R. Doc. 248-1 at 6-7; R. Doc. 251-5 at 382-83.
[165] R. Doc. 255-5 at 17.
[166] R. Doc. 248-1 at 2-4.

Further evidence of an actual conflict of interest is that the Judges have sought ways to increase collections from criminal defendants. At a City Council hearing in July 2014, a judge explained that the Judges were sharing ideas "in an effort to increase [their] collection" of fines and fees.[167] The Collections Department itself was created by the Judges in the 1980s to facilitate collection efforts.[168] Moreover, at least from 2013 through 2015, the amount of fees (which go entirely to OPCDC) imposed by the Judges far exceeded the amount of fines (only half of which goes to OPCDC).[169] This suggests that the Judges prefer to impose fees for OPCDC rather than share fines with the DA.

Defendants' reliance on *Broussard v. Parish of New Orleans*, 318 F.3d 644 (5th Cir. 2003), is misplaced. The plaintiffs in *Broussard* challenged the constitutionality of the Louisiana bail fee statutes on a number of grounds. As relevant here, the plaintiffs argued that these statutes violated *Tumey* and *Ward* by "tempt[ing] sheriffs to stack charges against arrestees in violation of their due process rights." *Id.* at 661. The court found that *Tumey* and

---

[167] R. Doc. 251-5 at 284. Defendants object to City Council transcripts as incomplete and taken out of context. R. Doc. 255-5 at 18. But the Judges' statements are admissible as admissions of party opponents. Fed. R. Evid. 801(d)(2). Moreover, defendants do not contend that the statements at issue were inaccurately transcribed.

[168] R. Doc. 248 at 7.

[169] *See* R. Doc. 248-1 at 7-9, 11-13.

*Ward* were inapplicable because the sheriffs-defendants in *Broussard* did not exercise a judicial function. *Id.* at 662. As purely executive actors, the sheriffs were "not expected to maintain a level of impartiality equal to that expected of judges." *Id.* Unlike the sheriffs in *Broussard*, the Judges in this case do exercise a judicial function when they are required to determine ability to pay fines and fees. Thus, unlike in *Broussard*, the *Ward* test applies to whether the Judges have an unconstitutional conflict of interest.

That the Judges have an institutional, rather than direct and individual, interest in maximizing fines and fees revenue is immaterial. *See Chrysler Corp. v. Tex. Motor Vehicle Comm'n*, 755 F.2d 1192, 1199 (5th Cir. 1985) ("Certainly the due process principle distilled from the *Tumey* line reaches beyond immediate economic stakes to include economic interests said to be 'indirect' or 'institutional.'"). *Ward* itself involved a mayor who had no direct, personal interest in traffic fine revenue; his interest related solely to his "executive responsibilities for village finances." 409 U.S. at 60. Likewise, the Judges' interest in fines and fees revenue is related to their executive responsibilities for OPCDC finances.

Additionally, that the Judges manage court funds collectively does not render their institutional interest too remote. Unlike in *Dugan*, where the mayor was only one member of a five-person commission that shared

executive power with the city manager (who was the acting executive), collectively the Judges exercise all executive power over OPCDC's share of fines and fees revenue. Moreover, the Supreme Court has applied *Tumey* and *Ward* to the members of a state board of optometry, all of whom had a personal interest in revoking the licenses of optometrists employed by corporations. *Gibson v. Berryhill*, 411 U.S. 564, 578 (1973). The Court held that the board members were disqualified from adjudicating charges against such optometrists. *Id.*; *cf. Chrysler*, 755 F.2d at 1199 (finding no impermissible bias where only four out of nine commissioners potentially had conflict of interest).

Plaintiffs have established that the Judges' dual role creates a "possible temptation . . . not to hold the balance nice, clear, and true between the state and the accused." *Ward*, 409 U.S. at 60 (quoting *Tumey*, 273 U.S. at 532). By no fault of their own, the Judges' "executive responsibilities for [court] finances may make [them] partisan to maintain the high level of contribution," in the form of fines and fees, from criminal defendants. *Id.*

### 3.    *The Judges' Conflict of Interest Is Substantial*

Plaintiffs must also establish that the Judges' conflict of interest is substantial. In *Tumey*, the Court noted that "[t]he minor penalties usually attaching to the ordinances of a village council, or to the misdemeanors in

72

which the mayor may pronounce final judgment without a jury, do not involve any such addition to the revenue of the village as to justify the fear that the mayor would be influenced in his judicial judgment by that fact." 273 U.S. at 534. According to the Ninth Circuit, the proper question is "whether the official motive here is 'strong,' so that it 'reasonably warrants fear of partisan influence on the judgment.'" *Alpha Epsilon Phi Tau Chapter Hous. Ass'n v. City of Berkeley*, 114 F.3d 840, 847 (9th Cir. 1997) (quoting *Commonwealth of N. Mariana Islands v. Kaipat*, 94 F.3d 574, 575, 582 (9th Cir. 1996)).

The Judges' institutional interest in maximizing fines and fees revenue is substantial. Fines and fees revenue is obviously important to the Judges; fines and fees provide approximately 10% of the total OPCDC budget and one quarter of the Judicial Expense Fund.[170] *Cf. DePiero v. City of Macedonia*, 180 F.3d 770, 780-82 (6th Cir. 1999) (finding a due process violation when a maximum of 9% of municipality's general fund derived from mayor's court revenue). Judge Zibilich emphasized the importance of this revenue during a City Council hearing, stating that the fines and fees revenue "probably represents fully a fourth of the monies that we need to be operational, and if we are handcuffed in that particular regard, that money['s] replacement's

---

[170]    R. Doc. 248 at 2; R. Doc. 248-1 at 1-4.

going to have to come from some place."[171]  The Judges spend most of the Judicial Expense Fund on salaries and benefits for their employees (though not themselves), and most of the money for these salaries and benefits comes from the Judicial Expense Fund.[172]

Moreover, the aggregate amount at stake in determining criminal defendants' ability to pay is significant.  According to the parties' joint stipulations of fact, OPCDC collects only between 40% and 50% of the fines and fees it assesses.[173]  The amounts that go uncollected run in the hundreds of thousands of dollars.  In 2013, for example, OPCDC assessed $1,517,031.17 in Judicial Expense Fund fees, Indigent Transcript Fund fees, and drug testing fees—the three largest categories of fees that go into the Judicial Expense Fund.[174]  OPCDC collected only $805,067.12 in these fees.[175]  The amount uncollected, $711,964.05, was equal to 17% of the Judicial Expense

---

[171]     R. Doc. 251-5 at 247.
[172]     R. Doc. 251-2 at 5-6; R. Doc. 255-5 at 2.
[173]     R. Doc. 248 at 5.
[174]     *See* R. Doc. 248-1 at 7.
[175]     *See id.* at 11.  Of course, fees assessed in one year may be collected in later years.  But the record does not include time frames for collections of specific assessments.

Fund revenue in 2013.[176]  That same figure was 14% in 2014, and 18% in 2015.[177]

Both Administrator Kazik and Judge Zibilich have suggested that collection rates are low partly because most criminal defendants are indigent.  In a 2014 letter requesting a higher appropriation from the City of New Orleans, Administrator Kazik explained that most of the OPCDC budget "is received from the various fines and fees assessed to defendants at sentencing."[178]  But, he stated, "[m]ost defendants are unemployed and indigent, which makes collecting those assessed fees a challenge and an unreliable revenue resource for the Court's operational needs."[179]  At a City Council meeting, Judge Zibilich noted that nearly 95% of the criminal defendants in OPCDC cannot afford an attorney, and stated: "If they can't afford an attorney, just imagine how difficult it's going to be for us to have to chase them around the block to try to get money from them."[180]

It is undisputed that OPCDC depends heavily on fines and fees revenue, that many criminal defendant subject to these fines and fees are

---

[176]    *See id.* at 2 (2013 general fund revenue was $4,100,413).
[177]    *See id.* at 3 (2014 general fund revenue was $3,928,025); *id.* at 4 (2015 unrestricted fund revenue was $3,940,535); *id.* at 8-9 (2014 and 2015 assessments); *id.* at 12-13 (2014 and 2015 collections).
[178]    R. Doc. 251-5 at 174.
[179]    *Id.*
[180]    *Id.* at 286.

indigent, and that collection rates are only 40% to 50%. Based on these facts, it is clear the Judges' motive to maximize fines and fees revenue is strong enough reasonably to warrant fear of partisan influence on ability-to-pay determinations. *See Alpha Epsilon*, 114 F.3d at 847 (9th Cir. 1997). Thus, plaintiffs have established that the Judges face a substantial conflict of interest when they determine ability to pay fines and fees (or are supposed to do so).

This conflict of interest exists by no fault of the Judges themselves. It is the unfortunate result of the financing structure, established by governing law, that forces the Judges to generate revenue from the criminal defendants they sentence. Of course, the Judges would not be in this predicament if the state and city adequately funded OPCDC. So long as the Judges control and heavily rely on fines and fees revenue, however, the Judges' adjudication of plaintiffs' ability to pay those fines and fees offends due process. Thus, plaintiffs are entitled summary judgment on Count Five to the extent they seek a declaration that the Judges' institutional incentives create an impermissible conflict of interest when they determine, or are supposed to determine, plaintiffs' ability to pay fines and fees.

### D. Plaintiffs Are Not Entitled Summary Judgment on Count Six

Count Six is an equal protection challenge against defendants' debt collection practices. Plaintiffs argue that these practices are harsher than debt collection measures available to private creditors.[181]

Plaintiffs attempt to show discrimination on the face of the Louisiana statutory framework for contempt proceedings. *See, e.g.*, *Lewis v. Ascension Par. Sch. Bd.*, 72 F. Supp. 3d 648, 662-63 (M.D. La. 2014) (distinguishing explicit classification from discriminatory application of facially neutral law); *see also Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 543-45 (3d Cir. 2011) (same). Plaintiffs principally rely on *James v. Strange*, 407 U.S. 128 (1972), where the Supreme Court addressed a Kansas recoupment statute that allowed the state to "recover in subsequent civil proceedings counsel and other legal defense fees expended for the benefit of indigent defendants." *Id.* at 128. The statute excluded these indigent defendants from "the array of protective exemptions Kansas has erected for other civil judgment debtors," such as "the exemption of his wages from unrestricted garnishment." *Id.* at 135. The Court struck down the statute as "embod[ying] elements of

---

[181]   R. Doc. 251-1 at 53.

punitiveness and discrimination which violate the rights of citizens to equal treatment under the law." *Id.* at 142.

Plaintiffs argue that defendants' practice of jailing criminal defendants is similarly discriminatory. They note that Louisiana has abolished the writ of *capias ad satisfaciendum*, which allowed a private creditor to imprison a debtor until her judgment was satisfied. *See* La. Rev. Stat. § 13:4281 (abolishing writ); *Capias*, Black's Law Dictionary (defining *capias ad satisfaciendum* as "[a] postjudgment writ commanding the sheriff to imprison the defendant until the judgment is satisfied"). According to plaintiffs, a private creditor seeking to enforce a judgment against a debtor may now seek contempt of court. A debtor in that situation has various procedural protections under Louisiana law. For example, the court must issue a rule "to show cause why [the debtor] should not be adjudged guilty of contempt"; this rule to show cause must be served on the debtor at least 48 hours before trial; and if the court finds the debtor guilty, it must issue "an order reciting the facts constituting the contempt." La. Code Civ. Proc. art. 225.

By law, criminal defendants have similar procedural protections in contempt proceedings: the judge must issue a rule to show cause; this rule must be served on the criminal defendant at least 48 hours before trial; and

if the court finds the defendant guilty, it must issue "an order reciting the facts constituting the contempt." La. Code Crim. Proc. art. 24. Thus, the statutory procedures for contempt proceedings are essentially the same for both civil and criminal defendants. Unlike in *James*, there is no discrimination on the face of these statutes. Plaintiffs are not entitled summary judgment on Count Six.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS plaintiffs' motion for summary judgment on Count Five. The Court GRANTS defendants' motion for summary judgment on Counts One, Two, and Four. The parties' motions are otherwise DENIED. Counts One, Two, and Four are DISMISSED AS MOOT. Administrator Kazik is DISMISSED from this case.


New Orleans, Louisiana, this __13th__ day of December, 2017.


_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE