# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
August 23, 2019

No. 18-30955

Lyle W. Cayce
Clerk

ALANA CAIN; ASHTON BROWN; REYNAUD VARISTE; REYNAJIA VARISTE; THADDEUS LONG; VANESSA MAXWELL,

       Plaintiffs - Appellees

v.

LAURIE A. WHITE, Judge Section A of the Orleans Parish Criminal District Court; TRACEY FLEMINGS-DAVILLIER, Judge Section B of the Orleans Parish Criminal District Court; BENEDICT WILLARD, Judge Section C of the Orleans Parish Criminal District Court; KEVA LANDRUM-JOHNSON, Judge Section E of the Orleans Parish Criminal District Court; ROBIN PITTMAN, Judge Section F of the Orleans Parish Criminal District Court; BYRON C. WILLIAMS, Judge Section G of the Orleans Parish Criminal District Court; CAMILLE BURAS, Judge Section H of the Orleans Parish Criminal District Court; KAREN K. HERMAN, Judge Section I of the Orleans Parish Criminal District Court; DARRYL DERBIGNY, Judge Section J of the Orleans Parish Criminal District Court; ARTHUR HUNTER, Judge Section K of the Orleans Parish Criminal District Court; FRANZ ZIBILICH, Judge Section L of the Orleans Parish Criminal District Court; HARRY E. CANTRELL, Magistrate Judge of the Orleans Parish Criminal District Court,

       Defendants - Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana

No. 18-30955

Before HAYNES, GRAVES, and HO, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

Plaintiff-Appellees are former criminal defendants in Orleans Parish, Louisiana who sued Defendant-Appellants, Judges of the Orleans Parish Criminal District Court ("OPCDC"), under 42 U.S.C. § 1983. Plaintiffs alleged the Judges' practices in collecting criminal fines and fees violated the Due Process Clause of the Fourteenth Amendment. The district court granted summary judgment in Plaintiffs' favor. We affirm, although we emphasize at the outset that the resolution of this case is dictated by the particular facts before us.

## I. BACKGROUND

**A. The Parties**

Plaintiff-Appellees are Alana Cain, Ashton Brown, Reynaud Variste, Reynajia Variste, Thaddeus Long, and Vanessa Maxwell, former criminal defendants in OPCDC who pleaded guilty to various criminal offenses between 2011 and 2014. All but Reynaud Variste qualified for and were appointed public defenders. At sentencing, Plaintiffs were assessed fines and fees ranging from $148 to $901.50. All were arrested for failure to pay their assessed fines and fees, given a $20,000 bond, and spent anywhere from six days to two weeks in jail.

Defendant-Appellants are twelve OPCDC judges, Judges Laurie A. White, Tracey Flemings-Davilier, Benedict Willard, Keva Landrum-Johnson, Robin Pittman, Byron C. Williams, Camille Buras, Karen K. Herman, Darryl Derbigny, Arthur Hunter, Franz Zibilich, and Magistrate Judge Harry Cantrell (the "Judges").[1]

---

[1] All claims against the OPCDC and the City of New Orleans were dismissed prior to the district court's order granting summary judgment at issue here. Judicial Administrator Robert Kazik and Orleans Parish Sheriff Marlin Gusman are not parties to this appeal.

2

Case: 18-30955 Document: 00515149001 Page: 3 Date Filed: 10/08/2019
Case 2:15-cv-04479-SSV-JCW Document 343-1 Filed 10/08/19 Page 3 of 13

No. 18-30955

## B. The Judicial Expense Fund ("JEF")

The JEF is established pursuant to La. Rev. Stat. § 13:1381.4 and consists of OPCDC revenue that is not designated or restricted for a specific purpose. Accordingly, it is also known as the General Fund. The JEF receives funding from a variety of sources, including the City of New Orleans and bail bond fees, but approximately one quarter of the monies it receives comes from the court's collection of fines and fees.

The Judges have exclusive control over how the JEF is spent, and generally use it for the following:

> salaries and related-employment benefits (excluding the judges), CLE travel, legislative expenses, conferences and legal education, ceremonies, office supplies, cleaning supplies, law books, bottled water, jury expenses, telephone, postage, pest control, dues and subscriptions, paper supplies, advertising, building maintenance and repairs, cleaning services, capital outlay, equipment maintenance and repairs, lease payments, equipment rentals, professional and contractual expenses, the drug testing supplies, coffee, transcripts, insurance, and miscellaneous.

Money from the fund may not be used to supplement the Judges' own salaries, although, as noted above, it can be used to pay the salaries of court personnel. La. Rev. Stat. § 13:1381.4(D). Each judge is allocated $250,000 per annum for personnel salaries and $1,000 for court costs from the JEF. The fund also covers the cost of professional liability insurance coverage as authorized by the Louisiana Supreme Court. "For some time prior to 2011, some judges received supplemental benefits" from the JEF in the form of supplemental health insurance policies and reimbursement for out-of-pocket medical expenses; however, this practice fully ended by 2012 following an investigation by the Louisiana Legislative Auditor.

No. 18-30955

When collection of the fines and fees is reduced, the OPCDC can have a difficult time meeting its operational needs, leading to cuts in services, reduction of staff salaries, and leaving some positions unfilled. During these times, the Judges have attempted to increase their collection efforts and have also requested assistance from other sources of funding, including the City of New Orleans.

**C. The Fines and Fees**

Several Louisiana statutes and codes permit the Judges to assess fines and fees to criminal defendants at sentencing. Some fines and fees have specific purposes and are collected to be distributed for specific statutory purposes,[2] while others are collected and then split between the court and other agencies.[3] However, some fines and fees go directly into the JEF.[4] The statutory requirements of yet other fines and fees is ambiguous.[5]

---

[2] Restitution is collected to benefit the victims of crime, *see* La. Code Crim. Proc. Art. 883.2, and a $14 fee is collected to be deposited into the indigent transcript fund to compensate court reporters. La. Rev. Stat. § 13:1381.1. Additionally, Louisiana statute allows the assessment of the costs of drug treatment or drug testing if the defendant is found not to be indigent. § 13:5304(B)(3)(e), (C)(3)–(4). After 2012, it appears that these the indigent transcript fund fee and drug testing costs were deposited into the JEF.

[3] For example, fines pursuant to La. Rev. Stat. § 15:571.11 are split between the OPCDC and the District Attorney, and "court costs" assessed by the Judges can include fees that go to other agencies, including the Orleans Public Defender, the District Attorney, the Criminal Sheriff, etc. The Sheriff also collects a 3% fee on bail bonds, two thirds of which goes to an "administration of criminal justice fund" overseen by the chief judge of the OPCDC, the Orleans Parish sheriff, the district attorney, and the director of the Orleans Parish indigent defender's program, or their designees. § 22:822(A)(2), (B)(3); § 13.1381.5. The remaining third goes to the OPCDC. § 22.822(3).

[4] These include a mandatory $5 fee, La. Rev. Stat. § 13:1381.4, an "additional cost" of up to $500 for a defendant convicted of a misdemeanor and $2,000 for a defendant convicted of a felony. § 13:1381.4(A)(2), (B).

[5] For instance, three Plaintiffs were charged a $100 or $200 fee to go into the indigent transcript fund as a "condition of probation," which went into the JEF. Louisiana Code of Criminal Procedure Article 887(A) also allows for the collection of "all costs of the prosecution or proceeding, . . . recoverable by the party or parties who incurred the expense." The Judges assessed these costs, but it is not clear where these costs went once collected.

4

Case: 18-30955    Document: 00515149001    Page: 5    Date Filed: 10/08/2019
Case 2:15-cv-04479-SSV-JCW   Document 343-1   Filed 10/08/19   Page 5 of 13

No. 18-30955

### D. OPCDC's Debt Collection Practices

Prior to this lawsuit, the Judges delegated collection authority to the Collections Department, established by the OPCDC judges[6] in the late 1980s "to (1) facilitate the collection of costs and fines [and] (2) to minimize the administrative and logistical burden on" the OPCDC's dockets. The Collections Department, supervised by both Mr. Kazik and the Judges, worked with criminal defendants in creating payment plans, accepting payments, and granting extensions. The Collections Department had "no standard list of factors or questions . . . to ask a criminal defendant except those at intake when collections obtained address, telephone and employment information and used it for purposes of contacting the criminal defendant when they did not pay."

Before issuing a warrant for a defendant's arrest for failure to pay a court debt, the Collections Department would send two form letters to the defendant warning them of their overdue fines and fees and the possibility of arrest for failure to pay. If checking the court dockets or probation and jail records did not reveal a reason for nonpayment, the Collections Department issued an alias capias warrant for contempt of court and generally set surety bail at $20,000. A person imprisoned on one of these warrants would usually remain "in jail until their family or friends could make a payment on their court debt, or until a judge released them."

After Plaintiffs filed the instant suit, the Judges withdrew the Collections Department's authority to issue warrants, recalled all active fines and fees warrants issued prior to September 18, 2015 (except those where restitution remained unpaid or the individual had not appeared in court), and wrote off approximately $1,000,000 in court debts. The Judges now handle

---

[6] None of the Judges who are defendants in this lawsuit were on the bench or otherwise employed at the court when Collections was created.

5

Case: 18-30955      Document: 00515149001     Page: 6     Date Filed: 10/08/2019
Case 2:15-cv-04479-SSV-JCW   Document 343-1   Filed 10/08/19   Page 6 of 13

No. 18-30955

collection issues on their own dockets, although they still issue alias capias warrants for failure to pay fines and fees. At the time of the district court's summary judgment ruling, there was no evidence that the Judges had ever instituted a practice of considering a defendant's ability to pay before jailing them for failure to pay their court debts.

### E. Procedural Background

Plaintiffs brought this action under 42 U.S.C. § 1983, alleging that the Judges' collection practices violated their Fourth and Fourteenth Amendment rights, as well as Louisiana tort law. The only one of their seven claims at issue on appeal is Count Five, summarized by the district court as follows:

> Defendants' policy of jailing indigent debtors for nonpayment of court debts without any inquiry into their ability to pay is unconstitutional under the Due Process clause and the Equal Protection Clause of the Fourteenth Amendment, *and the Judge's authority over both fines and fees revenue and ability-to-pay determinations violates the Due Process Clause.*

*Cain v. City of New* Orleans, 281 F. Supp. 3d. 624, 633 (E.D. La. 2017) (emphasis added). The district court ordered the parties to submit cross-motions for summary judgment on Count Five (and several other counts) and granted summary judgment to Plaintiffs on both portions of Count Five. The district court then certified a class and issued a declaratory judgment.

The Judges only challenge the portion of the district court's declaratory judgment which declared that "with respect to all persons who owe or will incur court debts arising from cases adjudicated in OPCDC, and whose debts are at least partly owed to the OPCDC Judicial Expense Fund, the Judges' failure to provide a neutral forum for determination of such persons' ability to pay is unconstitutional." They do not challenge the district court's judgment stating that "the Judges' policy or practice of not inquiring into the ability to pay of

No. 18-30955

such persons before they are imprisoned for nonpayment of court debts is unconstitutional."

## II. STANDARD OF REVIEW

"This court reviews a district court's grant of summary judgment de novo, applying the same legal standards as the district court." *Tradewinds Envtl. Restoration, Inc. v. St. Tammany Park, LLC*, 578 F.3d 255, 258 (5th Cir. 2009) (quoting *Condrey v. SunTrust Bank of Ga.,* 429 F.3d 556, 562 (5th Cir. 2005)). "Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *United States v. Nature's Way Marine, L.L.C.*, 904 F.3d 416, 419 (5th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).

## III. DISCUSSION

"It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (quoting *In re Murchison,* 349 U.S. 133, 136 (1955)). "That officers acting in a judicial or quasi judicial capacity are disqualified by their interest in the controversy to be decided is of course the general rule." *Tumey v. State of Ohio*, 273 U.S. 510, 522 (1927). However, "[a]ll questions of judicial qualification may not involve constitutional validity." *Id.* at 523. The issue here is whether the Judges' administrative supervision over the JEF, while simultaneously overseeing the collection of fines and fees making up a substantial portion of the JEF, crosses the constitutional line.

### A. "Average Man as Judge" versus "Average . . . Judge"

The Judges primary argument is that the district court improperly applied the "average man as judge" standard rather than the "average judge" standard when determining whether the Judges' interest in the JEF violated due process. According to the Judges, the "average man as judge" standard is applied in situations where "the impartiality of non-judges acting as judges" is

7

Case: 18-30955      Document: 00515149001      Page: 8      Date Filed: 10/08/2019
Case 2:15-cv-04479-SSV-JCW   Document 343-1   Filed 10/08/19   Page 8 of 13

No. 18-30955

called into question, not cases where the "average judge's" impartiality is under debate. Essentially, the Judges argue that an average *man* might be swayed by the institutional interest at play here, but not an average *judge*. The caselaw simply does not support such a distinction.

### 1. Legal Background

In *Tumey*, the mayor of an Ohio village presided over a "liquor court," which allowed him to try and convict individuals alleged to unlawfully possess intoxicating liquor within the county. *Tumey*, 273 U.S. at 515. The Ohio statutes which established the liquor courts allowed the mayor to impose a fine on those convicted and to order the person sentenced to remain in prison until the fine was paid. *Id.* at 516. As remuneration for his troubles, the mayor could retain the amount of his costs in each case from the convicted defendant over and above his regular salary. *Id.* at 519–20. In addition, the village over which the mayor presided received half the funds from the imposed fines (the other half went to the state). *Id.* at 534–35.

Eventually, a defendant challenged the mayor's qualifications to hear his case and the Court found the defendant "was entitled to halt the trial because of the disqualification of the judge, which existed both because of his direct pecuniary interest in the outcome, and because of his official motive to convict and to graduate the fine to help the financial needs of the village." *Id.* at 535. The Court observed,

> Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law.

*Id.* at 532.

While *Tumey* was generally thought to focus on a judge's financial interest, both personal and institutional, *In re Murchison,* 349 U.S. 133 (1955)

Case: 18-30955 Document: 00515149001 Page: 9 Date Filed: 10/08/2019
Case 2:15-cv-04479-SSV-JCW Document 343-1 Filed 10/08/19 Page 9 of 13

No. 18-30955

established a separate line of Supreme Court cases focusing on a judge's possible "conflict arising from his participation in an earlier proceeding." *Caperton*, 556 U.S. at 880. In *Murchison*, the unconstitutional conflict came from a judge who, as allowed by statute, had been examining witnesses as a "one-man judge-grand jury" in deciding whether criminal charges should be brought. *Murchison*, 349 U.S. at 133–34. The judge, unhappy with the responses of two witnesses, subsequently charged, tried, and convicted each one of contempt based on his belief that one witness lied and the other refused to answer questions before him as "judge-grand-jury." *Id.* at 134–35. The Court concluded this dual-role violated due process, and quoted *Tumey* in saying that "[e]very procedure which would offer a possible temptation to the average man as a judge * * * not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law." *Murchison*, 349 U.S. at 136 (quoting *Tumey*, 273 U.S. at 532).

In a case fairly similar to *Tumey*, the Supreme Court again addressed the possible institutional biases inherent in another mayor's court. *Ward v. Vill. of Monroeville, Ohio*, 409 U.S. 57 (1972). In *Ward*, an Ohio statute allowed "mayors to sit as judges in cases of ordinance violations and certain traffic offenses" and the "fines, forfeitures, costs, and fees imposed by" the mayor in these courts formed a major part of the village's funding. *Ward*, 409 U.S. at 57–58. In addition, the mayor was the "president of the village council, preside[d] at all meetings, vote[d] in case of a tie, account[ed] annually to the council respecting village finances, fill[ed] vacancies in village offices and ha[d] general overall supervision of village affairs." *Id.* at 58.

> The Court applied the same test espoused in *Tumey*:
>
> Although 'the mere union of the executive power and the judicial power in him cannot be said to violate due process of law,' the test is whether the mayor's situation is one 'which would offer a possible temptation to the average man as a judge to forget the

Case: 18-30955    Document: 00515149001    Page: 10    Date Filed: 10/08/2019
Case 2:15-cv-04479-SSV-JCW    Document 343-1    Filed 10/08/19    Page 10 of 13

No. 18-30955

> burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused . . . .'

*Ward*, 409 U.S. at 60 (quoting *Tumey*, at 532, 534) (internal citations removed)). Because "that 'possible temptation' may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court," the Court found the mayor's court in *Ward* presented "a 'situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, (and) necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him.'" *Id.* at 60.

Over a decade later, the Supreme Court again had occasion to discuss what level of financial interest might render "the average . . . judge" unable "to hold the balance nice, clear and true." *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986). In *Aetna*, a justice on the Alabama Supreme Court participated in a decision regarding punitive damages in bad faith insurance claims while he was simultaneously a lead plaintiff in a class action suit seeking punitive damages on a bad faith claim. *Id.* at 817. While the Court discussed many factors that might bear on the necessity for recusal, the Court held "simply that when Justice Embry made that judgment, he acted as 'a judge in his own case.'" *Id.* at 824 (quoting *Murchison*, 349 U.S. at 136).

While it was possible that the justice was not influenced by his participation in the state court case, under the principles laid out in *Tumey*, *Murchison*, and *Ward*, *actual* influence was not necessary—it only mattered whether the situation "would offer a possible temptation to the average . . . judge to . . . lead him to not to hold the balance nice, clear and true." *Aetna*, 475 U.S. at 825 (quoting *Ward*, 409 U.S. at 60). Because of Justice Embry's participation in the case, the Court found the "appearance of justice" best

10

Case: 18-30955   Document: 00515149001   Page: 11   Date Filed: 10/08/2019
Case 2:15-cv-04479-SSV-JCW   Document 343-1   Filed 10/08/19   Page 11 of 13

No. 18-30955

"served by vacating the decision and remanding for further proceedings." *Id.* at 828.

### 2. Judges' Argument

Disregarding the principles undergirding *Aetna*, the Judges argue that *Aetna* essentially came along and established a new standard by shortening *Tumey* and *Ward*'s "average man as judge" to "average . . . judge." *Aetna*, 475 U.S. at 822, 825. While the Court did alter "average man as judge," the Court applied the exact same principles discussed in *Ward*, *Murchison*, and *Tumey* to the Alabama Supreme Court justice. There was no articulation of a higher standard for judges, much less an explanation as to how such a standard might differ from that applied to mayors acting as judges. *Aetna*, 475 U.S. at 825. Furthermore, reading *Aetna* as the Judges suggest would mean reading *Aetna* to overrule *Murchison*, which applied the "average man as judge" standard to a sitting judge. *Murchison*, 349 U.S. at 136. We find it hard to believe that the Court overruled one of its cases with an ellipsis. Finally, the recent Supreme Court case of *Caperton* reinforces the idea that the standards announced, and the situations presented, in *Tumey* and *Ward* apply equally to judges and non-judges acting as judges. *Caperton*, 556 U.S. at 877–82 (discussing the various principles from *Tumey, Ward, Murchison* and *Aetna* as applying to "judges").

The district court did not err in applying the principles from *Tumey* and *Ward* to the facts of this case.

### B. The Judges' Institutional Interest in the JEF

### 1. The District Court's Reliance on *Ward*

The Judges next contest the district court's reliance on *Ward* to find that the Judges' pecuniary interest in the JEF "crosses the constitutional line." They allege "[t]he district court erred in its blanket comparison of the Judges' institutional interest here to the mayor's institutional interest in *Ward*." The Judges distinguish *Ward* by noting the mayor there had broad executive power

11

Case: 18-30955    Document: 00515149001    Page: 12    Date Filed: 10/08/2019
Case 2:15-cv-04479-SSV-JCW    Document 343-1    Filed 10/08/19    Page 12 of 13

No. 18-30955

over all the village finances and he was politically responsible for the town's funds, whereas here the Judges only directly manage a portion of the revenue from the fines and fees. Plaintiffs argue that the Judges' interest here is almost exactly like that in *Ward* because the Judges impose the fines and fees and exercise complete control over how the revenue generated from the fines and fees is spent.

The district court very thoroughly examined the ways in which the Judges have an institutional interest in the JEF. It observed that the "[f]ines and fees revenue goes into the Judicial Expense Fund," over which "the Judges exercise total control." *Cain*, 281 F. Supp. 3d at 654. It noted that while the money does not support the Judges' personal salaries, it largely goes to support the salaries of each Judges' staff. In addition, the district court noted that while some of the money collected from fees is earmarked for specific purposes, the revenue all goes to the JEF and makes up approximately one-fourth of the OPCDC's budget.

In *Ward*, "[a] major part of village income [was] derived from the fines, forfeitures, costs, and fees imposed" by the mayor in his court, and the mayor had "wide executive powers" that included accounting to the village council regarding village finances, filling vacancies in village offices, and "general overall supervision of village affairs." *Ward*, 409 U.S. at 58. Here, the Judges have exclusive authority over how the JEF is spent, they must account for the OPCDC budget to the New Orleans City Council and New Orleans Mayor, and the fines and fees make up a significant portion of their annual budget. We agree with the district court that the situation here falls within the ambit of *Ward*. In doing so, we emphasize it is the totality of this situation, not any

Case: 18-30955 Document: 00515149001 Page: 13 Date Filed: 10/08/2019
Case 2:15-cv-04479-SSV-JCW Document 343-1 Filed 10/08/19 Page 13 of 13

No. 18-30955

individual piece, that leads us to this conclusion. In sum, when everything involved in this case is put together, the "temptation"[7] is too great.

Given this constitutional infirmity, we find the Judges' remaining arguments unavailing.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court. The Judges' motion to supplement the record is DENIED.

---

[7] In so concluding, we do not in any way suggest that the Judges actually succumbed to that "temptation."